WALTER RILEY, SBN 95919
LAW OFFICE OF WALTER RILEY
1407 Webster Street, Suite 206
Oakland, CA 94612
Telephone: (510) 451-1422
Facsimile: (510) 451-0406
Email: walterriley@rrrandw.com

DAN SIEGEL, SBN 56400
ANNE BUTTERFIELD WEILLS, SBN 139845
JANE BRUNNER, SBN 135422
SONYA Z. MEHTA, SBN 294411
EMILYROSE JOHNS, SBN 294319
ANDREW CHAN KIM, SBN 315331
SIEGEL, YEE, BRUNNER   & MEHTA
475 14th Street, Suite 500
Oakland, California 94612
Telephone: (510) 839-1200
Facsimile: (510) 444-6698
Email: danmsiegel@gmail.com;
abweills@gmail.com;
janebrunner@hotmail.com;
sonyamehta@siegelyee.com;
emilyrose@siegelyee.com;
chankim@siegelyee.com

JAMES DOUGLAS BURCH, SBN 293645
National Lawyers Guild
558 Capp Street
San Francisco, CA 94110
Telephone: (415) 285-5067 x.104
Email: james_burch@nlgsf.org

Attorneys for Plaintiffs
ANTI POLICE-TERROR PROJECT,
COMMUNITY READY CORPS,
AKIL RILEY, IAN McDONNELL, NICO
NADA, AZIZE NGO, and JENNIFER LI

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANTI POLICE-TERROR PROJECT, COMMUNITY READY CORPS, AKIL RILEY, IAN McDONNELL, NICO NADA, AZIZE NGO, and JENNIFER LI, on behalf of themselves and similarly situated individuals, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF OAKLAND, OPD Police Chief SUSAN E. MANHEIMER, OPD Sergeant PATRICK GONZALES, OPD Officer MAXWELL D'ORSO and OPD Officer CASEY FOUGHT, <br><br> Defendants. | ) Case No. 3:20-cv-03866-JCS <br> ) <br> ) **MEMORANDUM OF POINTS AND** <br> ) **AUTHORITIES IN SUPPORT OF** <br> ) **PLAINTIFFS' APPLICATION FOR A** <br> ) **TEMPORARY RESTRAINING ORDER** <br> ) **AND/OR ORDER TO SHOW CAUSE AND** <br> ) **FOR PRELIMINARY INJUNCTION** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

# Table of Contents

**Page**

INTRODUCTION ...............................................................................................................1

PROCEDURAL HISTORY...............................................................................................1

STATEMENT OF FACTS..................................................................................................2

    I.    Oakland Police Department Used Excessive Force Against Peaceful Protesters. ............... 2

    II.   OPD Tactics Chilled and Continue to Chill Demonstrators' Speech.................................. 6

    III.   The Use of Military Weapons and Tactics on Citizens During COVID-19. ......................7

    A.    Defendants' Use of Tear Gas Helps Spread the Deadly Coronavirus and Exacerbates its Harmful Nature. ......................................................................................................7

    B.    OPD Tactics Forced Demonstrators to Break Social Distancing Rules. ........................... 8

LEGAL ARGUMENT ........................................................................................................ 9

    IV.   Plaintiffs are Likely to Succeed on the Merits of Their Constitutional Claims because Defendants Used Excessive Force against Peaceful Protestors and Violated Plaintiffs' Rights to Assemble and Speak, and Their Actions Would Chill a Reasonable Person from Exercising Her Right to Assemble. ...............................................................................................10

    A.    Defendants' Actions Violated the Fourth Amendment because they Used Tear Gas and Projectiles against Peaceful Protestors who Posed no Threat. ...............................................10

    B.    Defendants' Actions Violated Plaintiffs' First Amendment Rights Where Their Violent Conduct Interfered with Plaintiffs' Right to Assemble and Speak. .......................................12

    C.    Defendants Placed Plaintiffs in  Affirmative Danger Due to their Crowd Control Tactics During the COVID-19 Pandemic. ....................................................................................14

    V.   Plaintiffs Have Been and Will be Irreparably Harmed if this Court does not Protect their Constitutional Rights by Issuing a Temporary Restraining Order.............................................15

    VI.   The Balance of Equities Weighs Entirely in Plaintiffs' Favor as it is Always in the Public Interest to Protect Constitutional Rights. .........................................................................15

CONCLUSION..................................................................................................................17

# Table of Authorities

**FEDERAL CASES**

*Abay et al. v. City of Denver*
2020 WL 3034161 (D. Colo. June 5, 2020) .................................................. 16, 17

*Allee v. Medrano*
416 U.S. 802 (1974)........................................................................................13

*Alliance for Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011) ......................................................................... 9

*Associated Press v. Otter*
682 F.3d 821 (9th Cir. 2012)..........................................................................15

*Black Lives Matter Seattle-King Cty. v. City of Seattle, Seattle Police Dep't*
2020 WL 3128299 (W.D. Wash. June 12, 2020) ....................................... 15, 16

*Boos v. Barry*
485 U.S. 312 (1988).................................................................................. 12, 13

*Chew v. Gates*
27 F.3d 1432 (9th Cir. 1994) .........................................................................10

*Cmty. House, Inc. v. City of Boise*
490 F.3d 1041 (9th Cir. 2007)........................................................................16

*Cohen v. California*
403 U.S. 15 (1971)..........................................................................................13

*Connick v. Myers*
461 U.S. 138 (1983) .......................................................................................13

*Cuviello v. City of Vallejo*
944 F.3d 816 (9th Cir. 2019)..........................................................................15

*Deorle v. Rutherford*
272 F.3d 1272 (9th Cir. 2001) ....................................................................... 11

*DeShaney v. Winnebago County Dep't of Soc. Serv.*
489 U.S. 189 (1989)........................................................................................14

*Don't Shoot Portland v. City of Portland*

    2020 WL 3078329 (D. Or. June 9, 2020) ................................................................ 16, 17

*Drakes Bay Oyster Co. v. Jewell*

    747 F.3d 1073 (9th Cir. 2014) ................................................................ 15

*Elrod v. Burns*

    427 U.S. 347 (1976) ................................................................ 15

*Graham v. Connor*

    490 U.S. 386 (1989) ................................................................ 10

*Headwaters Forest Defense v. County of Humboldt*

    240 F.3d 1185 (9th Cir.2000) ................................................................ 11

*Kennedy v. City of Ridgefield*

    439 F.3d 1055 (9th Cir. 2006) ................................................................ 14

*League of Wilderness Defs/Blue Mountains Biodiversity Project v. Connaughton*

    752 F.3d 755 (9th Cir. 2014) ................................................................ 16

*Liston v. Cty. of Riverside*

    120 F.3d 965 (9th Cir. 1997) ................................................................ 10

*McCutcheon v. Fed. Election Com'n*

    572 U.S. 185 (2014) ................................................................ 13

*Melendres v. Arpaio*

    695 F.3d 990 (9th Cir. 2012) ................................................................ 16

*Mendocino Envtl. Ctr. v. Mendocino Cty.*

    192 F.3d 1283 (9th Cir. 1999)................................................................ 13

*NAACP v. Claiborne Hardware Co.*

    458 U.S. 886 (1982) ................................................................ 13

*Nelson v. City of Davis*

    685 F.3d 867 (9th Cir. 2012) ................................................................ 11, 12

*New York Times Co. v. Sullivan*

    376 U.S. 254 (1964)................................................................ 12

*NRDC v. Winter*

　　518 F.3d 658 (9th Cir. 2008) ........................................................................ 15

*Sanchez v. City of Fresno*

　　914 F. Supp. 2d 1079 (E.D. Cal. 2012) ....................................................... 14

*Sloman v. Tadlock*

　　21 F.3d 1462 (9th Cir.1994) ......................................................................... 13

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*

　　240 F.3d 832 (9th Cir. 2001) ......................................................................... 9

*Terminiello v. Chicago*

　　337 U.S. 1 (1949) .......................................................................................... 13

*United States v. Neill*

　　166 F.3d 943 (9th Cir.1999) .......................................................................... 11

*Warsoldier v. Woodford*

　　418 F.3d 989 (9th Cir. 2005) ....................................................................... 15

*Winter v. Nat. Res. Def. Council, Inc.*

　　555 U.S. 7 (2008) ............................................................................................ 9

*Young v. Cty. of Los Angeles*

　　655 F.3d 1156 (9th Cir. 2011) .......................................................... 10, 11, 12

**INTRODUCTION**

Plaintiffs Anti Police-Terror Project et al. hereby request this Court to issue a Temporary Restraining Order and/or Order to Show Cause and, following hearing, a Preliminary Injunction, forbidding the defendants and all persons acting with them or under their control from engaging in the following actions:

1. Using tear gas or any other chemical weapons against persons taking part in a protest or demonstration;

2. Firing rubber bullets or similar projectiles at persons taking part in a protest or demonstration;

3. Firing flash bang grenades at persons taking part in a protest or demonstration;

4. Failing to maintain their body worn cameras in the "on" position while engaged in policing public protests and demonstrations;

5. Failing to display their name and department badges while engaged in policing public protests and demonstrations; and

6. Kettling persons taking part in or observing public protests and demonstrations.

This motion will be made on the grounds that immediate and irreparable injury will result to plaintiffs unless the activities described above are enjoined pending trial of this action, and will be based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, and the declarations of Andrew Chan Kim, Dr. Peter Sporn, Cat Brooks, Sarah Belle Lin, Anne Kelson, Christa Artherholt, Erica Hruby, Liam Cain, Ian McDonnell, Jennifer Li, Leila Mottley, Melissa Miyara, Niko Nada, and Qiaochu Zhang filed concurrently with this Memorandum of Points and Authorities..

**PROCEDURAL HISTORY**

Plaintiffs filed their Complaint on June 11, 2020. (ECF No. 1.) Plaintiffs asserted that they represent a class of similarly situated persons and that they seek an order enjoining defendants' unconstitutional conduct. (*See* ECF No. 1 at ¶¶ 80, 110(1).) Plaintiffs asserted violations of the First, Fourth, and Fourteenth Amendments of the United States Constitution. They also alleged that the City of Oakland had a pattern and practice of such conduct.

On June 15, 2020, following the consent of the plaintiffs and the City of Oakland to the jurisdiction of Magistrate Judge Joseph C. Spero, the Court set a briefing schedule allowing plaintiffs to present a memorandum and points of authority in support of their application for a Temporary Restraining Order and setting a deadline for the defendants to respond if the Court issues an Order to Show Cause. (ECF Nos. 7, 9, and 10.) The consent of all parties to Magistrate Spero's jurisdiction shortly followed. (ECF No. 11.)

## STATEMENT OF FACTS

On Monday, May 25, 2020, a Minneapolis police officer brutally murdered George Floyd while other police officers stood by and watched. A bystander captured the tragedy on video, and the video was quickly shared world-wide, via various media and social media outlets. The entire world erupted in protest to demand justice for Mr. Floyd and for the many other Black and Brown people subjected to violence and death at the hands of law enforcement.

On May 29, 2020, after learning that Bay Area residents were planning to gather in Oakland to share in the demands for justice and collective mourning, attorneys with the National Lawyers Guild sent a letter to police Chief Susan E. Manheimer, Mayor Libby Schaaf, and other City of Oakland representatives to remind them of their legal obligation to comply with the OPD Crowd Control policy and to honor and protect the First Amendment rights of those intending to gather. (See Exhibit A to the Declaration of Andrew Chan Kim, ¶ 5.) The email was ignored.

## I.    Oakland Police Department Used Excessive Force Against Peaceful Protesters.

On May 29, 2020 at about 8 p.m., demonstrators assembled at Oscar Grant Plaza at Broadway and 14th Streets to hold a peaceful protest. (Declaration of Ian McDonnell ("McDonnell Dec."), ¶¶ 3-6; Declaration of Anne Kelson ("Kelson Dec."), ¶ 4; Declaration of Melissa Miyara ("Miyara Dec."), ¶ 3.) From there, demonstrators marched to the Oakland Police Department headquarters on Broadway and 7th Street. (Kelson Dec., ¶ 8; Miyara Dec., ¶ 6.) The demonstrators were peaceful. (McDonnell Dec., ¶ 13; Kelson Dec., ¶ 3; Miyara Dec., ¶ 11.) Demonstrators held up signs and chanted the names of victims of police murder. (Kelson Dec., ¶ 9; Miyara Dec., ¶ 11.) Many in the crowd were young. (Kelson Dec., ¶ 29.) Despite the

peaceful gathering of demonstrators, Oakland police officers "kettled" the demonstrators by tear gassing parallel streets. (McDonnell Dec., ¶ 7.)

With the crowd of several hundred gathered in front of the Oakland Police Department headquarters, the OPD began launching concussion grenades into the crowd. (Kelson Dec., ¶¶ 8, 10-11.) Sometime after, the OPD made an announcement that the protestors had a First Amendment right to assemble. (Kelson Dec., ¶ 12.) Following that announcement, the OPD made a second announcement that sounded like a dispersal order, giving protestors three minutes to disperse. (Kelson Dec., ¶ 13). announcement was hard to hear because the loudspeaker was bad, and OPD was still launching concussion grenades into the crowd. (Kelson Dec., ¶ 14; Miyara Dec., ¶¶ 12-14; McDonnell Dec.¶ 20.) Video footage confirms this. (Kim Dec., ¶ 4(a); Kelson Dec., ¶ 15.)

OPD then started indiscriminately launching tear gas and flashbang grenades, and shooting projectiles at the demonstrators. (McDonnell Dec., ¶ 8; Cain Dec., ¶ 5; Kelson Dec., at ¶ 16; Miyara Dec., ¶¶ 17-18.) Video evidence confirms this. (Kim Dec., ¶¶ 4(a), (c)-(f).) Up to this point, the protest was peaceful, and demonstrators who were caught in the tear gas clouds had not observed any unlawful conduct. (McDonnell Dec., ¶¶ 14-15; Kelson Dec., ¶ 17.) OPD launched several rounds of tear gas into the crowd. (Kelson Dec., ¶¶ 17, 19.) Video footage confirms this. (Kim Dec., ¶¶ 4(a), (f).)

Demonstrators did not anticipate getting tear gassed and were not prepared to be tear gassed. (McDonnell Dec., ¶¶ 10-11; Kelson Dec., ¶¶ 6-7; Miyara Dec., ¶¶ 19, 23.) Video footage confirms this. (Kim Dec., ¶ 4(f)-(g).) As a result of OPD's use of chemical irritants, many demonstrators, including younger people, required medical assistance. (Kelson Dec., ¶¶ 28-29.) Video footage confirms this. (Kim Dec., ¶ 4(f).) Audio evidence confirms this. (Kelson Dec., ¶ 23.)

On May 30, 2020, at a protest at Latham Square Plaza, police officers shot a journalist with a rubber bullet. (Declaration of Sarah Belle Lin ("Lin Dec."), ¶ 18.) The journalist had a press pass and was obviously carrying a camera. (*Id.* at ¶ 7.) She was engaged in constitutionally

protected activity. (*Id*. at ¶ 8.) Police officers shoved their riot shields at her. (*Id*. at ¶ 23.) She sustained a large bruise on her inner thigh near her femoral artery. (*Id*. at ¶¶ 28, 29.)

On May 31, 2020, there was a peaceful protest that began as a car caravan at the Port of Oakland. (McDonnell Dec., ¶ 23.) Demonstrators, including families and children, later gathered at Oscar Grant Plaza on Broadway and 14th Street. (*Id*. at ¶ 24.) OPD kettled demonstrators by driving their vehicles towards protestors in a reckless fashion. (*Id*. at ¶ 27.) There were about 20 police vans and tactical trucks. (*Id*.) Without warning, officers rushed out of the vans and started tear gassing and throwing flashbang grenades at the demonstrators. (*Id*. at ¶¶ 29-31; Kim Dec., ¶ 4(i).) As a result of OPD's use of chemical irritants, many demonstrators required medical assistance. (*Id*. at ¶ 34.)

On June 1, 2020, young people organized a march from Oakland Technical High School beginning at 4 p.m. (Hruby Dec., ¶ 4; Mottley Dec., ¶ 4.) Fifteen thousand people gathered to participate in the march. (Hruby Dec., ¶ 14.) Many demonstrators were young people of color. (Declaration of Niko Nada ("Nada Dec."), ¶ 17.) At around 5 p.m., the demonstrators received a notification through their phones advising them that the County of Alameda issued a curfew order for 8 p.m. (Nada Dec., ¶ 5; Hruby Dec., ¶ 5; Mottley Dec., ¶ 5.) The demonstration continued in the pre-curfew hours. (Mottley Dec., ¶¶ 8, 13; Declaration of Qiaochu Zhang ("Zhang Dec."), ¶¶ 3, 5.)

However, even before the curfew went into effect, and before the march reached its intended destination, OPD started kettling demonstrators. (ECF No. 1 at ¶ 56; McDonnell Dec., ¶ 45; Hruby Dec., ¶ 32.) OPD made an announcement that was muffled and hard to hear. (Nada Dec., ¶ 9; Declaration of Jennifer Li ("Li Dec."), ¶ 8; Mottley Dec., ¶¶ 10-11; Zhang Dec., ¶¶ 10, 21.) At around 7:40 p.m., OPD fired tear gas, flashbang grenades, and projectiles at demonstrators. (McDonnell Dec., ¶ 46; Nada Dec., ¶ 11; Li Dec., ¶ 9; Declaration of Christa Artherholt ("Artherholt Dec.'), ¶¶ 10-11; Hruby Dec., ¶ 9; Mottley Dec., ¶ 12.) Video footage confirms this. (Artherholt Dec., ¶¶ 17; Kim Dec., ¶ 4(k); Hruby Dec., ¶¶ 10, 22; Zhang Dec., ¶ 10.) Even after the majority of demonstrators left the area, OPD fired more tear gas into the

small and peaceful crowd of protestors. (Artherholt Dec., ¶¶ 12-18.) Video footage confirms this. (Artherholt Dec., ¶ 25.)

Demonstrators who had fled the tear gas were peacefully gathered at Oscar Grant Plaza as it hit 8 p.m. (Artherholt Dec., ¶ 30; Hruby Dec., ¶¶ 23-26.) Video footage confirms this. (Hruby Dec., ¶ 27.) Police made an announcement at 8 p.m., saying that there was a curfew and if demonstrators did not leave, they would be arrested. (Artherholt Dec., ¶ 32.) As demonstrators attempted to comply and leave, police kettled them in between 14th and 15th Streets on Broadway. (Artherholt Dec., ¶¶ 33-34; Hruby Dec., ¶¶ 28-32.) Video footage confirms this. (Artherholt Dec., ¶ 40.) Officers then arrested demonstrators by tackling them and/or touching them. (Kim Dec., ¶ 4(h).) The police were without masks or facial coverings. (McDonnell Dec., ¶¶ 56-59; Nada Dec., ¶¶ 26-27, 41; Hruby Dec., ¶¶ 35-36.) Demonstrators were cited and released for breaking curfew. (McDonnell Dec., ¶ 60; Nada Dec., ¶ 39; Hruby Dec., ¶¶ 34, 37.)

"Kettling" derives from a German military term referring to an army that is completely surrounded by a much larger force. (ECF No. 1 at ¶ 66.) The practice of kettling as applied by the OPD forced large crowds, including peaceful and nonviolent demonstrators and bystanders who were not participating, into a contained area lacking any egress. OPD's own photos confirm this. (Kim Dec., ¶ 4(l).) Kettling represses demonstrators' rights to protest, rights to be free of unlawful seizure, creates panic, and elevates tensions. OPD kettled demonstrators by tear gassing parallel streets (McDonnell Dec., ¶ 7; Zhang Dec., 11-16), driving vehicles into crowds (McDonnell Dec., ¶ 27), and forming police lines. (Kim Dec., ¶ 4(b) (video footage showing police line).)

The demonstrators were not engaged in illegal conduct. (McDonnell Dec., ¶¶ 14-15; Nada Dec., ¶ 15; Artherholt Dec., ¶ 54; Kelson Dec., ¶ 27; Lin Dec., ¶ 9.) Although police claimed that demonstrators threw Molotov cocktails at them, demonstrators impacted by the police's use of force did not throw Molotov cocktails or see Molotov cocktails being thrown prior to the officers' use of flashbang grenades and tear gas. (McDonnell Dec., ¶¶ 61-62; Nada Dec., ¶ 42.) Officers did not warn demonstrators that they would use tear gas, flashbangs, projectiles, or any

other weapons. (Artherholt Dec., ¶¶ 10-13, 18; Kelson Dec., ¶ 16; Hruby Dec., ¶ 15). The officers' conduct frightened, scared, and traumatized demonstrators. (McDonnell Dec., ¶¶ 28, 36; Artherholt Dec., ¶¶ 35-38; Li Dec., ¶ 15; Miyara Dec., ¶¶ 27, 29, 34; Mottley Dec., ¶ 17; Zhang Dec., ¶ 15.) Demonstrators described that they felt like they were in a war zone environment due to the officers' conduct. (McDonnell Dec., ¶ 12; Artherholt Dec., ¶¶ 17; Hruby Dec., ¶ 45; Miyara Dec., ¶ 40.) Demonstrators sustained serious bodily injuries, including Daniel Sanchez, who was shot in the eye with a rubber bullet. (EFC No. 1 ¶ 52; Nada Dec., ¶ 29; Li Dec., ¶ 29; Miyara Dec., ¶¶ 20, 24-26, 30-34; Mottley Dec., ¶¶ 19-20, 27-28, 30-35.)

On June 8, 2020, at the Oakland Police Commission Special Town Hall meeting, hundreds of members of the public testified about their concerns over police use of force during the demonstrations, and attendees recounted their horrific experiences and sustained injuries during the protests in days prior. (Exhibit A to Declaration of EmilyRose Johns in Support of Plaintiffs' Request for Judicial Notice ("Johns Dec.").)

## II. OPD Tactics Chilled and Continue to Chill Demonstrators' Speech.

At least one demonstrator stated that she would not have attended the protests had she known officers were going to throw tear gas and flashbang grenades and otherwise use other excessive tactics against demonstrators. (Kelson Dec., ¶ 7.) Other demonstrators stated that following the protest, they decided not to participate in further protests due to fear of police violence and/or health concerns. (McDonnell Dec., ¶ 21; Li Dec., ¶ 24.)

In yet another instance, an officer told a declarant that he would be sent straight to Santa Rita if he participated in another protest. (Zhang Dec., ¶ 27.) In its indiscriminate use of a military tactic, OPD kettled and trapped demonstrators who otherwise were peaceful, nonviolent, and intended to comply with curfew and police orders. (Artherholt Dec., ¶ 33; Hruby Dec., ¶¶ 28-32; Zhang Dec., ¶ 11.)

The Anti Police-Terror Project "frequently organizes and leads protests against police misconduct." (Declaration of Cat Brooks, ¶ 3.) Supporters and members of the Anti Police-Terror Project have been discouraged from participating in protests due to the actions of OPD beginning on May 25, 2020. (*Id.*, ¶ 4.) The Anti Police-Terror Project will attend and plan additional actions in the coming days and months. (*Id.*, ¶ 5.) Their members and supporters

will continue to be impacted if OPD is allowed to continue its indiscriminate use of force against peaceful demonstrators.

### III.   The Use of Military Weapons and Tactics on Citizens During COVID-19.

#### A.   Defendants' Use of Tear Gas Helps Spread the Deadly Coronavirus and Exacerbates its Harmful Nature.

Coronavirus or COVID-19 is a novel and life-threatening infection. The research shows that police use of tear gas against crowds likely spreads the infection and renders people less able to fight it. Dr. Peter Sporn is Board Certified in Pulmonary Disease. (Declaration of Dr. Peter Sporn, ¶ 5.)  Among his many accomplishments, he is Director of the Northwestern Medicine Sarcoidosis Program. (*Id.* at ¶ 8.)

Dr. Sporn points to recent studies that show that tear gas, pepper spray, and pepper balls can cause serious and long-lasting lung problems, skin burns, eye injuries, and even death. (*Id.*, ¶¶ 14-15.) One review of 5,131 people showed that 8.9% of those exposed to tear gas or pepper spray suffered severe injuries that required medical attention, 58 individuals experienced permanent disability, and two people died due to injuries from the chemical agents. (*Id.*, ¶ 14.) There were 231 projectile injuries, 27% of which were severe, including major trauma and eye loss. (*Id.*) Another study showed that pepper spray is not less harmful than tear gas and that respiratory failure was the most common mode of death. (*Id.*, ¶ 16)

Dr. Sporn is a member of the American Thoracic Society. (*Id.*, ¶ 11.) The American Thoracic Society's statement calls for a "moratorium on tear gas and other chemical agents deployed by law enforcement against protestors" because they "cause significant short and long-term respiratory health injury and likely propagates the spread of viral illnesses, including COVID-19." (*Id.*, ¶ 20.) The Society identified chronic bronchitis, compromised lung function, and acute lung injury as consequences of the use of tear gas. (*Id.*) "The airborne nature of tear gas" also endangers bystanders, medics, and the media. (*Id.*)

The Society is concerned that a "tear gas-exposed person with asymptomatic COVID-19 would be unable to maintain a safe distance" and masks would have to be discarded due to tear gas contamination, further spreading the disease. (*Id.*) Tear gas may also "degrade the lungs' antiviral defenses." (*Id.*) The Society notes that the studies showing the above have not

addressed the potential health effects for vulnerable populations such as children, older adults, and people with underlying health conditions. (*Id.*) Launching tear gas or pepper spray at large crowds places dozens or hundreds of people in grave danger because eight percent of the United States population suffers from asthma. (*Id.*, ¶ 17.)

Dr. Sporn notes that the 1925 Geneva Gas Protocol, of which the United States is a signatory, condemns and prohibits the use of these asphyxiating and poisonous gasses. (*Id.* at ¶ 12.) He notes that the 1993 Chemical Weapons Convention "undertakes not to use riot control agents," such as "any chemical … which can produce rapidly in humans sensory irritation or disabling physical effects," "as a method of warfare." (*Id.* at ¶ 13.)

Based on the evidence and his 33 years of clinical experience and research in pulmonary disease, it is Dr. Sporn's professional opinion to a high degree of medical certainty that the use of tear gas, pepper spray and related chemicals, as described in this complaint, is directly harmful to the health of large numbers of individuals. (*Id.*, ¶ 21.) In addition, the use of these agents against large crowds inevitably places people with asthma and other respiratory diseases at even higher risk of serious harm, up to and including death. (*Id.*)

Furthermore, use of tear gas and pepper spray increases the likelihood of spreading COVID-19 among protest participants and observers, and by extension among the community at large. (*Id.*) Finally, African American and Latinx individuals are likely to suffer disproportionate adverse health effects, particularly related to COVID-19, if use of tear gas and pepper spray at protests continues to be allowed. (*Id.*) In addition, African Americans are more likely to suffer from asthma. (*Id.*, ¶ 17.) It is his opinion that the use of tear gas and similar chemical agents by law enforcement is irresponsible and there should be an immediate end to their use. (*Id.*, ¶ 22.)

### B.   OPD Tactics Forced Demonstrators to Break Social Distancing Rules.

Most demonstrators wore masks or other face coverings and maintained social distancing to the best of their abilities. (McDonnell Dec., ¶ 4; Nada Dec., ¶ 4; Artherholt Dec., ¶¶ 49-50; Kelson Dec., ¶ 24; Li Dec., ¶ 4; Hruby Dec., ¶ 38.) Officers present at the protests did not wear masks or other face coverings. (McDonnell Dec., ¶ 58; Nada Dec., ¶ 41; Artherholt Dec., ¶¶ 51-53; Hruby Dec., ¶ 40.) OPD's own photos confirm this. (Kim Dec., ¶ 4(l).)

Demonstrators who were trying to heed advice about social distancing and wearing protective equipment such as masks were forced to abandon their efforts due to the indiscriminate use of tear gas. (Kelson Dec., ¶¶ 25-26.)

At all instances where officers kettled demonstrators together, demonstrators were forced to break social distancing rules, making them more vulnerable to infection. (Artherholt Dec., ¶ 51; Hruby Dec., ¶ 39.) OPD's own photos confirm this. (Kim Dec., ¶ 4(l).) At all instances where officers shot tear gas at demonstrators, demonstrators were forced to break social distancing rules to administer medical aid to themselves and to others, making them more vulnerable to infection. (McDonnell Dec., ¶ 19; Kelson Dec., ¶¶ 25-26.)

## LEGAL ARGUMENT

In determining whether to grant a temporary restraining order, the Court must analyze the following factors: (1) whether the movant has a substantial likelihood of success on the merits; (2) whether irreparable harm will ensue if the request for a TRO is denied; (3) whether the threatened injury outweighs the harm that the TRO may cause the defendants; and (4) whether, a TRO is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008) (addressing the standard for issuance of a preliminary injunction); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001) (noting that the Ninth Circuit treats the standards for a TRO and a preliminary injunction as substantially identical).

"The elements of this test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). "For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." *Id.* Likewise, serious questions going to the merits, together with a balance of equities that tips sharply in favor of plaintiffs, will support the issuance of an injunction where the other elements are met. *Id.* at 1134-35. Therefore, even if plaintiffs' claims were not as completely robust as they are, a TRO would still be appropriate because of how strongly the balance of harms tips in their favor.

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IV.     Plaintiffs are Likely to Succeed on the Merits of Their Constitutional Claims because Defendants Used Excessive Force against Peaceful Protestors and Violated Plaintiffs' Rights to Assemble and Speak, and Their Actions Would Chill a Reasonable Person from Exercising Her Right to Assemble.**

Plaintiffs and other similarly situated individuals alleging violations of their First, Fourth, and Fourteenth Amendment rights are likely to succeed on the merits of their claims because police used tear gas, projectiles, kettling, and other excessive force tactics against peaceful demonstrators. The indiscriminate use of force by police put peaceful participants in real and immediate danger of being harmed and interfered with plaintiffs' right to assemble and speak freely, and participants were harmed.

**A.     Defendants' Actions Violated the Fourth Amendment because they Used Tear Gas and Projectiles against Peaceful Protestors who Posed no Threat.**

The Fourth Amendment guarantees the right to be free from excessive force. Excessive force claims are analyzed under the objective reasonableness standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989). "In determining reasonableness, 'the nature and quality of the intrusion on the individual's Fourth Amendment interests must be balanced against the 'countervailing government interests at stake.'" *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994) (quoting *Graham*, 490 U.S. at 396).

When the governmental interests at stake are substantial, a greater intrusion upon the Fourth Amendment rights of the person may be justified. Conversely, when the governmental interest is insubstantial, the application of even minimal force may be unreasonable. *See, e.g.*, *Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1165 (9th Cir. 2011) ("When, as here, a suspect's disobedience of a police officer takes the form of passive noncompliance that creates a minimal disturbance and indicates no threat, immediate or otherwise, to the officer or others, it will not, without more, give rise to a governmental interest in the use of significant force.") When balancing the degree of force used against the governmental interests, "it is the need for force which is at the heart of the *Graham* factors." *Liston v. Cty. of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997) (citation omitted).

Pepper spray and less-lethal projectiles constitute significant force. *Young*, 655 F.3d. at 1161 (pepper spray is "'intermediate force' that, while less severe than deadly force, nonetheless

present a significant intrusion upon an individual's liberty interests."); *Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001) (beanbag projectiles are significant force). The application of such significant force is only appropriate where the government's interests are, in turn, significant. *Young*, 655 F.3d at 1162-63 ("Whatever such force is ultimately labeled, there is no question that its use against an individual is a sufficiently serious intrusion upon liberty that it must be justified by a commensurately serious state interest.")

It is clearly established in the Ninth Circuit that the use of pepper spray, projectile bean bags, and pepper ball projectiles against people "who were suspected of only minor criminal activity, offered passive resistance, and posed little to no threat to others" is unreasonable. *Nelson v. City of Davis,* 685 F.3d 867, 880 (9th Cir. 2012). Pepper spray, specifically, "'is *designed* to cause intense pain' and inflicts 'a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx,' as well as 'disorientation, anxiety, and panic.'" *Young*, 655 F.3d. at 1162 (quoting *Headwaters Forest Defense v. County of Humboldt,* 240 F.3d 1185, 1199-1200 (9th Cir.2000), *vacated and remanded on other grounds,* 534 U.S. 801 (2001)). Pepper spray is also understood as force "capable of causing protracted impairment of a function of a bodily organ as well as lifelong health problems such as asthma." *United States v. Neill,* 166 F.3d 943, 949-50 (9th Cir.1999) (internal quotations omitted). As such, in *Nelson*, the Ninth Circuit "rejected the contention that the use of pepper spray is a minimal intrusion, due to the immediacy and uncontrollable nature of the pain involved." 685 F.3d. at 878. The use of pepper spray to disperse protestors can constitute excessive force where it is "unnecessary to subdue, remove, or arrest the protestors." *Young*, 655 F.3d. at 1167.

The Ninth Circuit acknowledged that even where police accused some in the crowd of throwing bottles and other debris at officers, their indiscriminate use of force against those who were not throwing bottles or engaging in any other threatening of dangerous behavior was unjustified. *Nelson,* 685 F.3d. at 880. The failure to immediately comply with an officer's order to disperse "could only rise to the level of passive resistance" which "neither rises to the level of

1   active resistance nor justifies the application of a non-trivial amount of force." *Id.* at 881. *See*

2   *also Young*, 655 F.3d. at 1165-66.

3       Demonstrators who peacefully assembled in the City of Oakland beginning on May 29,

4   2020, suffered from the indiscriminate use of force by the Oakland Police Department and

5   officers from other law enforcement agencies who provided mutual aid at the request of OPD

6   and operated as their agents. Video footage, public testimony at the Oakland Police

7   Commission, and the sworn testimony of declarants, show that OPD indiscriminately released

8   tear gas, flashbang grenades, and less-lethal projectiles into a crowd of peaceful protestors,

9   without clear and adequate warning and without justification.

10       OPD also used the corralling technique known as kettling to confine the space in which

11   demonstrators could remain, thus exacerbating the effects of their use of force, the confusion of

12   the crowd, and the inability to social distance. Their techniques were used against peaceful,

13   nonviolent demonstrators, including demonstrators who intended to comply with the curfew

14   and police orders but were otherwise trapped.

15       Demonstrators stated that they could not hear the announcement police made over the

16   loudspeaker. And even if they did, officers gave demonstrators only three minutes to comply.

17   Moreover, OPD targeted journalists and medics and used military weapons and tactics against

18   many young demonstrators of color who were peaceful and nonviolent. All declarants stated

19   that they were not engaged in criminal conduct nor did they witness others engaged in criminal

20   conduct before the OPD started using excessive force. Video footage further confirms this. As

21   such, the OPD's use of force was unconstitutional.

22   **B.   Defendants' Actions Violated Plaintiffs' First Amendment Rights**

23   **Where Their Violent Conduct Interfered with Plaintiffs' Right to Assemble and Speak.**

24       "[T]he First Amendment reflects a 'profound national commitment' to the principle that

25   "debate on public issues should be uninhibited, robust, and wide-open . . .'" *Boos v. Barry*, 485

26   U.S. 312, 318 (1988) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). The

27   amendment "safeguards an individual's right to participate in the public debate through

28   political expression and political association." *McCutcheon v. Fed. Election Com'n*, 572 U.S. 185,

---

203 (2014). Public discourse is of "fundamental societal value[]," *Cohen v. California,* 403 U.S. 15, 24 (1971), and the Supreme Court has consistently commented on the central importance of protecting speech on public issues, *see, e.g.*, *Connick v. Myers*, 461 U.S. 138, 145 (1983); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982). Organized political protest is "classically political speech." *Boos*, 485 U.S. at 318. The full protections of the First Amendment extend to even speech that "stirs passion, resentment or anger," *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949).

"In order to demonstrate a First Amendment violation, a plaintiff must provide evidence showing that 'by his actions [the defendant] deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct.'" *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (quoting *Sloman v. Tadlock*, 21 F.3d 1462, 1469 (9th Cir.1994) (alterations in original)). The United States Supreme Court has upheld preliminary injunctions based on the First Amendment where police action "chill[s] the willingness of people to exercise their First Amendment rights." *Allee v. Medrano*, 416 U.S. 802, 810 (1974).

Here, OPD indiscriminately kettled. used tear gas and flash bang grenades, and shot projectiles at peaceful, nonviolent demonstrators, including demonstrators who intended to comply with the curfew and/or police orders but were otherwise trapped. Demonstrators stated that they were frightened, scared, traumatized, and decided not to participate in protests for fear of police violence and/or health concerns. At least one declarant stated she would not have participated in the protest had she known officers were going to use excessive force. Another declarant stated that officers shot her with a rubber bullet despite her having her press badge and camera visible. A third declarant removed crosses showing that he was present as a medic from his sweatshirt and bags out of fear he would be targeted. Such indiscriminate use of force is precisely the type of police action that was meant to and would chill a person of ordinary firmness from engaging in protected activity. *Allee*, 416 U.S.at 804 (injunction issued where police interfered with Union's right to assemble and picket by "unlawfully arresting, detaining,

1   and confining them without due process and without legal justification, and by unlawfully

2   threatening, harassing, coercing, and physically assaulting them").

3   **C.   Defendants Placed Plaintiffs in Affirmative Danger Due to their Crowd**
        **Control Tactics During the COVID-19 Pandemic.**

4          Due to the unprecedented COVID-19 pandemic, demonstrators who took to the streets in

5   collective grief and outrage over yet another murder of a Black man by a police officer did so

6   with social distancing protocols in mind. Demonstrators wore masks and attempted to maintain

7   social distance as they marched in the streets of Oakland. The OPD's actions of tear gassing

8   demonstrators, forcing them into close proximity with kettling and mass arrests, and coming

9   into close proximity of demonstrators without wearing masks were deliberate actions taken by

10  the police department with total disregard for the harm such actions would cause.

11         Affirmative actions taken by the Oakland Police Department that expose plaintiffs to the

12  known dangers of COVID-19 violates plaintiffs' substantive due process rights. *See Kennedy v.*

13  *City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (*citing DeShaney v. Winnebago County*

14  *Dep't of Soc. Serv.*, 489 U.S. 189, 197, 201 (1989)) ("It is [] well established that, although the

15  state's failure to protect an individual against private violence does not generally violate the

16  guarantee of due process, it can where the state action 'affirmatively place[s] the plaintiff in a

17  position of danger,' that is, where state action creates or exposes an individual to a danger

18  which he or she would not have otherwise faced.") A plaintiff's right to be free from such state-

19  created danger protects her from a City's affirmative actions that occur with complete disregard

20  to the harms that action creates. *See, e.g., Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1102

21  (E.D. Cal. 2012) (addressing a homeless plaintiff's substantive due process right to be free from

22  the state's proposed action to demolish his shelter at the onset of winter weather).

23         The use of tear gas is particularly dangerous during the COVID-19 pandemic. It has been

24  well understood how COVID-19 is transmitted, and the use of chemical irritants that cause

25  coughing will spread the virus. Chronic bronchitis, compromised lung function, and acute lung

26  injury are consequences of the use of tear gas. (Sporn Dec. at ¶ 20.) "The airborne nature of tear

27  gas" also endangers bystanders, medics, and the media. (*Id.*) A "tear gas-exposed person with

28  asymptomatic COVID-19 would be unable to maintain a safe distance" and masks would have to

---

1    be discarded due to tear gas contamination, further spreading the disease. (*Id.*) This was borne

2    out by the experience of demonstrators. Launching tear gas or pepper spray at large crowds

3    places dozens or hundreds of people in grave danger because eight percent of the United States

4    population suffers from asthma, as does Ms. Miyara. (*Id.*, ¶ 17; Miyara Dec. at ¶¶ 20-37.)

5    **V.    Plaintiffs Have Been and Will be Irreparably Harmed if this Court does not
6    Protect their Constitutional Rights by Issuing a Temporary Restraining
     Order.**

7    "The loss of First Amendment rights, for even minimal periods of time, unquestionably

8    constitutes irreparable injury." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012)

9    (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). A "colorable First Amendment claim . . . is

10   irreparable injury sufficient to merit the grant of relief." *Warsoldier v. Woodford,* 418 F.3d 989,

11   1001 (9th Cir. 2005). Plaintiffs seeking a TRO must establish that they are "likely to suffer

12   irreparable harm in the absence of preliminary relief." *NRDC v. Winter,* 518 F.3d 658, 677 (9th

13   Cir. 2008). The Ninth Circuit does "not require a strong showing of irreparable harm for

14   constitutional injuries." *Cuviello v. City of Vallejo,* 944 F.3d 816, 833 (9th Cir. 2019).

15   Demonstrators have already suffered irreparable harm at the hands of the OPD,

16   including at least one man who will likely permanently lose an eye. COVID-19 makes the OPD's

17   use of military tactics and weapons even more dangerous by forcing demonstrators to break

18   social distancing rules for unnecessary and avoidable reasons. Without keeping the OPD

19   accountable, demonstrators will suffer further constitutional violations including violations of

20   their rights to peaceably assemble, be free of excessive force, be free of unlawful seizures, and be

21   free of being placed in a state-created danger.

22   Plaintiffs require immediate injunctive relief form this Court to protect them from

23   ongoing and likely future harm to the class. The protests are continuing and growing.

24   **VI.   The Balance of Equities Weighs Entirely in Plaintiffs' Favor as it is Always in
25   the Public Interest to Protect Constitutional Rights.**

     When the government is a party, these last two factors of the preliminary injunction

26   inquiry—the balancing of equities and the public interest inquiry—merge. *Drakes Bay Oyster*

27   *Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). *See also Black Lives Matter Seattle-King Cty.*

28   *v. City of Seattle, Seattle Police Dep't*, 2020 WL 3128299, at *5 (W.D. Wash. June 12, 2020).

Where plaintiffs raise "serious First Amendment questions . . . the balance of hardships tips sharply in [the plaintiffs'] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007). Further, "it is always in the public's interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). "The public interest inquiry primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014).

Faced with similar indiscriminate uses of force by police officers during "Justice for George Floyd" demonstrations, at least three district courts have issued injunctions on the use of tear gas, flash bang grenades, and projectiles after finding that the balance of the equities tips in demonstrators' favors and that protecting the constitutional rights of demonstrators is in the public interest. *Black Lives Matter Seattle-King Cty.*, 2020 WL 3128299, at *5; *Don't Shoot Portland v. City of Portland*, 2020 WL 3078329, at *4 (D. Or. June 9, 2020); *Abay et al. v. City of Denver*, 2020 WL 3034161 at *4-5 (D. Colo. June 5, 2020).

The harm to movants is weighty and disturbing. The Oakland Police Department and their mutual aid law enforcement agencies have inflicted serious bodily injury, terror, and trauma on peaceful protestors. The harm to the defendants is minimal. Here, limiting the Oakland Police Department and its mutual aid law enforcement agencies from using crowd control force such as tear gas may, as the District Court in Portland acknowledged, "[i]n theory . . . impede officers' ability to protect themselves against potential violence from demonstrators." *Don't Shoot Portland*, 2020 WL 3078329, at *4. However, as the court concluded, "any harm in limiting Defendant's use of tear gas is outweighed by the irreparable harm that Plaintiffs— engaged in peaceful protest—are likely to endure." *Id.*

Further, while the City may aver that there is harm to property that may—or is even likely to occur—the District Court in Denver held that "property damage is a small price to pay for constitutional rights—especially the constitutional right of the public to speak against widespread injustice." *Abay et al.*, 2020 WL 3034161 at *5. "If a store's windows must be broken to prevent a protestor's facial bones from being broken or eye being permanently

damaged, that is more than a fair trade." *Id*. "If a building must be graffiti-ed to prevent the suppression of free speech, that is a fair trade." *Id*.

Finally, in the unprecedented time of COVID-19, the harm of police activities is stark. Demonstrators took care to wear face coverings and keep distance where possible. They were confronted by officers who ignored those protections by having their faces uncovered, and who forced them to abandon social distancing protections through kettling and mass arrests. Concerning COVID-19, the Court in Portland held that "the unconstrained use of tear gas cannot weigh in the public's interest when this use is likely to exacerbate the transmission of COVID-19, for those engaged in peaceful protest as well as the community at large." *Don't Shoot Portland*, 2020 WL 3078329, at *4.

**CONCLUSION**

For the reasons stated above, plaintiffs respectfully request that this Court grant its application for a temporary restraining order and/or an order to show Cause, and, following a hearing, issue a preliminary injunction.

Dated:  June 17, 2020

SIEGEL, YEE, BRUNNER & MEHTA

By:    */s/ Dan Siegel*
      Dan Siegel

Attorneys for Plaintiffs
ANTI POLICE-TERROR PROJECT,
COMMUNITY READY CORPS,
AKIL RILEY, IAN McDONNELL, NICO
NADA, AZIZE NGO, and JENNIFER LI