| | |
|---|---|
| WALTER RILEY, SBN 95919<br>LAW OFFICE OF WALTER RILEY<br>1407 Webster Street, Suite 206<br>Oakland, CA 94612<br>Telephone: (510) 451-1422<br>Facsimile: (510) 451-0406<br>Email: walterriley@rrrandw.com | JAMES DOUGLAS BURCH, SBN 293645<br>National Lawyers Guild<br>558 Capp Street<br>San Francisco, CA 94110<br>Telephone: (415) 285-5067 x.104<br>Email: james_burch@nlgsf.org |

Attorneys for Plaintiffs
ANTI POLICE-TERROR PROJECT, COMMUNITY READY CORPS, AKIL RILEY, IAN McDONNELL, NICO NADA, AZIZE NGO, and JENNIFER LI

DAN SIEGEL, SBN 56400
ANNE BUTTERFIELD WEILLS, SBN 139845
JANE BRUNNER, SBN 135422
SONYA Z. MEHTA, SBN 294411
EMILYROSE JOHNS, SBN 294319
ANDREW CHAN KIM, SBN 315331
SIEGEL, YEE, BRUNNER & MEHTA
475 14th Street, Suite 500
Oakland, California 94612
Telephone: (510) 839-1200
Facsimile: (510) 444-6698
Email: danmsiegel@gmail.com;
abweills@gmail.com;
janebrunner@hotmail.com;
sonyamehta@siegelyee.com;
emilyrose@siegelyee.com;
chankim@siegelyee.com

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTI POLICE-TERROR PROJECT, COMMUNITY READY CORPS, AKIL RILEY, IAN McDONNELL, NICO NADA, AZIZE NGO, and JENNIFER LI, on behalf of themselves and similarly situated individuals,<br><br>　　　　　　Plaintiffs,<br>　vs.<br><br>CITY OF OAKLAND, OPD Police Chief SUSAN E. MANHEIMER, OPD Sergeant PATRICK GONZALES, OPD Officer MAXWELL D'ORSO and OPD Officer CASEY FOUGHT,<br><br>　　　　　　Defendants. | Case No. 3:20-cv-03866-JCS<br><br>**DECLARATION OF DR. PETER SPORN IN SUPPORT OF MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND/OR ORDER TO SHOW CAUSE AND FOR PRELIMINARY INJUNCTION** |

I, Peter Haldis Shelley Sporn, M.D., declare as follows:

1. I am a physician licensed to practice in the State of Illinois and an employee of Northwestern University and the U. S. Department of Veterans Affairs.

2. I make this declaration based on my personal knowledge, and if called as a witness, can testify competently as to the truth thereof.

3. I graduated from the University of Chicago with an A. B. in Biological Sciences with Honors and Special Honors in Biology in 1976. I received my M.D. from Wayne State University School of Medicine, graduating with High Distinction in 1980.

4. I did my Internship and Residency in Internal Medicine at Bronx Municipal Hospital Center/Albert Einstein College of Medicine, Bronx, New York from 1980 to 1983. I was a Postdoctoral Research Fellow in Allergy and Immunology at Albert Einstein College of Medicine, Bronx New York from 1983 to 1984. I then trained as a Clinical and Research Fellow in Pulmonary and Critical Care Medicine at the University of Michigan Medical Center in Ann Arbor, Michigan from 1984 to 1987.

5. I am Board Certified in Internal Medicine (1983), Pulmonary Disease (1986), and Critical Care Medicine (1987, 2004 and 2014). In addition to my Illinois license, I hold medical licenses in the states of New York and Michigan.

6. I was a member of the faculty in the Department of Internal Medicine at the University of Michigan, Ann Arbor, Michigan from 1987 to 1991. I joined the full-time faculty at the Feinberg School of Medicine of Northwestern University, Chicago, Illinois as Assistant Professor of Medicine in 1991. Subsequently, I was promoted to

Associate Professor, then Full Professor in the Department of Medicine at Northwestern. I also hold secondary appointments as Professor in the Department of Cell and Developmental Biology and the Department of Medical Education at the Feinberg School of Medicine

7. I have hospital appointments as an attending physician at Northwestern Memorial Hospital and the Jesse Brown Veterans Affairs Medical Center, both in Chicago, Illinois. These are the two primary teaching hospitals for the Feinberg School of Medicine of Northwestern University.

8. I currently serve as Director of the Northwestern Medicine Sarcoidosis Program, designated as a Sarcoidosis Center of Excellence by the World Association of Sarcoidosis and Other Granulomatous Diseases.

9. I am a member of the American Board of Internal Medicine (ABIM) Pulmonary Disease Board, and I chair of the ABIM Pulmonary Disease Test Writing Committee. This Committee creates the examination that physicians must pass to become board-certified in the specialty of pulmonary disease throughout the United States.

10. I have published forty-eight peer-reviewed articles and sixteen reviews, book chapters and case reports dealing with experimental and clinical aspects of airway inflammation, lung injury, innate immunity and lung infections.

11. I am a Fellow of the American College of Chest Physicians and of the American Thoracic Society. I am a member of the American Thoracic Society Scientific Advisory Board. I have also been voted by my peers to the Best Doctors in America list

annually from 2006 to the present.

12. The 1925 Geneva Gas Protocol, of which the United States is a signatory, states the following: "Whereas the use in war of asphyxiating, poisonous or any other gases, and of all analogous liquids, materials and devices, has been justly condemned by the general opinion of the civilized world; To the end that this prohibition shall be universally accepted as part of International Law, binding alike the conscience and the practice of nations: Declare: That the High Contracting Parties, so far as they are not already Parties to Treaties prohibiting such use, accept this prohibition."

13. Article I(5) of the 1993 Chemical Weapons Convention, of which the United States is a signatory, states: "Each State Party undertakes not to use riot control agents as a method of warfare." Article II(7) of the 1993 Chemical Weapons Convention defines "Riot Control Agent" as "any chemical … which can produce rapidly in humans sensory irritation or disabling physical effects which disappear within a short time following termination of exposure." At the same time that the Chemical Weapons Convention prohibits use of chemical agents in warfare, Article II(9) states that use of such agents by law enforcement for "domestic riot control purposes" is not prohibited.

14. Tear gas, containing chloroacetophenone (CN) or chlorobenzylidene malonontrile (CS), and pepper spray or pepper balls, containing oleoresin capsicum (OC), are the most common riot control agents used by law enforcement agencies in the U.S. While it has been claimed that these agents produce only temporary irritation and discomfort, recent studies document that they can cause serious and long-lasting lung problems, skin burns, eye injuries and even death.

*APTP v. City of Oakland*, No. 3:20-cv-03866-JCS
Declaration of Dr. Peter Sporn- 4

15. A recent review compiled the results of 31 studies including 5,131 people who suffered 9,261 injuries from exposure to tear gas or pepper spray (Haar et al, BMC Public Health 17:831, 2017). 8.7% of the injuries were severe and required professional medical attention, 17% were moderate, and 74% were mild. 58 of the individuals suffered permanent disability and two died of injuries due to the chemical agents. There were 231 projectile injuries, 63 (27%) of which were severe, including major head trauma and loss of vision.

16. In another study, Toprak et al performed autopsies on 10 individuals who died as a result of acute exposure to riot control agents (Journal of Forensic and Legal Medicine 29:36-42, 2015). The majority of the subjects were in their 20s or 30s without significant prior medical problems. The most common mode of death was respiratory failure. Three died after exposure to combinations of tear gas and pepper spray, and seven died following exposure to pepper spray alone. This and other studies indicate that pepper spray is not less harmful or less potentially lethal than tear gas.

17. Tear gas and pepper spray both cause acute respiratory symptoms. In individuals with asthma or other chronic respiratory conditions, exposure to these agents may precipitate severe, acute attacks that can be fatal. Given that approximately 8% of the U.S. population suffers from asthma, launching tear gas or pepper spray at large crowds inevitably places dozens or hundreds of individuals with asthma and other respiratory conditions in grave danger. Because asthma is more common and often more severe in African Americans than the majority population in the U.S., use of tear gas and pepper spray places black individuals in targeted crowds at especially high risk of respiratory harm.

18. Because exposure to tear gas and pepper causes severe irritation of the eyes, nose, mouth and respiratory system, exposed individuals rub their eyes, hypersalivate, cough uncontrollably, and hyperventilate. This typically forces people to take off the masks they are wearing in order to be able to breathe. By damaging the respiratory epithelium, tear gas and pepper spray increase susceptibility to respiratory infection. All of this greatly increases the risk of disseminating the novel coronavirus and of contracting COVID-19. Because African Americans and Latinx individuals experience disproportionately high rates of respiratory failure and death due to COVID-19 (Yancy, JAMA 323:1891-2, 2020), use of tear gas and pepper spray further increases the risk of serious harm to the health of individuals in these groups.

19. Major news media have documented multiple cases of serious respiratory complications, skin burns, projectile injuries (including loss of an eye), and at least one death among protestors and journalists as a result of tear gas or pepper spray fired by law enforcement in incidents across the U.S. in recent weeks (New York Times, 6/1/2020, 6/3/2020, 6/12/2020 and 6/16/2020; Washington Post 6/3/2020; New York Post 6/9/2020; Time Magazine 6/12/2020).

20. The American Thoracic Society is the largest and most prestigious professional organization of pulmonary and critical care medicine physicians in the United States, with approximately 16,000 members. On June 11, 2020 the Society issued the following statement stating that the use of tear gas and similar chemical agents by law enforcement during the COVID-19 pandemic is irresponsible and calling for a moratorium on their use:

The American Thoracic Society calls for a moratorium on the use of tear gas and other chemical agents deployed by law enforcement against protestors participating in demonstrations, including current campaigns sparked by the death of George Floyd.

The use of chemical crowd control agents is outlawed in the time of war. They cause significant short- and long-term respiratory health injury and likely propagate the spread of viral illnesses, including COVID-19," said ATS President Juan C. Celedón, MD, DrPH, ATSF.

Recent research calls into question the assumed safety of tear gas such as 2-chlorobenzalmalononitrile (CS), and the highly concentrated pepper oil used in exploding shells and grenades," said Sven-Eric Jordt, PhD, a leading researcher in tear gas and related lung injury. Those studies have identified chronic bronchitis, compromised lung function, and acute lung injury (in military recruits) as consequences of tear gas exposure.

The airborne nature of tear gas also makes it impossible to use in a manner that doesn't endanger uninvolved persons such as innocent bystanders and the media. Tear gas is also a concern to medical personnel exposed when treating protestors, since the agents can contaminate clothing and medical equipment.

In addition to questions about safety, the ATS is concerned that exposure to tear gas may affect COVID-19 transmission. A tear gas- exposed person with asymptomatic COVID-19 would be unable to maintain a safe distance and is likely to spread the virus much more efficiently to bystanders, increasing the risk of infection. Protective masks would have to be discarded due to tear gas contamination, further increasing risks of spreading or contracting the infection.

Outcomes of a study by the U.S. military are a clear warning sign. Recruits exposed to CS tear gas in training just once had a strongly increased likelihood to develop respiratory illnesses such as influenza, pneumonia, or bronchitis, conditions often caused by viral infections. This may also apply to COVID-19. Reactive chemicals such as 2-chlorobenzalmalononitrile, and the combustion products and solvents produced by tear gas shells and grenades, are known to degrade the lungs' antiviral defenses. COVID-19 patients often report loss of their sense of smell. COVID-19 patients were also found to lose their capability to sense irritants, increasing their risk of inhaling tear gas and developing chemical injuries.

Current events in the U.S. provide evidence of tear gas use escalation domestically. Inadequate training, monitoring, and accountability in use of these weapons contribute to misuse and risk of injury. If used at all, tear gas should be a last resort.

The industry manufacturing tear gas systems have developed advanced launching technologies allowing deployment of much higher amounts of tear gas over

longer distances. Much of what we currently know about the health effects of exposure to tear gas and other chemical agents is based on military research conducted in the 50s, 60s, and 70s using young healthy male research participants. These studies do not address the potential health effects for vulnerable populations who are exposed, including children, older adults, and people with underlying health conditions.

Based on the lack of crucial research, the escalation of tear gas use by law enforcement, and the likelihood of compromising lung health and promoting the spread of COVID-19, the American Thoracic Society calls for a moratorium on CS tear gas and OC pepper weapons use", said Dr. Celedón.

21. Based on the foregoing evidence and my 33 years of clinical experience and research in pulmonary disease, it is my professional opinion to a high degree of medical certainty that the use of tear gas, pepper spray and related chemicals, as described in this complaint, is directly harmful to the health of large numbers of individuals. In addition, the use of these agents against large crowds inevitably places people with asthma and other respiratory diseases at even higher risk of serious harm, up to and including death. Furthermore, use of tear gas and pepper spray increases the likelihood of spreading COVID-19 among protest participants and observers, and by extension among the community at large. Finally, African American and Latinx individuals are likely to suffer disproportionate adverse health effects, particularly related to COVID-19, if use of tear gas and pepper spray at protests continues to be allowed.

22. For all of the above reasons, I unequivocally support the June 11, 2020 American Thoracic Society statement indicating that use of tear gas and similar chemical agents by law enforcement is irresponsible and calling for an immediate end to their use.

23. I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct. Executed on June 17, 2020, at Chicago, Illinois.

Peter H. S. Sporn, MD

*APTP v. City of Oakland*, No. 3:20-cv-03866-JCS
Declaration of Dr. Peter Sporn- 9