BARBARA J. PARKER, City Attorney, CABN 069722
MARIA BEE, Chief Assistant City Attorney , CABN 167716
DAVID A. PEREDA, Special Counsel, CABN 237982
BRIGID M. MARTIN, Special Counsel, CABN 231705
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California  94612
Telephone:  (510) 238-6520, Fax:  (510) 238-6500
Email: dpereda@oaklandcityattorney.org

Attorneys for Defendants
CITY OF OAKLAND, et al.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ANTI POLICE-TERRO PROJECT, COMMUNITY READY CORPS, et al.<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF OAKLAND, et al.<br><br>Defendants. | Case No. C 20-3866 JSC<br><br>**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION** |

1

# TABLE OF CONTENTS

2

**OVERVIEW** ...................................................................................................... 1

3

**ISSUE PRESENTED** .......................................................................................... 1

4

**FACTUAL BACKGROUND** ............................................................................... 3

5

I.  OPD's CROWD MANAGEMENT POLICY ...................................................... 3

6

A.  General Principles ...................................................................................... 3

7

B.  Crowd Control ........................................................................................... 4

8

C.  Chemical Agents ........................................................................................ 5

9

II.  CROWD MANAGEMENT OVER THE PAST FIVE YEARS ............................. 5

10

III. MAY 29 THROUGH JUNE 1 ........................................................................ 6

11

A.  May 29 ...................................................................................................... 6

12

B.  May 30 ...................................................................................................... 8

13

C.  May 31 ...................................................................................................... 8

14

D.  June 1 ....................................................................................................... 9

15

IV. THE ENSUING DAYS ................................................................................ 10

16

V.  MUTUAL AID ............................................................................................ 11

17

VI. REVIEW MECHANISMS ............................................................................ 12

18

A.  OPD Investigations ................................................................................. 12

19

B.  Oakland Police Commission and the CPRA ............................................ 13

20

C.  Munitions Logs ....................................................................................... 13

21

**PROCEDURAL HISTORY** .............................................................................. 14

22

I.  PLAINTIFFS' COMPLAINT AND MOTION .............................................. 14

23

II.  TRO ......................................................................................................... 15

24

III. CITY COUNCIL RESOLUTION .................................................................. 17

25

**LEGAL STANDARDS** .................................................................................... 17

26

I.  PRELIMIANRY INJUNCTION ................................................................... 17

27

II.  SECTION 1983 CLAIMS ........................................................................... 18

28

A.  First Amendment .................................................................................... 18

B. Fourth Amendment ........................................................................................ 18

C. Fourteenth Amendment ................................................................................. 19

D. *Monell* ............................................................................................................ 20

**DISCUSSION** ................................................................................................... 20

I. LIKELIHOOD OF SUCCESS ........................................................................ 20

A. First Amendment ........................................................................................ 21

   1. Protected Activity .................................................................................. 21

   2. Chilling ................................................................................................... 21

   3. Motivating conduct ............................................................................... 22

B. Other Claims ................................................................................................ 22

II. IRREPARABLE INJURY AND PUBLIC INTEREST ................................. 23

III. STANDING .................................................................................................... 23

**CONCLUSION** ................................................................................................ 25

1

## TABLE OF AUTHORITIES

2

**CASES**

3

*Ariz. Dream Coalition v. Brewer*
    757 F.3d 1053 (9th Cir. 2014) ............................................................ 23

4

*Bull v. City and Cty. of San Francisco*
    595 F.3d 964 (9th Cir. 2010) ............................................................. 20

5

6

*Bryan v. MacPherson*
    630 F.3d 805 (9th Cir. 2010) ............................................................. 19

7

*City of Los Angeles v. Lyons*
    461 U.S. 95 (1983).............................................................................. 24

8

9

*City of Oklahoma City v. Tuttle*
    471 U.S. 808 (1985)............................................................................ 20

10

*Cuviello v. City & Cnty. of San Francisco*
    940 F.Supp.2d 1071 (N.D.Cal.2013).................................................. 25

11

12

*Drakes Bay Oyster Co. v. Jewell*
    747 F.3d 1073 (9th Cir. 2014) ........................................................... 18

13

*George v. Morris*
    736 F.3d 829 (9th Cir. 2013) ............................................................. 19

14

*Gest v. Bradbury*
    443 F.3d 1177 (9th Cir.2006)............................................................. 25

15

16

*Glenn v. Washington Cty.*
    673 F.3d 864 (9th Cir. 2011) ............................................................. 19

17

*Graham v. O'Connor*
    490 U.S. 386 (1989)............................................................................ 18

18

19

*Hayes v. Cty. of San Diego*
    736 F.3d 1223 (9th Cir. 2013) ........................................................... 18

20

*LGS Architects, Inc. v. Concordia Homes*
    434 F.3d 1150 (9th Cir.2006)............................................................. 17

21

22

*Mandrigues v. World Savings, Inc.*
    C 07–4497 JS, 2009 WL 160213 (N.D. Cal. June 20, 2009) ............. 18

23

*Menotti v. City of Seattle*
    409 F.3d 1113 (9th Cir. 2005) ........................................................... 20

24

25

*Monell v. Dep't of Social Servs. of New York*
436 U.S. 658 (1978) ........................................................................... 20

26

*Mattos v. Agarano*
    661 F.3d 433 (9th Cir. 2011) ............................................................. 19

27

28

*Save CCSF Coalition v. Lim*
    C 14-5286 SI, 2015 WL 3409260 (N.D. Cal. May 27, 2015) ................................ 24

*Pension Plan for Pension Trust Fund for Operating Engineers v. Weldway Const., Inc.,*
    920 F.Supp.2d 1034 (N.D. Cal. 2013) .................................................................. 17

*Pinard v. Clatskanie Sch. Dist. 6J*
    467 F.3d 755 (9th Cir.2006) ................................................................................. 18

*The Presbyterian Church (U.S.A.) v. United States*
    870 F.2d 518 (9th Cir.1989) ................................................................................. 24

*Tatum v. Moody*
    768 F.3d 806 (9th Cir. 2014) ................................................................................ 20

*Terry v. Ohio*
    392 U.S. 1 (1968) ................................................................................................. 19

*Thompson v. City of Los Angeles*
    885 F.2d 1439 (9th Cir. 1988) .............................................................................. 20

*Wilkinson v. Torres*
    610 F.3d 546 (9th Cir. 2010) ................................................................................ 19

*Winter v. Natural Res. Def. Council, Inc.*
    555 U.S. 7 (2008) ................................................................................................. 17

**OTHER AUTHORITIES**

42 U.S.C. § 1983 ......................................................................................................18

Fed. R. Civ. P. 65 .....................................................................................................17

Oakland City Charter § 604 .....................................................................................13

### OVERVIEW

May 25, 2020 marks a watershed moment in our nation's history.  The murder of George Floyd, on the heels of the killings of Ahmaud Arbery and Breonna Taylor and mounting disparities—by race—in health, housing security, and other life outcomes, forced the nation to take a sober view of its insidious structural racism.

Four days later, demonstrations began in earnest within the City.  They have been powerful and inspiring.  Activism is integral to the City's identity.

Unfortunately, from May 29 through June 1, there was also devastating violence and destruction, including within the City's most vulnerable communities.  Over these days, the City saw five murders, several shootings, and extensive damage in East Oakland, Chinatown, Downtown, and Uptown, straining City resources.  To facilitate unplanned protests that quickly swelled, keep peace, and protect public safety, the City relied heavily on mutual aid.  Officers faced extraordinarily challenging conditions, especially after nightfall when the exercise of free speech fell and the exploitation of communities spiked.

For the past five years, until May 29, and on every day since June 1, there have been demonstrations in Oakland with no major issues.

Over these four days, both OPD officers and mutual aid officers used force.  Under OPD's crowd management and use of force policies, OPD officers cannot make the decision to do so lightly.  Further, subject to strict federal monitoring, OPD thoroughly reviews each use of force and investigates each complaint of misconduct.  Pursuant to OPD's crowd management policy, OPD is also preparing an *After-Action Report*, which will include "lessons learned and training opportunities, as well as an assessment of the effectiveness and quality of the Operations Plans."  Separately, a civilian team within the Community Police Review Agency ("CPRA") will investigate complaints.

If an officer failed to comply with policy, he or she will be held accountable.  OPD is also studying its operational choices, the varying crowd dynamics and

behaviors, and the overall circumstances of each day to continually improve as an organization. OPD's policies, plus the moment, call for nothing less.

Further, the City has one of the most powerful systems in the nation for civilian oversight of a police department, owing to a 2016 voter initiative, Measure LL. As part of that system, the Oakland Police Commission is empowered to propose changes to use of force and crowd management policies.

For these reasons, the City's review and policy revision processes should be allowed to take their course without court intervention at this stage.

## ISSUE PRESENTED

Have Plaintiffs made a clear showing that they are likely to succeed on the merits of their claims and that the equities dictate preempting the City's processes?

## FACTUAL BAGROUND

In 2015, President Obama's *Task Force on 21st Century Policing* made the following recommendation for managing mass protests:

> Law enforcement agencies should create policies and procedures for policing mass demonstrations that employ a continuum of managed tactical resources that are designed to minimize the appearance of a military operation and avoid using provocative tactics and equipment that undermine civilian trust.

*Final Report of the President's Task Force on 21st Century Policing* (May 2015), at 25 (May 2015) (https://cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf).

To that end, the *Task Force* offered two "action items." First, an agency's "policies should address procedures for implementing a layered response to mass demonstrations that prioritize de-escalation and a guardian mindset," the *Task Force* said. *Id.* Second, the *Task Force* called for a federal "mechanism for investigating complaints and issuing sanctions regarding the inappropriate use of equipment and tactics during mass demonstrations." *Id.*

OPD's crowd management policy embraces these mechanisms and mindset

even though the policy predates this report.  During protests, OPD aims to facilitate expression and to keep peace with procedural justice and legitimacy.  Key concepts for this are communication with demonstrators, a differentiated response to people who are acting violently and people who are protesting, and a thorough, consequential after-action review of operations and investigation of complaints.

## I.      OPD's CROWD MANAGEMENT POLICY

### A.      General Principles

OPD has a carefully designed crowd management policy.  The policy reflects substantial input from the court, the National Lawyers Guild, the American Civil Liberties Union, and other civil rights lawyers, including Rachel Lederman and Jim Chanin.  Ex. L, *Spalding v. City of Oakland*, C11-2867 TEH (LB), Settlement Agreement, Dkt. No. 95-1 (May 22, 2013).  Ms. Lederman and Mr. Chanin helped train OPD sergeants on the policy.

The policy is calibrated to,

> Apply the appropriate level of direction and control to protect life, property, and vital facilities;
>
> Maintain public peace and order; and
>
> Uphold constitutional rights of free speech and assembly while relying on the minimum use of physical force and authority required to address a crowd management or crowd control issue.

Ex. A, *Training Bulletin ("TB") III-G*, at 1.

To meet these objectives, the policy stresses communicating with demonstration liaisons; planning crowd-management operations in advance; facilitating safe demonstration spaces, including by reasonably diverting traffic; establishing lines of control of the public space; deploying a presence needed to keep order but not intimidate protestors; frequently reassessing a crowd and the best way to help facilitate a peaceful gathering; distinguishing between those who are expressing viewpoints and those who are committing unlawful acts; and minimizing the risk to innocent persons when responding to violence or destructive acts. *Id.* at 2-

6. The policy looks to the Incident Commander to approve dispersal tactics but does not prevent individual officers from "defending themselves or others from imminent danger when the delay in requesting permission to take action would increase the risk of injury." *Id.* at 4.

## B.   Crowd Control

OPD "may not disperse a demonstration or crowd event before demonstrators have acted illegally or before the demonstrators pose a clear and present danger of imminent violence." *Id.* at 10.

If those conditions occur, and OPD looks to use "crowd-control" techniques— such as "a display of formidable numbers of police officers, crowd containment, dispersal tactics, and arrest procedures"—the policy poses the following questions to bear in mind:

> 1. Will police action likely improve the situation?
>
> 2. Will targeting specific violent or disruptive individuals for arrest be more effective or appropriate than applying control tactics to the entire crowd?
>
> 3. Are sufficient resources available to effectively manage the incident?
>
> 4. Have clear and secure escape routes been established for both the crowd and the police?
>
> 5. Has the dispersal order been given (loudspeaker, personal contact, etc.)?
>
> 6. Have contingency plans been established in the event initial police efforts are ineffective?

*Id.* at 9-10.

As for the timing of "crowd-control" techniques, "[u]nless an immediate risk to public safety exists or significant property damage is occurring, sufficient time will be allowed for a crowd to comply with police commands before action is taken." *Id.* at 11.

If OPD determines that force is necessary, the level used must be "consistent

with the Department policy of using the minimal police intervention needed to address a crowd management or control issue in accordance with Department General Order K-3, USE OF FORCE." *Id.* at 12.  General Order K-3 stresses de-escalation and the use of the least-severe force options.  Ex. C, *General Order K-3.*

## C.   Chemical Agents

Under the crowd management policy, "chemical agents shall be used only if other techniques, such as encirclement and multiple simultaneous arrest or police formations have failed or will not accomplish the policing goal as determined by the Incident Commander." *Id.* at 13.  The Incident Commander must authorize the use of these agents.  *Id.*  The exception is that "[o]nly under exigent circumstances may a supervisor or commander authorize the immediate use of chemical agents." *Id.*

De-escalation is a key concept in OPD's policies.  *See General Order K-3*, at 1 (instructing that "[m]embers are required to de-escalate the force when the member reasonably believes a lesser level or no further force is appropriate.")  In that vein, chemical agents offer a tool for officers to disperse crowds without going into a crowd or physically overpowering people.  Allison decl. ¶ 8.

## II.   CROWD MANAGEMENT OVER THE PAST FIVE YEARS

Over the past five years, the City's crowd management policy has worked. Within that window, OPD has facilitated thousands of gatherings—including mass protests and demonstrations—attended by millions.  Ex. G, *Crowd Management Reports* (2015-2019).  Some of these events included violence and destructive acts. And in some situations, OPD used chemical agents—pursuant to the policy.  Allison decl., ¶ 10.  Looking back, the City found no assembly-related lawsuit filed against the City during those years.

As set forth in the Oakland Police Commission *Town Hall* transcript included with Plaintiffs' papers, one of the plaintiffs' lawyers who helped write the policy and train on it, said that there were "six years of relative peace," and he was "disconsolate" by the crowd management during the first few days.  Dkt. No. 28,

*Town Hall*, at 68 (Jun 8, 2020).  The data bears out the overall harmony.  Ex. G, *Crowd Management Reports* (2015-2019).

## III.   MAY 29 THROUGH JUNE 1

On May 29, 2020, the City activated its Emergency Operations Center ("EOC") to coordinate the City's operations during mass protests.  Among other City employees, OPD, Fire Department, and Public Works personnel staffed the EOC.  At the EOC, OPD contemporaneously tracked radio traffic and video feed in a running log, which was pared down to capture notable developments.  *See* Ex. H, *Activity Log* (May 29, 2020 through June 1, 2020).

There were many inspiring, peaceful assemblies.  In addition, there was extensive criminal activity and violence.  Approximately 200 businesses were looted and vandalized; 137 fires were set; there were five homicides and several shootings; two federal agents were shot, and one was killed; shots were fired at the PAB; and 30 first responders were injured, including 21 OPD officers and two City firefighters.  *Id.; see also* Ex. E, *Open Letter to Our Community from the Oakland Police Department and Interim Police Chief Susan Manheimer* (June 10, 2020).

The following summary is based on the *Activity Log*.

### A.   May 29

On May 29, between 5:00 p.m. and 8:00 p.m., there were up to 4000 demonstrators divided among two sites, City Hall and the PAB, which are seven blocks apart along Broadway.  Ex. H, *Activity Log*, at 1.

At one point, officers reported that someone in the crowd was throwing bottles towards them.  *Id.*  Many others among the crowd directed anger towards the officers who were facilitating the protests, but those protestors did so without throwing things.  *Id.*

Over the next 90 minutes, things dramatically changed.  *Id.*  Near City Hall, people had ripped down boards covering small store fronts and some windows were shattered.  *Id.*  More people came to the area, and a third group formed.  *Id.*  One

group took over Interstate 880.  *Id.*  Other agencies that responded to that activity reported that people among that group threw bottles and set off fireworks.  *Id.*

Meanwhile, three blocks away from the PAB, officers reported that people among a crowd there were throwing rocks and bottles at officers.  *Id.*

At 9:21 p.m., up to 6000 people were in front of the PAB.  *Id.*  Some people among the crowd were throwing rocks and bottles at officers.  *Id.*  An additional group of up to 1,500 people was joining the crowd in front of the PAB.  *Id.*  Over the next few minutes, officers gave unlawful assembly and dispersal orders in English and Spanish.  *Id.*  Chemical agents were deployed.  *Id.*

At 9:42, an OPD officer was injured by fireworks shot at the officer.  *Id.*

At 9:48, two federal agents were shot in front of the federal courthouse, blocks away from City Hall and the PAB.  *Id.*  One agent died, and the other was critically injured.  *Id.*

Over the next four hours, there was significant vandalism, looting, and arson in Chinatown, Downtown, and Uptown.  *Id.* at 2.  There were also reports of Molotov cocktails being thrown at officers.  *Id.*

This OPD Radio Traffic (Ex. R) captured the challenging circumstances OPD officers faced on this night (*see e.g.,* 41:00 (reporting gunshots), 54:00 (declaring unlawful assembly), 1:02:00 (shooting of officers), 1:15:00-1:20:00 (protecting crime scene, reporting violent activity), 1:27:00 (guarding City Hall), 2:16:00 (reporting arson/projectiles), 2:45:00-2:52:00 (reporting car driving through store and looting)).



(depicting officers struck by fireworks near PAB).

**B.     May 30**

On May 30, there were fewer demonstrators. *Id.* at 3-7. OPD officers responded to extensive looting in Emeryville, as well as to vandalism, looting, and arson in Oakland. *Id.* Officers reported instances of rocks and bottles being thrown at them. *Id.*

**C.     May 31**

On May 31, there were peaceful protests during the day. *Id.* at 8-12. OPD officers helped facilitate these protests. *Id.*

At 5:34 p.m., officers attempted to stop a vehicle near City Hall. *Id.* The driver, a man, drove onto the sidewalk and then fled on foot. *Id.* As officers chased the man, who was armed, an adverse crowd attempted to block the officers. *Id.* Officers deployed chemical agents, detained the man, and recovered the gun. *Id.*

At around 8:30 p.m., widespread looting and violence began in Oakland and San Leandro. *Id.* All night long, OPD officers responded to extensive looting, shootings, and other violent activities. *Id.* A group fired shots at the PAB. *Id.* At one point, there were 574 outstanding service calls, including over 100 priority calls. *Id.*

Meanwhile, officers were also facilitating protests. *Id.* At 10:00 p.m., an OPD commander coordinated a moment of silence and kneeling with officers and protestors. *Id.*

The EOC deactivated at 4:30 a.m.

East Oakland—which is home to some of the City's most vulnerable communities with the fewest resources—was hard hit. *Id.* For instance, due to looting and vandalism, La Clinica de La Raza was unable to provide certain essential services to the community, as the provider's CEO explained:

> La Clinica is a 49-year-old federally qualified health center
> borne out of a movement of the civil rights movement of

the 1960s.  We believe that everybody has the right to access healthcare, and that's why we exist.  We understand the pain and the anger that our community is feeling, and we feel it too . . . And we know that our community is being disproportionally affected by the pandemic, by the virus.  We are reporting close to a 30 percent positive rate.  That is not what the rest of community is experiencing.  So we understand the issue of discrimination and not being treated equally.

So it's for this very reason that we are concerned about what's going to happen to our communities and to urge our colleagues to please respect the businesses and the organizations and the nonprofits that are there.  The code of pandemic is an outcome of the social injustices of the inequities that are in our system and today we had to close our clinics earlier. We had to board up in preparation. This past weekend our optometry clinic was vandalized. We now have graffiti on a number of our buildings.  So when we are struggling and working to make sure that there's more equity in our communities, it breaks our heart to see this kind of events happening in our very community.

So we are with you.  We know that many of our patients that are suffering don't have access to enough food.  They don't have access to income right now, and they are disproportionally hurt by what's going on.  So this added burden of not being able to receive services when they are needed because we have to lock down, hurts us and is counterintuitive to the very reasons that - that this movement is so actively and so vibrant.

Ex. M, EOC Press Conference, at 8-9 (June 2, 2020).

**D.    June 1**

On June 1, the Alameda County Sheriff's Office issued a county-wide curfew. Ex. N, Sheriff's Curfew Order (June 1, 2020).  The City also decided to adopt a temporary curfew.  San Francisco and other Bay Area cities had done so the night before.  As the City points out in the curfew order, the City resisted this extraordinary measure, recognizing the City's proud tradition of activism and the use of tools like curfews to oppress.  Ex. O, City's Curfew Order (June 1, 2020).  But the violence and destruction preceding the curfew made it necessary.  *Id.*

There were peaceful protests throughout the day, highlighted by a gathering of up to 15,000 people that started at Oakland Technical High School—on Broadway,

near 43rd Street—and marched to City Hall.  Ex. H, *Activity Log*, at 13-16.

By 7:00 p.m., this demonstration had ended, leaving two residual crowds.  *Id.*
One group, at Broadway and 8th Street, had about 1000 people.  *Id.*

By 7:36 p.m., the group in front of Broadway and 8th Street was smaller.  *Id.*
There were reports of rocks and bottles being thrown at officers, as well of a Molotov
Cocktail in the crowd.  *Id.*  As video submitted by Plaintiffs shows—*see*, *e.g.*, Dkt.
Nos. 24-1 and 25-1—people threw objects at officers, OPD made announcements,
and chemical agents were deployed.  *See also* Ex. P, Body-Camera Footage (depicting
events from behind the officers, who were mainly OPD officers on the left side and
another agency's officers on the right side).

By 8:08 p.m., OPD announced the curfew.  Ex. H, *Activity Log*, at 14-16.  At
8:20 p.m., after having made additional curfew announcements, OPD officers
detained a group near Broadway and 14th Street.  *Id.*  OPD officers cited and
released these individuals at nearby sites.  *Id.*

## IV.    THE ENSUING DAYS

Almost daily since June 1, there have been additional demonstrations and
gatherings.  Demonstrations have occurred without any major issue.  Allison decl., ¶
18.  There was some looting and vandalism.

After June 1, protestors violated the curfew in an act of civil disobedience;
OPD did not detain or cite anyone for curfew violations.  *Ibid.*

On June 4, the City lifted the curfew.

On June 19, there were mass marches and celebrations, starting in the
morning at the Port, passing by the PAB, and wrapping up at Lake Merritt.  OPD
helped facilitate these events.

## V.    MUTUAL AID

Especially during the first four days of protests, the City relied heavily on
mutual aid from the Alameda County Sheriff's Office and police departments from
across the Bay Area and state.  Allison decl.  ¶¶ 11-18.  The City has around 732

officers and can deploy only so many of them at any given time. *Id.* On nights, such as May 29 and June 1, when OPD is at once attempting to facilitate mass protests and respond to mass looting and violence throughout the City, mutual aid is critical. *Id.*

To the fullest extent possible, OPD attempts to deploy its officers on the front lines when responding to events. *Id.* This becomes challenging when there are multiple events happening at once, in various locations, and circumstances are rapidly evolving. *Id.*

Here is an estimate of the officers deployed during on the relevant days:

| DATE | OPD OFFICERS | MUTUAL AID OFFICERS |
|------|-------------|--------------------|
| **MAY 29** | 215 | 508 |
| **MAY 30** | 380 | 550 |
| **MAY 31** | 380 | 200 |
| **JUNE 1** | 380 | 222 |

*Id.*

During these days, mutual aid partners reported that they used force, including CS, smoke, and projectiles. *Id.*

Mutual aid partners have informed the City that if crowd control techniques—including chemical agents—are prohibited, these partners will not provide mutual aid. *Id.*

The U.S. Marshal, for instance, explained that mutual aid was needed to preserve the crime scene where two federal agents were shot. Ex. J, Email from U.S. Marshal (June 10, 2020). Further, he said this:

> If the City of Oakland refuses to allow the use of chemical agents as a last resort to quell rioting and violence, I will advise the Chief Judge and United States Attorney, that the Oakland Court House & Federal Building, and it's occupants, cannot be sufficiently protected during civil unrest, and recommend that all court proceedings be transferred to San Francisco or San Jose Court Houses for

1

2

3

4

5

> an indeterminate period.    Employees in the Oakland Federal building and United Court House rely on our Federal Protective Service, and the Oakland Police Department as first responders.    The safety of our employees, and members of the public is paramount. Banning the use of chemical agents/tear gas hampers our efforts to protect our employees and members of the public from rioters and violence.  It also undermines the rule of law and administrator [sic] of justice.

6    *Id.*

7    **VI.    REVIEW MECHANISMS**

8    As President Obama's *Task Force* pointed out, a department must critically

9    examine its operations after the fact.  After years of enhancing its procedures

10   through federal oversight of OPD, the City's processes for investigating the use of

11   force and complaints are among the most thorough and thoughtful in law

12   enforcement.

13   **A.    OPD Investigations**

14   First, OPD reviews all use of force.  *General Order K-4.*  For certain force

15   levels, OPD also convenes force review boards.  *General Order K-4.1.*  The federal

16   monitoring team observes many boards.  Within the five years preceding February

17   2020, the monitoring team had reviewed nearly 80 boards and agreed with OPD's

18   findings over 95% of the time.  *Allen v. City of Oakland*, C 00-4599 WHO, Dkt. No.

19   1358, Joint Statement, at 42-44 (Feb. 18, 2020).

20   Second, OPD is preparing an *After-Action Report*, which, among other things,

21   will include, "lessons learned and training opportunities, as well as an assessment of

22   the effectiveness and quality of the Operations Plans."  Ex. B, *TB III-G*, at 22.

23   Third, OPD's Internal Affairs Division is investigating each misconduct

24   complaint.

25   **B.    Oakland Police Commission and the CPRA**

26   In 2016, voters passed Measure LL, installing one of the most powerful

27   systems in the nation for civilian oversight of a police department.  Among other

28   levers, Measure LL created the CPRA, which is a civilian team that investigates

complaints involving use of force, in-custody deaths, profiling, and public assemblies. The CPRA is reviewing complaints stemming from the recent protests.

In addition, the Oakland Police Commission is empowered to "[p]ropose changes, including modifications to the Department's proposed changes, to any policy, procedure, custom, or General Order of the Department which governs use of force, use of force review boards, profiling based on any of the protected characteristics identified by federal, state, or local law, or First Amendment assemblies, or which contains elements expressly listed in federal court orders or federal court settlements. . ." Oakland Charter § 604.

### C.   Munitions Logs

At this stage, the City can offer munitions inventories, which show the munitions the authorized teams checked out and back in for each day. The inventories do not show where or what time the munitions were deployed. Nor do they account for any failed deployments. Here is a tally of what was not returned:

| DATE | CS | SMOKE | PROJECTILES |
|------|-----|-------|-------------|
| **JUNE 4** | 0 | 0 | 0 |
| **JUNE 3** | 0 | 0 | 0 |
| **JUNE 2** | 0 | 0 | 0 |
| **JUNE 1** | 31 | 4 | 3 |
| **MAY 31** | 19 | 4 | 8 |
| **MAY 30** | 65 | 10 | 6 |
| **MAY 29** | 91 | 7 | 0 |

Ex. I, *Munitions Logs*, (May 29, 2020 through June 4, 2020); *see* Ex. C, *TB V-F.2*, at 6-16 (July 2006).

As for projectiles, OPD does not use rubber pellets or bullets, but foam projectiles are a force option. *TB III-G*, at 15 (2013).

1  **PROCEDURAL HISTORY**

2  **I.     PLAINTIFFS' COMPLAINT AND MOTION**

3        On June 11, 2020, Plaintiffs filed a *Verified Application for a Temporary*

4  *Restraining Order and Class Action Complaint for Damages and Injunctive and*

5  *Declaratory Relief.*  Dkt. No. 1, Complaint.  Plaintiff Akil Riley verified the

6  complaint.  *Id.* at 19.

7        On June 13, 2020, Plaintiffs' counsel sent a copy to the City Attorney's Office.

8        On June 14, 2020, the parties filed a stipulation making Plaintiffs' TRO

9  application materials due on June 16, 2020 and the City's response to the TRO

10 application due on June 24, 2020.

11       On June 15, 2020, the City Attorney's Office accepted service for the

12 individually named defendants.

13       On June 16, 2020, Plaintiffs filed their application materials consisting of

14 video footage and the following declarations:

| DKT. | DECLARANT | STATEMENTS |
|---|---|---|
| **14** | Andrew Chan Kim | Mr. Kim is with the Siegel & Yee firm.  ¶ 1.  His declaration attaches footage allegedly depicting "OPD and/or local mutual aid" using force.  ¶ 4. |
| **15** | Sara Belle | Ms. Belle is a journalist.  ¶ 2.  She states that on May 30, at 11:20 p.m., near City Hall, "police" shot her with a rubber bullet.  ¶¶ 5-18. |
| **16** | Qiaochu Zhang | Mr. Zhang states that on June 1, he inhaled tear gas launched by "police" near Broadway and 8th Street.  ¶¶ 3-8.  Further, he states that he did not hear that an unlawful assembly was declared.  ¶ 21.  He states that he was detained and then cited and released near West Oakland BART station (1.2 miles away).  ¶¶ 16-25. |
| **17** | Niko Nada | Mr. Nada is a plaintiff.  He states that on June 1, he took part in the demonstration at Oakland Tech.  ¶ 6.  At around 7:45 p.m., he alleges, he thought that the protest was "declared unlawful," and he saw "officers" deploying tear gas, but he did not first see any "activity" or "criminal behavior" to warrant the deployment.  ¶¶ 9-16.  He alleges that "officers" approached him and other demonstrators.  ¶ 20.  The officers "demanded we all get |

| | | |
|---|---|---|
| | | on our knees," he alleges. ¶ 21. He alleges that he then attempted to help "pull an officer of a helpless demonstrator," when an OPD officer placed Mr. Nada in a chokehold and put his knee on his back. ¶¶ 22-32. |
| **18** | Melissa Miyara | Ms. Miyara states that on May 29, at 8:17 p.m., she joined a peaceful protest near City Hall and marched to the PAB, where they met "police in riot gear." ¶¶ 3-11. She states that she heard an undiscernible announcement and then saw "what looked like fireworks." ¶¶ 10-18. She could not tell if they came from the crowd or the police. *Id.* She then saw flashbangs and experienced tear gas, she states. *Id.* She explains that this was a disorientating, difficult ordeal; she believes that the "police turned [the protest] into a riot." ¶¶ 19-44. |
| **19** | Liam Cain | Mr. Cain states that on May 29, he saw "multiple incidents of police deploying tear gas on the crowd" and "projectile weapons," including "rubber bullets" fired at "peaceful protestors." ¶¶ 4-8. |
| **20** | Leila Mottley | Ms. Mottley states that on June 1, at around 7:40 p.m., she was trying to understand a "muffled announcement" when flashbangs and tear gas "erupted all around" a group of demonstrators near Broadway and 8th Street. ¶¶ 4-13. She explained that the experience was "terrifying" and "painful." ¶¶ 14-43. After June 1, she states, she was "scared" to "go back," but she decided "not to sacrifice [her] values." *Id.* |
| **21** | Jennifer Li | Ms. Li is a Plaintiff. Ms. Li states that on June 1, at around 7:40 p.m., she was "shot directly by a stinger ball and flashbang grenade." ¶¶ 3-17. She states that she felt "apprehensive" to protest again and still feels "traumatized," but she was able to protest again on June 3. ¶¶ 19-31. |
| **22** | Ian McDonnell | Mr. McDonnell is a Plaintiff. He alleges that on May 29, he saw OPD officers deploy tear gas; on May 31, "police officers" deployed gas; on June 1, OPD officers deployed tear gas. ¶¶ 2-47. He alleges that each deployment was not warranted. *Id.* He states that on June 1, he was detained by an OPD officer. *Id.* at ¶ 57. |
| **23** | Peter Sporn, M.D. | Dr. Sporn is a physician. ¶ 1. Among other things, he opines that the American Thoracic Society "is concerned that exposure to tear gas may affect COVID-19 transmission. A tear gas exposed person with asymptomatic COVID-19 would be unable to maintain a safe distance and is likely to spread the virus much more efficiently to bystanders, increasing the risk of infection. Protective masks would have to be discarded due to tear gas contamination, further increasing risks of spreading |

| | | or contracting the infection."  ¶ 20. |
|---|---|---|
| **24** | Erica Hruby | Ms. Hruby states that on June 1, she was at Broadway and 8th Street with other protestors "gathered in front of this blockade, chanting and holding up signs for  about 20 minutes, when at around 7:40 p.m., police started firing a ton of flashbang grenades and tear gas into the crowd."  ¶¶ 3-9.   She states that she was later detained and cited for violating the curfew order.  ¶¶ 23-46. |
| **25** | Christa Artherholt | Ms. Artherholt alleges that on June 1, at around 7:45 p.m., near Broadway and 8th Street, "nothing was really happening" when "police started throwing flashbangs, smoke bombs, and teargas into the crowd."  ¶¶ 3-14.  She alleges that at around 8:00 p.m., "police" announced that "there is a curfew and if we didn't leave, we would be arrested."  ¶¶ 32-54.  She states that there was nowhere to go, and she was cited.  *Id.* |
| **26** | Cat Brooks | Ms. Brooks is a cofounder of APTP.  ¶¶ 1-5.  She alleges that unspecified actions on May 29 are chilling APTP members' exercise of free speech but that APTP still plans to continue attending protests.  *Id.* |
| **27** | Anne Kelson | Ms. Kelson states that after nightfall, she was exposed to tear gas near the PAB.  ¶¶ 4-30. |

Plaintiffs do not seek provisional class certification.  Dkt. No. 1, Complaint; Dkt. No. 13, Motion.

## II.   TRO

On June 17, 2020, the parties attended a scheduling hearing.  The Court helped facilitate a stipulated temporary order which is in effect until July 2, 2020. Dkt. No. 34, Order (June 17, 2020).  The Court converted the TRO into a motion for preliminary injunction.  Dkt No. 35.

## III.   CITY COUNCIL RESOLUTION

On June 16, 2020, the City Council passed a resolution urging OPD and mutual aid partners to stop using tear gas for crowd control during the COVID-19 pandemic.  Ex. Q, Reso. (June 16, 2020).  Further, the resolution calls for the Oakland Police Commission to study this issue and to make policy recommendations.  *Id.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

L<small>EGAL</small> S<small>TANDARDS</small>

## I.     PRELIMINARY INJUNCTION

Federal Rule of Civil Procedure 65 "permits the issuance of a preliminary injunction to preserve the positions of the parties until a full trial can be conducted." *Pension Plan for Pension Trust Fund for Operating Engineers v. Weldway Const., Inc.*, 920 F.Supp.2d 1034, 1043 (N.D. Cal. 2013)(citing *LGS Architects, Inc. v. Concordia Homes*, 434 F.3d 1150, 1158 (9th Cir.2006)).

"A preliminary injunction is a matter of equitable discretion and is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Cal. v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). "Crafting a preliminary injunction is 'an exercise of discretion and judgment often dependent as much on the equities of a given case as the substance of the legal issues it presents.'" *Azar*, 911 F.3d at 582 (quoting *Trump v. Int'l Refugee Assistance Project*, —— U.S. ——, 137 S. Ct. 2080, 2087, 198 L.Ed.2d 643 (2017)).  The point of the relief "is not to conclusively determine the rights of the parties but to balance the equities as the litigation moves forward.'" *Id.*

To obtain this relief, the plaintiff must show that (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm without preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest.  *Winter*, 555 U.S. at 20, 129 S.Ct. 365. "When the government is a party, the last two factors merge." *Azar*, 911 F.3d at 575 (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).

"In addition, where injunctive relief is sought on a class wide basis, the moving party must prove that (1) the named plaintiffs face imminent, irreparable harm, and (2) there is reason to believe that the putative class members face the same harm." *Mandrigues v. World Savings, Inc.*, C 07–4497 JS, 2009 WL 160213, at *3 (N.D. Cal. June 20, 2009).

1

## II.    SECTION 1983 CLAIMS

2        Plaintiffs sued under 42 U.S.C. § 1983, alleging suppression of the right to

3   free speech and assembly, excessive force and unlawful seizure, and denial of

4   substantive due process in violation of the First, Fourth, and Fourteenth

5   Amendments.  Plaintiffs also assert a *Monell* claim against the City.

6        ### A.    First Amendment

7        To prove a First Amendment retaliation claim, Plaintiffs must prove that "(1)

8   [they were] engaged in a constitutionally protected activity, (2) the defendant's

9   actions would chill a person of ordinary firmness from continuing to engage in the

10  protected activity, and (3) the protected activity was a substantial or motivating

11  factor in the defendant's conduct." *Pinard v. Clatskanie Sch. Dist. 6J,* 467 F.3d 755,

12  770 (9th Cir.2006).

13       ### B.    Fourth Amendment

14       "Determining whether the force used to effect a particular seizure is reasonable

15  under the Fourth Amendment requires a careful balancing of the nature and quality of

16  the intrusion on the individual's Fourth Amendment interests against the

17  countervailing governmental interests at stake." *Graham v. O'Connor*, 490 U.S. 386,

18  396 (1989) (citations and internal quotation marks omitted). A court must evaluate

19  "the facts and circumstances of each particular case, including [(1)] the severity of the

20  crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the

21  officers or others, and [(3)] whether he is actively resisting arrest or attempting to

22  evade arrest by flight." *Id.* (citations omitted).

23       The Graham factors are not exhaustive.  *George v. Morris*, 736 F.3d 829, 837–38

24  (9th Cir. 2013).  Because "there are no per se rules in the Fourth Amendment excessive

25  force context," *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc), courts

26  must "examine the totality of the circumstances and consider 'whatever specific factors

27  may be appropriate in a particular case, whether or not listed in Graham[,]'" *Bryan v.*

28  *MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citations omitted). Other factors

1    relevant to the analysis include the availability of less intrusive alternatives to the

2    force used and giving proper warnings before using force, if feasible. *Glenn v.*

3    *Washington Cty.*, 673 F.3d 864, 872 (9th Cir. 2011).

4          "The 'reasonableness' of a particular use of force must be judged from the

5    perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

6    hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)).

7    This is because "[t]he calculus of reasonableness must embody allowance for the fact

8    that police officers are often forced to make split-second judgments—in circumstances

9    that are tense, uncertain, and rapidly evolving—about the amount of force that is

10   necessary in a particular situation." *Id.* at 396–97.

11         **C.     Fourteenth Amendment**

12         The standard is higher for Fourteenth Amendment claims.  As compared to

13   the Fourth Amendment's reasonableness standard, "the Due Process Clause is

14   violated by executive action only when it 'can be properly characterized as arbitrary,

15   or conscience shocking, in a constitutional sense[,]'" *Lewis*, 523 U.S. 845, 847 (1998)

16   (quoting *Collins v. Harker Heights*, 503 U.S. 115, 128 (1992)); accord *Porter v.*

17   *Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) ("[O]nly official conduct that 'shocks the

18   conscience' is cognizable as a due process violation.") (citing *Lewis*, 523 U.S. at 846).

19   "Where actual deliberation is practical, then an officer's 'deliberate indifference' may

20   suffice to shock the conscience." *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1230 (9th

21   Cir. 2013) (citing *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)).  Under this

22   standard, the plaintiffs must show that the officers acted with "conscious or reckless

23   disregard of the consequence[s] of [their] acts or omissions." *Tatum v. Moody*, 768

24   F.3d 806, 821 (9th Cir. 2014) (quotation omitted). "On the other hand, where a law

25   enforcement officer makes a snap judgment because of an escalating situation, his

26   conduct may be found to shock the conscience only if he acts with a purpose to harm

27   unrelated to legitimate law enforcement objectives." *Hayes*, 736 F.3d at 1230.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### D.    *Monell*

A city is liable under § 1983 if it maintained a custom, practice, or policy was deliberately indifferent to the plaintiff's constitutional rights, and the policy resulted in violation of those rights. *Monell v. Dep't of Social Servs. of New York*, 436 U.S. 658, 690–91 (1978). The plaintiff can establish a policy or custom (1) by showing "a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity;" (2) "by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision;" or (3) "by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (quotation omitted).

The practice or custom must be more than "random acts or isolated events" and instead, must be the result of a "permanent and well-settled practice." *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443–44 (9th Cir. 1988), overruled on other grounds by *Bull v. City and Cty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010). "[A] single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless" there is proof that the incident "was caused by an existing, unconstitutional municipal policy . . . ." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985).

### DISCUSSION

## I.    LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs have not shown that they will likely succeed on their claims. Plaintiffs' motion centers on the First Amendment, and the order they seek is for "protests" and demonstrations." *See* Dkt. No. 13, Motion, at 1. Plaintiffs contend that they are likely to succeed on the merits because an "indiscriminate use of force by police put peaceful participants in real and immediate danger of being harmed and interfered with plaintiffs' right to assemble and speak freely, and participants were harmed." *Id.* at 15.

A.     **First Amendment**

1.     **Protected activity**

For starters, Plaintiffs have not established that they were all engaged in constitutionally protected activity when they allegedly encountered police force.  Nor have all Plaintiffs established that they encountered police force.  The record contains no evidence as to APTP or CRC on these issues.

As for Mr. Ngo, he neither verified the complaint nor provided a declaration.

As for Mr. Riley, who did not submit a declaration but verified the complaint, there are bare, conclusory allegations that "[a]t the May 29, 2020, protest, a flashbang grenade hit him. The police shot teargas and flashbangs indiscriminately into the crowd. OPD were attacking people even as they were trying to comply with OPD. He helped organize the 15,000-person youth-led march on June 1, 2020."  Dkt. No. 1, Complaint, at 11, 19.  From this statement alone, it is not possible to draw reasonable inferences about the circumstances of this incident.

As for Mr. Nada, he states that when an OPD officer allegedly put him in a chokehold—which OPD policy prohibits—he was attempting to pull the officer from someone.  Dkt. No. 17, Nada Decl., at ¶¶ 20-32.

At the very least, then, as to five of seven Plaintiffs—APTP, CRC, Mr. Ngo, Mr. Nada, and Mr. Riley—there is no clear showing as to the circumstances that existed when they were allegedly subjected to improper force.

2.     **Chilling**

Second, Plaintiffs have not established that they were subjected to actions by OPD officers, and there is therefore no clear showing that the actions of OPD officers are having a chilling effect on Plaintiffs.  Hundreds of mutual aid officers assisted, at times using force.

Against that backdrop, in discussing deployments, the proffered declarations fail to distinguish between OPD officers and mutual aid officers.  Further, the limited submissions as to five of seven Plaintiffs—APTP, CRC, Mr. Ngo, Mr. Nada,

1   and Mr. Riley—make it even more challenging to infer a chilling effect.

2         In addition, many of the declarants said that they attended later protests and

3   others said they planned to do the same.  The demonstrations after June 1 occurred

4   without a major issue.  During the curfew, for instance, OPD helped facilitate

5   demonstrations after curfew hours and did not issue curfew citations.  And on June

6   19, there were inspiring, mass marches and celebrations.  On this day, the City

7   believes, APTP took part in an assembly in front of the PAB.

8         **3.    Motivating conduct**

9         Lastly, Plaintiffs have made no showing that the protected activity was a

10  substantial or motivating factor in any improper act by an OPD officer against a

11  Plaintiff.  To begin, Plaintiffs fail to differentiate between OPD officers and mutual

12  aid officers.  Further, while each use of force must be reviewed and judged on its own

13  merits, there is ample evidence in this record that OPD officers encountered violence

14  against them and others, arson, unlawful assemblies, and other activities

15  threatening public safety.

16        At bottom, there is no clear showing as to this prong.

17        **B    Other Claims**

18        Likewise, Plaintiffs have made no clear showing that they will likely prevail

19  on their Fourth or Fourteenth Amendment claims, or on their *Monell* claim.  For the

20  same reasons discussed as to the First Amendment claim, Plaintiffs have not

21  established that OPD used excessive force against them or that Plaintiffs can meet

22  the even higher standard for their substantive due process claim.

23        As for the *Monell* claim, OPD's polices and training on crowd management

24  and use of force speak to policies and training that would overcome the claim, even if

25  there is always room for enhancement.

26  **II.   IRREPARABLE INJURY AND THE PUBLIC INTEREST**

27        The equities do not favor changing OPD policy this way.  "Irreparable harm is

28  traditionally defined as harm for which there is no adequate legal remedy, such as

1  an award of damages." *Ariz. Dream Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th

2  Cir. 2014).  Here, Plaintiffs face no irreparable harm, and the status quo is in the

3  public interest.

4  First, as discussed above, Plaintiffs have made no clear showing that OPD

5  officers—as opposed to other agencies' officers—used excessive force against them.

6  And they have therefore made no clear showing that OPD officers' actions deter

7  them from participating in future demonstrations.

8  Second, mass marches and protests have occurred almost every day since

9  June 1, and they have gone well—just as they have in the past five years.  On June

10  2, for instance, OPD facilitated civil disobedience after curfew hours and issued no

11  curfew citations.  On June 19, there were mass marches and celebrations, including

12  in front of the PAB.

13  Third, OPD has a carefully drawn crowd management policy meant to protect

14  First Amendment rights.  As mentioned, it reflects substantial input from the court,

15  the National Lawyers Guild, the American Civil Liberties Union, and other civil

16  rights lawyers.  Under that policy, chemical agents are tool when other options are

17  not feasible.  And OPD uses this tool to avoid using a higher level of force.

18  Fourth, as discussed in detail throughout this brief, each use of force, each

19  complaint of misconduct, and all the OPD's operations are undergoing extensive

20  review by internal and outside bodies.

21  Fifth, there is a voter-approved process for changing policy on crowd

22  management and use of force.  The City Council and others have raised important

23  questions about the unknown relationship between chemical agents and COVID-19.

24  The Cities relies on the Alameda County Health Officer, who has prescribed some of

25  the most aggressive measures in the state to combat the pandemic.  *See* Alameda

26  County Health Department COVID-19 Updates (http://www.acphd.org/2019-

27  ncov.aspx). The Health Officer has not banned chemical agents.  All that said, OPD

28  takes all the guidance and concerns strongly into account and intends to adhere

1   strictly to the use of chemical agents as last resort.

2        Lastly, the Alameda County Sheriff's Office and the U.S. Marshals Services

3   informed OPD that they will not provide mutual aid if chemical agents are banned.

4   The loss of mutual aid resources would jeopardize public safety if the City were to

5   again face the level of mass protests, violence, and destruction that occurred from

6   May 29 through June 1.

7   **III.   STANDING**

8        For all the same reasons, Plaintiffs lack standing for injunctive relief.  To

9   have standing, "a plaintiff must allege that a "real or immediate threat" exists that

10   he will be wronged again.  *Save CCSF Coalition v. Lim*, C 14-5286 SI, 2015 WL

11   3409260, at *10 (N.D. Cal. May 27, 2015) (citing *City of Los Angeles v. Lyons*, 461

12   U.S. 95, 111 (1983)).  "The 'threatened injury must be certainly impending to

13   constitute injury in fact, and allegations of possible future injury are not sufficient.'"

14   *Ibid.* (citations omitted).

15        There must be a "'substantial risk' that the harm will occur."  *Ibid.* (citations

16   omitted).  "The alleged threat cannot be "conjectural" or "hypothetical," *Lyons*, 461

17   U.S. at 101–02, but must be a "credible threat of future injury," *The Presbyterian*

18   *Church (U.S.A.) v. United States*, 870 F.2d 518, 528–29 (9th Cir.1989) (quotation

19   marks and citations omitted).

20        "[P]ast exposure to illegal conduct does not in itself show a present case or

21   controversy ... if unaccompanied by any continuing, present adverse effects."

22   *Cuviello v. City & Cnty. of San Francisco*, 940 F.Supp.2d 1071, 1080 (N.D.Cal.2013)

23   (citation omitted).  A plaintiff "must demonstrate that [he is] realistically threatened

24   by a repetition of the violation" at issue. *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th

25   Cir.2006) (quotation marks and citations omitted, emphasis in original).

26        For all the reasons discussed in the previous sections, Plaintiffs have not met

27   this standard and thus lack standing.

28

1

## CONCLUSION

2      This is an important time in history.  The City recently declared in federal

3 court that institutional racism "is the biggest challenge . . . bar none, in every aspect

4 of running this city."  *Allen,* C 00-4599 WHO, R.T., at 41 (May 27, 2020).  In another

5 City leader's words, "the rage that we're seeing across the country is ancestral rage";

6 serving one's community and effecting change is a "moral and ancestral mandate."

7      Every City agency—especially OPD—is committed to this work.  Reducing

8 disparities—both within OPD and among OPD's interactions with the community—

9 is foundational to every policy, practice, and investment the OPD makes.

10      In the same way, the City's crowd management policy, as well as the City's

11 review and policy revisions procedures, are rooted in reform and legitimacy.  The

12 current crowd management policy is balanced towards protecting First Amendment

13 rights.  Within the past five years, OPD has faithfully executed this policy. The

14 extraordinarily challenging four days at issue in this case are undergoing extensive

15 review.  If any OPD officer used force that was out of compliance, he or she will be

16 held accountable.  And pursuant to OPD's policy, OPD will learn all it can from the

17 four days to continually improve as an organization.  In addition, the City has a

18 specific process for revising policies based on community input.

19      The City respectfully requests that at this stage, these procedures be allowed

20 to stand and work as designed.

21

22 Dated: June 24, 2020                    Respectfully submitted,

23

24                                        BARBARA J. PARKER, City Attorney
                                         DAVID A. PEREDA, Special Counsel

25

26                          By:    _____/s/ David Pereda___
                                   Attorneys for Defendant
27                                 CITY OF OAKLAND

28