1   WALTER RILEY, SBN 95919
LAW OFFICE OF WALTER RILEY
2   1407 Webster Street, Suite 206
Oakland, CA 94612
3   Telephone: (510) 451-1422
Facsimile: (510) 451-0406
4   Email: walterriley@rrrandw.com

5
DAN SIEGEL, SBN 56400
6   ANNE BUTTERFIELD WEILLS, SBN 139845
JANE BRUNNER, SBN 135422
7   SONYA Z. MEHTA, SBN 294411
EMILYROSE JOHNS, SBN 294319
8   ANDREW CHAN KIM, SBN 315331
SIEGEL, YEE, BRUNNER & MEHTA
9   475 14th Street, Suite 500
Oakland, California 94612
10   Telephone: (510) 839-1200
Facsimile: (510) 444-6698
11   Email: danmsiegel@gmail.com;
abweills@gmail.com;
12   janebrunner@hotmail.com;
sonyamehta@siegelyee.com;
13   emilyrose@siegelyee.com;
chankim@siegelyee.com

JAMES DOUGLAS BURCH, SBN 293645
National Lawyers Guild
558 Capp Street
San Francisco, CA 94110
Telephone: (415) 285-5067 x.104
Email: james_burch@nlgsf.org

Attorneys for Plaintiffs
ANTI POLICE-TERROR PROJECT,
COMMUNITY READY CORPS,
AKIL RILEY, IAN McDONNELL, NIKO
NADA, AZIZE NGO, and JENNIFER LI

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANTI POLICE-TERROR PROJECT, COMMUNITY READY CORPS, AKIL RILEY, IAN McDONNELL, NIKO NADA, AZIZE NGO, and JENNIFER LI, on behalf of themselves and similarly situated individuals,<br><br>        Plaintiffs,<br><br>  vs.<br><br>CITY OF OAKLAND, OPD Police Chief SUSAN E. MANHEIMER, OPD Sergeant PATRICK GONZALES, OPD Officer MAXWELL D'ORSO and OPD Officer CASEY FOUGHT,<br><br>        Defendants. | ) Case No. 3:20-cv-03866-JCS<br>)<br>) **REPLY IN SUPPORT OF PLAINTIFFS'**<br>) **MOTION FOR A PRELIMINARY**<br>) **INJUNCTION**<br>)<br>) Date: July 2, 2020<br>) Time: 11 a.m.<br>) Courtroom: *via Zoom*<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 2

I.    Defendants have Committed Egregious Violations of Plaintiffs' Constitutional Rights
and of their own Policies. ........................................................................................... 2

A.    OPD Used Excessive Force Against Nonviolent, Peaceful Demonstrators. ................... 2

B.    OPD and its Mutual Aid Partners Knowingly Exposed Peaceful Demonstrators to
Dangers they Created................................................................................................ 3

C.    May 29, 2020. ......................................................................................................... 4

D.    May 30, 2020. ......................................................................................................... 5

E.    May 31, 2020. ......................................................................................................... 5

F.    June 1, 2020 ........................................................................................................... 5

II.    OPD Controls and is Responsible for the Actions of Mutual Aid Partners. ................... 6

STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION ........................................ 7

I.    There are Serious Questions Going to the Merits, Which Will Likely Result in Success
on Plaintiffs' Claims.................................................................................................. 8

A.    The Record Shows First Amendment Violations Against the Exercise of Constitutional
Rights. .................................................................................................................... 8

i.    The Record Shows that OPD and its Mutual Aid Partners Took Actions that
Would Chill a Person of Reasonable Firmness. ................................................... 9

ii.    The Record Presents Serious Questions that OPD was Motivated by Retaliatory
Animus. ............................................................................................................ 10

B.    Plaintiffs Show that OPD Used Unlawful and Unreasonable Force Against Plaintiffs and
Declarants. ............................................................................................................. 10

C.    Plaintiffs' Fourteenth Amendment Claims are Uncontested by the City, and a
Preliminary Injunction Must issue to Protect Plaintiffs from Future Danger Created by the
Actions of OPD....................................................................................................... 11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

II.     Without a Preliminary Injunction, Plaintiffs will Suffer Irreparable Injury to the Exercise of Their Constitutional Rights; The Equities and Public Interest Sharply Tip to Protecting the Right to Protest. .................................................................................12

III.    Plaintiffs Have Standing to Pursue a Preliminary Injunction. .......................................13

CONCLUSION ............................................................................................................................15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*All. for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011) ..................................................................7

*Angotti v. Rexam*
    2006 WL 1646135 at *1 (N.D. Cal. June 14, 2006)...................................... 8

*City of Los Angeles v. Lyons*
    461 U.S. 95 (1983) ................................................................................... 14

*Cmty. House, Inc. v. City of Boise*
    490 F.3d 1041 (9th Cir. 2007.)................................................................... 8

*Cuviello v. City & Cty. of San Francisco*
    940 F. Supp. 2d 1071 (N.D. Cal. 2013).....................................................14

*Cuviello v. City of Vallejo*
    944 F.3d 816 (9th Cir. 2019) ..................................................................... 8

*Drakes Bay Oyster Co. v. Jewell*
    747 F.3d 1073 (9th Cir. 2014) ................................................................... 8

*Gest v. Bradbury*
    443 F.3d 1177 (9th Cir. 2006) ..................................................................14

*Kennedy v. City of Ridgefield*
    439 F.3d 1055 (9th Cir. 2006) ..................................................................12

*LaForest v. Former Clean Air Holding Co.*
    376 F.3d 48 (2d Cir. 2004) ....................................................................... 8

*Mandrigues v. World Sav., Inc.*
    2009 WL 160213, at *1 (N.D. Cal. June 14, 2009) .......................................... 8

*Melendres v. Arpaio*
    695 F.3d 990 (9th Cir. 2012) ..................................................................... 8

*Mendocino Envtl. Ctr. v. Mendocino Cty.*
    192 F.3d 1283 (9th Cir. 1999).............................................................9, 10

*Nelson v. City of Davis*

685 F.3d 867 (9th Cir. 2012)...................................................................................... 11

*Save CCSF Coal. v. Lim*

2015 WL 3409260, at \*1 (N.D. Cal. May 27, 2015) ..................................................... 13, 14

*The Presbyterian Church (U.S.A.) v. United States*

870 F.2d 518 (9th Cir. 1989)...................................................................................14

*Winter v. Nat. Res. Def. Council, Inc.*

555 U.S. 7 (2008). .................................................................................................7

**INTRODUCTION**

The City of Oakland argues that the Court should not issue a preliminary injunction because its policies, training bulletins, orders, settlements of previous lawsuits, federal monitoring, good intentions, the creation of a Police Commission, and resolutions make further orders of this Court unnecessary and superfluous. But the City's lengthy account of its historical inability to conduct constitutional policing during demonstrations and protests supports plaintiffs' argument that this Court's order, enforceable by contempt proceedings if necessary, is required to protect people exercising their rights to condemn police violence and demand racial justice in Oakland and throughout the United States. The issue here is not whether the City has good policies and procedures, but whether it has violated those policies and the U.S. Constitution.

The City's brief and supporting documents are remarkable for their failure to counter any of the evidence in the Verified Application and 14 declarations presented by plaintiffs. This witness testimony, which must now be considered completely uncontested, demonstrates that the Oakland police continue to flagrantly violate the very commitments they have been making since their 2004 settlement in *Coles v. City of Oakland,* N.D. Cal. C-03-2961 and 2962. See, defendants' Exhibit L (ECF No. 36-14), pp. 16-44, especially pp. 32-33, and 38, where OPD policy adopted under the *Coles* settlement forbids the use of wooden pellets and Stinger Grenades, Direct Fired Specialty Impact Less-Lethal Munitions (SIMS) for crowd control except in very limited circumstances, and restricts the large scale and indiscriminate use of tear gas - the very tactics employed by Oakland police and mutual aid forces on May 29 and 30 and June 1. The fact that Oakland police refrained from violating the constitutional rights of people attending Raiders football games or participating in generally small demonstrations for a five-year period when millions of people nationwide were not demanding major changes in public policy (see defendants' Exhibit G [ECF No. 36-9]), does not give them a pass from accountability for their gross violations of protestors' constitutional rights this spring.

Oakland also claims that any injunction issued by this Court that restricts the use of tear gas and other non-lethal weapons will cause its mutual aid partners to refuse to provide crowd control assistance and will even cause the closure of the Oakland federal courthouse and require

---

*APTP v. City of Oakland*, No. 3:20-cv-03866-JCS
Reply in Support of Plaintiffs' Motion for a Preliminary Injunction - 1

the transfer of all legal proceedings to San Francisco and San Jose. This argument is hard to credit, because (1) mutual aid forces have long been required to follow Oakland's crowd control policies, including restrictions on the use of non-lethal weapons (ECF No 36-3 at pp. 23-24); (2) Oakland's policies have included restrictions on use of non-lethal weapons since at least 2004; and (3) San Francisco has already or is considering its own tear gas restrictions.

STATEMENT OF FACTS

**I.  Defendants have Committed Egregious Violations of Plaintiffs' Constitutional Rights and of their own Policies.**

    **A.  OPD Used Excessive Force Against Nonviolent, Peaceful Demonstrators.**

The City of Oakland used hand-thrown and launched munitions including CS blasts, tear gas, and projectiles against demonstrators on May 29 through June 1, 2020. (ECF No. 36-11.) During these nights, OPD used nearly every less lethal munition in its arsenal against demonstrators in the streets of Oakland. (*Id.*) Plaintiff Ian McDonnell recounted that on May 29, the Oakland Police Department launched tear gas and less lethal grenades at him despite his peaceful behavior and the peaceful behavior of those around him. (ECF No. 22 at ¶¶ 6-15.) Plaintiff Akil Riley was also hit by a CS blast grenade and observed OPD attacking people. (ECF No. 1 at ¶ 73.)

On May 29, OPD threw CS blast munitions into the crowd, hitting Andrea Marina in the leg, burning through her jeans and causing lacerations and bruising. (ECF No. 1 at ¶ 44.) That same night, Liam Cain witnessed police fire projectile weapons at peaceful protestors, including at their torsos and faces. (ECF No. 19 at ¶¶ 5, 8.)

On May 30, 2020, a police officer shot a projectile into Daniel Sanchez's eye. (ECF No. 1 at ¶ 52.) A police officer in Oakland shot a projectile at journalist Sarah Belle Lin, hitting her inner thigh. (ECF No. 15 at ¶ 18.) Police officers then roughly shoved their riot shields at her. (*Id.* at ¶ 23.)

On June 1, 2020, Natalie Cerullo observed OPD officers brutalize a man who had his arms up and saw other OPD officers roughly drag another demonstrator who was kneeling. (ECF No. 1 at ¶ 63). OPD Officer Fought put Niko Nada in a chokehold, put his knee into his back with all his weight, and tightly zip tied his hands together causing him to suffer physical

---

*APTP v. City of Oakland*, No. 3:20-cv-03866-JCS
Reply in Support of Plaintiffs' Motion for a Preliminary Injunction - 2

injuries requiring medical attention. (ECF No. 1 at ¶ 75; ECF No. 17.) Azize Ngo witnessed a man with a bloody ear due to a projectile and saw OPD officers tackling kneeling people and forcing people to lay down through the threat of force with automatic weapons. (ECF No. 1 at ¶ 76.) Jennifer Li was also hit by a CS Blast grenade, which exploded on her back, causing her to sustain welts, blisters, and a perforation of her left eardrum. (ECF No. 1 at ¶ 77; ECF No. 21.)

## B.   OPD and its Mutual Aid Partners Knowingly Exposed Peaceful Demonstrators to Dangers they Created.

OPD policy permits the use of encirclement if the crowd has failed to disperse after the required announcement. (ECF No. 36-14 p. 37.) This tactic is used to allow for multiple simultaneous arrests. (*Id.*) OPD's policy states that "[p]ersons who make it clear (e.g. by sitting down) that they seek to be arrested shall be arrested and not subjected to other dispersal techniques, such as the use of batons or chemical agents." (*Id.*) Here, kettling was used before dispersal orders were given, in violation of OPD's policy. (ECF No. 1 at ¶ 11.) Moreover, kettling was used despite known concerns about COVID-19 and against the Alameda County Health Officer's order to maintain social distancing. (Exhibit A to the Declaration of EmilyRose Johns in support of Request for Judicial Notice ("Johns Dec.").)

Prior to the curfew going into effect, Abner Hougie was kettled along with 200 or so other peaceful demonstrators. (ECF No. 1 at ¶ 53.) On June 1, OPD again kettled demonstrators, including Emily Juneau. (*Id.* at ¶¶ 57, 65.) OPD kettled demonstrators before using dispersing tactics such as chemical agents and CS munitions against them. (*Id.* at ¶ 68.) In doing so, OPD violated its own policy by issuing two conflicting commands simultaneously so that demonstrators were denied the opportunity to comply with dispersal orders because they were trapped. (ECF Nos. 16 at ¶ 11; 24 at ¶¶ 28-32; 25 at ¶ 33.) Kettled non-violent demonstrators were shot at with projectiles, chemical agents, and CS Blast grenades in violation of OPD crowd control policy. (ECF Nos. 22 at ¶ 45; 36-14, p. 37.)

Furthermore, when OPD and its mutual aid partners encountered peaceful demonstrators, they were not wearing masks or facial coverings, and instead mocked demonstrators who brought that to their attention. (ECF Nos. 14 at ¶ 4(l); 17 at ¶ 41; 22 at ¶ 58; 24 at ¶40; 25 at ¶¶ 51-53.)

As a result of such tactics, Ian McDonnell, Christa Artherholt, Erica Hruby, and Anne Kelson were forced to break social distancing rules. (ECF Nos. 22 at ¶ 17; 24 at ¶ 39; 25 at ¶ 51; 27 at ¶¶ 25-26.)

### C.   May 29, 2020.

On May 29, Ian McDonnell, Liam Cain, Anne Kelson, and Melisa Miyara participated in the protests. (ECF Nos. 18 at ¶¶ 3-4; 19 at ¶ 5; 22 at ¶ 6; 27 at ¶ 4.) Kelson and Miyara were at the Oakland Police Department that evening. (ECF Nos. 18 at ¶ 6; 27 at ¶ 8.) They and other demonstrators were peacefully marching, chanting, and holding up signs. (ECF Nos. 18 at ¶ 11; 22 at ¶ 13; 27 at ¶ 9.) They wore masks and/or facial coverings, and to the best of their ability, tried to maintain social distancing. (ECF Nos. 22 at ¶¶ 17, 19; 29 at ¶ 24). At no point did they engage in criminal behavior or looting. (ECF Nos. 18 at ¶ 43; 22 at ¶¶ 14-15).

Kelson stated that prior to any announcement, police officers shot several rounds of concussion grenades. (ECF No. 27 at ¶¶ 10-11). A few minutes later, OPD announced that the demonstrators had a right to assemble. (*Id.* at ¶ 12.) McDonnell and the declarants did not witness anything that would have prompted a change in response, nonetheless, while peaceful demonstrators were chanting, "Hands Up, Don't Shoot, I Can't Breathe," OPD started indiscriminately shooting chemical weapons and other munitions at them. (ECF No. 27 at ¶ 15.) McDonnell stated that OPD also fired tear gas onto parallel streets to restrict the demonstrators' movements. (ECF No. 22 at ¶ 7.)

Prior to shooting such weapons, the OPD made an announcement that was hard to hear to most demonstrators, even to Miyara, who was at the "front line." (ECF Nos. 18 at ¶¶ 12-14; 27 at ¶¶ 14-15). Demonstrators, including Miyara, who has asthma, were not prepared to be tear gassed, nor did they expect police officers to use chemical weapons and other munitions against them. (ECF Nos. 18 at ¶¶ 19, 23; 22 at ¶¶ 10-11; 27 at ¶ 6.) Kelson stated that, to protect her health, she would not have attended the protest if she knew OPD planned to deploy chemical agents. (ECF No. 27 at ¶ 7.)

McDonnell, Kelson, and Miyara suffered harm including fear, terror, panic, shock, trauma, loss of breath, loss of sight, eye irritation, throat irritation, and an asthma attack. (ECF Nos. 18 at ¶¶ 25-39; 22 at ¶¶ 9-11, 17-18, 21-22; 27 at ¶¶ 18, 20, 22, 25, 28-29.)

1

2

### D.   May 30, 2020.

On May 30, journalist Sarah Belle Lin arrived at Latham Square Plaza at around 11:20 p.m. (ECF No. 15 at ¶ 6.) She wore her press badge and had a camera. (*Id.* at ¶ 7.) At no point was she engaged in criminal activity. (*Id.* at ¶ 9.) She witnessed police officers shoot multiple projectiles at demonstrators. (*Id.* at ¶ 17.) An unidentified officer shot a projectile into her inner thigh. (*Id.* at ¶ 18.) She fell to the ground in intense pain. (*Id.* at ¶ 20.) Officers then shoved their riot shields against her. (*Id.* at ¶ 23.) Lin suffered damages, including a large welt with bruising and swelling. (*Id.* at ¶¶ 27-28.)

### E.   May 31, 2020.

On May 31, the Anti Police-Terror Project ("APTP") sponsored a large caravan from the parking lot at Middle Harbor Shoreline Park. (ECF No. 36-10 p. 9.)  Plaintiff McDonnell rode his bike there. (ECF No. 22 at ¶ 23.) He witnessed many students, young people, and families with young children enjoying music and listening to speeches. (*Id.* at ¶¶ 24-26.) Suddenly, 20 police vans full of police officers and tactical trucks recklessly drove towards the crowd of people, jumped out of the vehicles, and started indiscriminately deploying chemical agents and munitions at them without warning. (*Id.* at ¶¶ 27-30.) Plaintiff McDonnell suffered damages including fear and eye irritation. (*Id.* at ¶¶ 34, 36.)

### F.   June 1, 2020.

On June 1, Plaintiff Riley organized a peaceful march from Oakland Technical High School to the Oakland Police Administration Building. (ECF No. 1 at ¶ 54.) This powerful and inspiring march started at 4 p.m. and ultimately amassed an estimated 15,000 demonstrators, including many young Black and Brown high school students. (*Id.*) At 5 p.m., after the march was fully under way, the County of Alameda issued a curfew order effective at 8 p.m. (*Id.* at ¶ 58.)

Plaintiffs Li, McDonnell, Nada, and Riley, and Christa Artherholt, Erica Hruby, Leila Mottley, and Qiaochu Zhang participated in the march. (ECF Nos. 16 at ¶ 3; 17 at ¶ 6; 20 at ¶ 4; 21 at ¶ 6; 22 at ¶ 43; 24 at ¶ 3; 25 at ¶ 3.)  They were all nonviolent and peaceful. (ECF Nos. 17 at ¶ 15; 21 at ¶ 7; 24 at ¶ 9; 25 at ¶ 54.)  Before the curfew order went into effect, OPD officers kettled them, blocking any opportunities for egress. (ECF Nos. 16 at ¶ 7; 17 at ¶ 7; 20 at ¶¶ 8, 13;

24 at ¶ 9; 25 at ¶ 51.) OPD then deployed chemical agents and munitions indiscriminately against them, including medics and journalists. (ECF Nos. 16 at ¶ 8; 17 at ¶ 11; 20 at ¶¶ 14-16; 21 at ¶ 9; 22 at ¶¶ 45, 51-52; 24 at ¶ 9; 25 at ¶ 10.) OPD also assaulted demonstrators, including Nada, who was put in a chokehold. (ECF Nos. 17 at ¶ 26; 22 at ¶ 56; 25 at ¶ 29.) McDonnell, Nada, Artherholt, Hruby, and Zhang were detained, arrested, and/or cited. (ECF Nos. 16 at ¶ 23; 17 at ¶ 39; 22 at ¶¶ 57, 60; 24 at ¶ 43; 25 at ¶ 53.) Although defendants claim demonstrators threw rocks, bottles, and other objects, including a Molotov Cocktail, at officers, none of the plaintiffs or declarants witnessed such acts, nor have defendants offered admissible evidence of anyone possessing a Molotov Cocktail during the protests. (ECF Nos. 17 at ¶ 42; 22 at ¶ 61; 24 at ¶ 19; 25 at ¶ 54.)

Plaintiffs and declarants suffered harm, including inhaling chemical agents, stress, gaslighting, chilled speech, blunt trauma, numbness, immense pain, fear, loss of sight, loss of breath, coughing, severe lung problems, trauma, skin irritation, eye irritation, welts, ripped skin, and a small perforation of the eardrum. Li had to begin taking anti-anxiety medication. (ECF Nos. 16 at ¶¶ 9, 12, 27; 17 at ¶¶ 28-29, 37; 20 at ¶¶ 19-20, 27-37, 40; 21 at ¶¶ 19-25. 29; 22 at ¶¶ 47, 51-52, 54, 24 at ¶ 45; 25 at ¶ 36.)

## II.   OPD Controls and is Responsible for the Actions of Mutual Aid Partners.

Beginning on May 29, Oakland called on its mutual aid partners for assistance in anticipation of protests following the murder of George Floyd. (ECF No. 1 at ¶ 70). OPD policy requires that it control mutual aid officers. (ECF No. 1 at ¶ 70; No. 36-3 at pp. 23-24.)[1] Nonetheless, defendants state that their mutual aid partners informed them that if chemical agents are prohibited, they will not provide mutual aid. (ECF No. 37 at p. 11.) This assertion is

---

[1] OPD's crowd control policy requires, in part:
"[T]he [OPD Incident Commander] shall be responsible for ensuring to the extent possible that mutual aid agencies:
1. Are briefed and in agreement with OPD's Unity of Command structure under which only OPD Commanders may authorize the use of less lethal munitions for crowd control and dispersal;
2. Are briefed on OPD's policy on prohibited weapons and force;
3. Do not bring or use any weapons or force that is prohibited under OPD's policy;
4. Are provided a copy of OPD's Crowd Control Policy and Use of Force policies;
5. Are not assigned to front-line positions or used for crowd intervention, control or dispersal unless there is a public safety emergency . . ." (ECF No. 36-3 at 20.)

---

1  contrary to longstanding policy and the current trend to eliminate tear gas as a crowd control

2  tactics in Bay Area cities.

3      Mayor London Breed has ordered the San Francisco Police Department to revise its

4  policies to prevent the use of chemical agents against civilians and to eliminate all chemical

5  agent supplies by the end of 2021. (Johns Dec., Ex. B.) The Berkeley City Council also voted to

6  prevent the use of tear gas by its police department and any law enforcement department

7  responding to the City of Berkeley for mutual aid. (Johns Dec., Ex C.)

8              **STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION**

9      A preliminary injunction should issue where a plaintiff demonstrates "he is likely to

10 succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

11 relief, that the balance of equities tips in his favor, and that an injunction is in the public

12 interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit also

13 asks whether there is a serious question going to the merits. "[S]erious questions going to the

14 merits and a hardship balance that tips sharply toward the plaintiff can support issuance of a

15 preliminary injunction, so long as the plaintiff also shows that there is a likelihood of

16 irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v.

17 Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). The court held that at the preliminary injunction

18 stage, in most cases, "the *better* question to ask [than whether plaintiff is likely to prevail] is

19 whether there are serious questions going to the merits." *Id*. at 1140 (emphasis in original).

20     Plaintiffs submitted numerous sworn statements from plaintiffs and other participants in

21 the demonstrations evidencing the Oakland Police Department's egregious use of force against

22 peaceful demonstrators participating in protected First Amendment activity. Plaintiffs' record

23 also shows similar heinous uses of force by mutual aid partners that the City of Oakland invited

24 to assist OPD. In response, defendants presented non-sworn hearsay statements such as

25 Activity Logs and an Open Letter to the Community. (ECF Nos. 36-10 and 36-12.) None of their

26 hearsay evidence contests plaintiffs' sworn statements and most of it demonstrates what

27 plaintiffs' record establishes: the Oakland Police Department used excessive force against

28 peaceful demonstrators night after night from May 29, 2020 to June 1, 2020. Plaintiffs'

uncontested sworn testimony raises serious questions that go to the merits.

Further, plaintiffs easily satisfy the other elements necessary for a preliminary injunction. Where the government is a party, the balancing of equities and the public interest inquiry merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014). The "balance of hardships tips sharply" in plaintiffs' favor where they raise "serious First Amendment questions." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007.) "[I]t is always in the public's interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). The Ninth Circuit does not "require a strong showing of irreparable harm for constitutional injuries." *Cuviello v. City of Vallejo* 944 F.3d 816, 833 (9th Cir. 2019). In any case, the evidence shows that people will continue to peacefully protest and allowing OPD's indiscriminate force will chill their efforts.

## I. There are Serious Questions Going to the Merits, Which Will Likely Result in Success on Plaintiffs' Claims.

### A. The Record Shows First Amendment Violations Against the Exercise of Constitutional Rights.

Defendants argue that plaintiffs will not succeed on the merits of their First Amendment claim because they have not established that they were engaged in constitutionally protected activity or that they all encountered police violence. (Response to Motion for Preliminary Injunction, ECF No. 36 ("Response") at 21:3-6.) Defendants' reliance on *Mandrigues v. World Sav., Inc.*, 2009 WL 160213, at *3 (N.D. Cal. June 14, 2009) for the proposition that each named plaintiff must submit an affidavit verifying the violations is inapplicable in the context of the constitutional violations in this case.

*Mandrigues*, an unreported case about unfair mortgage practices, acknowledged that there was no "directly controlling authority" on point and followed *Angotti v. Rexam*, 2006 WL 1646135 at *1 (N.D. Cal. June 14, 2006). *Angotti* considered the declarations of some, not all, named plaintiffs, as well as affidavits from "other similarly situated retirees." *Id.* at *3. *Angotti* relied on *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48 (2d Cir. 2004), which found a "sufficient foundation" in six affidavits from declarants representative of the class. *Id.* at *14-15.

Here, there is "sufficient foundation" for plaintiffs' claims in the parties' sworn testimony. Defendants offer evidence that APTP was engaged in constitutionally protected

activity and encountered the police, stating that APTP organized a caravan protest, and that OPD requested mutual aid regarding the protest. (ECF No. 36-10 at 9.) Plaintiff Akil Riley verified that he was at a protest, a protected activity, when police shot tear gas indiscriminately into the crowd and that OPD attacked people even as they were trying to leave. (ECF No. 1, ¶ 73.) Plaintiff Niko Nada was at a peaceful protest when police threw tear gas at Nada and other protestors. (ECF No. 17, ¶¶ 6-15.) Plaintiff Jennifer Li was peacefully protesting when police shot at her and others, threw tear gas and other projectiles. (ECF No. 21, ¶¶ 6-10.) Plaintiff Ian McDonnell was peacefully protesting when OPD launched tear gas and other projectiles. (ECF No. 22, ¶¶ 6-8.) Representatives of the class also declare that they were engaged in peaceful activities when the police forcefully encountered them. (ECF No. 27, ¶¶ 10-11; ECF No. 15, ¶¶ 1-18.)

### i.   The Record Shows that OPD and its Mutual Aid Partners Took Actions that Would Chill a Person of Reasonable Firmness.

Defendants argue that plaintiffs do not show that it was OPD, and not mutual aid officers, that engaged in force against protestors. (Response at 21:22-25.) Second, they argue that some protestors returned to the protests, demonstrating that they were not chilled. (Response at 22:2-3.) However, there is more than enough evidence in the record that OPD engaged in force against protestors exercising their rights. (*See* ECF No. 22, ¶¶ 6-8; ECF No. 1, ¶ 73; ECF No. 14, ¶ 4(h).) In any case, as discussed above, OPD must take responsibility for its mutual aid partners.

Defendants argument is unpersuasive. Plaintiffs are not required to demonstrate that their desire to participate in First Amendment Activities was chilled. Instead, plaintiffs are required only to show that the actions of OPD would chill a person of "ordinary firmness." *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) ("Because it would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity, we conclude that the proper inquiry asks whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities.")

Here, the protestors experienced reactions that would chill a person of ordinary firmness, such as anxiety, asthma attacks, skin peeling, wounds, trauma, and concerns about police disregard of COVID-19 safety measures. (ECF No. 20, ¶¶ 27-34; ECF No. 21, ¶¶ 1-31; ECF No. 25, ¶¶ 53.) One putative class member declared that she would not have attended the protest if she knew OPD planned to deploy chemical agents. (ECF No. 27 at ¶ 7.) APTP representative Cat Brooks declared that OPD's actions "chilled and continues to chill the exercise of free speech rights by members and supporters of APTP." (ECF No. 26, ¶ 4.)

ii.     **The Record Presents Serious Questions that OPD was Motivated by Retaliatory Animus.**

Even without discovery, the record presents serious questions about police motivations for its excessive force against peaceful protestors. "Intent to inhibit speech, which is an element of the claim can be demonstrated either through direct or circumstantial evidence." *Mendocino Envtl. Ctr.*, 192 F.3d at 1300-01 (internal quotations and citations omitted). "Inequitable treatment of plaintiffs by police" is circumstantial evidence. *Id.* at 1303.

Retaliatory animus can be inferred by the fact that OPD provided demonstrators only three minutes to comply with their dispersal order. (ECF No. 27 at ¶ 16). The many accounts of police seriously injuring peaceful protestors indicates inequitable, animus driven conduct. (ECF No. 1 at ¶ 52 (protestor shot in eye); ECF No. 21, ¶ 77 (protestor hit in back).) Police fired on people while they were kneeling and chanting "I can't breathe," a direct reference to police brutality. (ECF No. 147, ¶ 4(b).) Police fired upon a journalist who was clearly engaged in her craft, with a visible press pass and camera. (ECF No. 15, ¶ 1-21.) These facts present serious questions as to police motivation.

B.     **Plaintiffs Show that OPD Used Unlawful and Unreasonable Force Against Plaintiffs and Declarants.**

Defendants argue that plaintiffs have not established that OPD used excessive force against them "for the same reasons discussed as to the First Amendment." (Response at 22:17-22.) This argument does not address plaintiffs' showing through sworn statements that they and other demonstrators were subjected to uses of force despite violating no laws. Defendants' only argument is that plaintiffs have not shown that OPD was responsible for the force used against

1  them. (*Id.*)  This is not so. Plaintiffs demonstrate that OPD used unreasonable force against

2  them and others.

3      Defendants' own record shows OPD used unreasonable force against largely peaceful

4  crowds. In the video submitted as Exhibit P to the Declaration of David Perada, OPD can be

5  seen on June 1 hurling canisters of tear gas into crowds of people without any audible warning

6  in response to one or two individuals throwing plastic water bottles at police. (ECF No. 36-2, Ex.

7  P at 0:00-3:00.) Defendants could not point to any evidence that plaintiffs or declarants posed

8  any threat whatsoever. The indiscriminant use of tear gas against entire crowds where someone

9  in the crowd threw a plastic water bottle is clearly excessive force. *Nelson v. City of Davis*, 685

10  F.3d 867, 880 (9th Cir. 2012). This not only violates the Fourth Amendment, it violates OPD's

11  own crowd control policy. (ECF No. 36-3 at p. 14.)

12  **C.  Plaintiffs' Fourteenth Amendment Claims are Uncontested by the City,**
**and a Preliminary Injunction Must issue to Protect Plaintiffs from**
13  **Future Danger Created by the Actions of OPD.**

14      Plaintiffs' motion for a temporary restraining order argued that the OPD must be

15  restrained from using tear gar against demonstrators because their actions affirmatively placed

16  demonstrators at greater risk from COVID-19 by forcing participants to break social distancing

17  protocols. (ECF Nos. 22 at ¶ 17; 24 at ¶ 39; 25 at ¶ 51; 27 at ¶¶ 25-26.) Plaintiffs and declarants

18  were forced to abandon social distancing efforts due to tear gas and kettling by OPD and mutual

19  aid partners. (ECF Nos. 22 at ¶ 17; 24 at ¶ 39; 25 at ¶ 51; 27 at ¶¶ 25-26.) Plaintiffs also provided

20  uncontested scientific evidence about the severe negative health impacts of tear gas on lung

21  health and the unprecedented danger of its use during the COVID-19 pandemic. (ECF No. 23.)

22      It is uncontested that OPD used tear gas against demonstrators. (ECF No. 37 at 7-10.)

23  Defendants argue that the record is not clear as to which plaintiffs and declarants were

24  impacted by which law enforcement agencies' use of tear gas, CS blast grenades and projectiles

25  on the nights in which they participated in protest. (Response at 22:17-25.) This is not so as

26  plaintiff's record shows clearly that OPD used force against peaceful demonstrators. (*See supra*

27  section I.A.)

28

The well-established standard under the state-created danger doctrine is 1) danger is affirmatively created by state action, and 2) the danger to which plaintiffs and the putative class was exposed was known and obvious, and 3) the state actors acted with deliberate indifference to this known danger. *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1063 (9th Cir. 2006).[2] Plaintiffs' record shows that the OPD and mutual aid affirmatively created a danger to demonstrators by using tear gas and kettling, which forced the removal of masks and defeated social distancing efforts. (*See supra* section I.B.) The dangers of not social distancing are well known, and the City acted with deliberate indifference to the known dangers. Further, the harms of chemical agents on the lungs is well established, and defendants provide no evidence to counter Dr. Sporn's testimony on these issues.

## II. Without a Preliminary Injunction, Plaintiffs will Suffer Irreparable Injury to the Exercise of Their Constitutional Rights; The Equities and Public Interest Sharply Tip to Protecting the Right to Protest.

Defendants argue that the need for a preliminary injunction has not been demonstrated because plaintiffs have not shown that OPD versus other departments was responsible for the violence, indiscriminate uses of force have not occurred at every demonstration, OPD has a crowd control policy, OPD will review its own actions, Alameda County Public Health Department has not banned the use of chemical agents, and mutual aid has threatened not to respond to Oakland if it cannot use chemical weapons against Oakland residents for crowd control. (Response at 23:4-6.) None of these arguments tips the balance of the equities against plaintiffs and a preliminary injunction must issue.

As addressed extensively above, plaintiffs demonstrate that OPD is responsible for the unlawful actions of those officers and that OPD itself violated peoples' rights. These actions happened under the current crowd control policy, which demonstrates the policy's inefficacy in stopping OPD from using force against peaceful protesters. The evidence shows that defendants deployed chemical weapons when there was no threat, without giving time to disperse, and directly at sensitive body parts. OPD has been under federal receivership for nearly 20 years

---

[2] Defendants argue for a different standard: "shocks the conscience." (Response at 19:12-27.) Defendants do not argue, however, that their actions did not constitute a state-created danger, and plaintiffs' arguments are therefore uncontested.

because they have not been able to demonstrate to the satisfaction of a Federal Court judge that they can responsibly use force and examine their own uses of force. (Johns Dec., Ex D.) The City of Oakland has not demonstrated it can be trusted to review its own uses of force. Plaintiffs submitted uncontested sworn testimony of the harmful effects of chemical agents during the COVID-19 pandemic, which must be credited despite the silence of Alameda County Public Health officials on the subject. Finally, defendants' arguments regarding mutual aid is unavailing because some of the jurisdictions mutual aid points to, such as San Francisco, have implemented similar bans.

The equities weigh heavily towards protecting people from OPD's indiscriminate and unreasonable use of these weapons, and support a preliminary injunction to protect people from excessive force as they continue to protest.

## III.   Plaintiffs Have Standing to Pursue a Preliminary Injunction.

Standing to pursue a preliminary injunction exists where plaintiffs allege past unconstitutional conduct from the police, demonstrate that they wish to engage in future peaceable activity, and show that there is a credible threat of unlawful violence from the police against plaintiffs during future actions. *Save CCSF Coal. v. Lim,* 2015 WL 3409260, at *10-11 (N.D. Cal. May 27, 2015). Defendants argue that plaintiffs do not demonstrate a realistic threat of future violence by the Oakland Police Department. (Response at 24:8-25.)  However, plaintiffs' record and defendants' statements in opposition reveal a credible threat that force such as tear gas, CS blasts and projectiles will indeed be used against demonstrators in the future.

First, defendants argue that during the evenings of intense violence, the City was operating pursuant to a crowd control policy. (Response  at 3:6-5:4.) Their papers do not show that they will cease their use of tear gas, CS blast grenades, and projectiles against peaceful demonstrators. Plaintiffs' sworn testimony establishes that they and, in the case of APTP, their membership, will continue to protest and fear violence from the police. (ECF Nos. 26, ¶ 5; ECF No. 21, ¶ 24; ECF No. 22, ¶ 21.) Indeed, police including members of the Oakland Police Department used force used against plaintiff Ian McDonnell night after night while he was peacefully demonstrating. (ECF No. 22 at ¶¶ 6-15; 23-31; 43-48.) The record is clear that there

is a credible threat that if not enjoined, the City will continue to use chemical agents and munitions against peaceful demonstrators.

As in *Save CCSF*, defendants' practices are inconsistent. It appears that defendants are more than willing to continue to tear gas peaceful protestors and demand that mutual aid partners be able to do the same. As in *Save CCSF*, this "supports the plaintiffs' claim that defendants' conduct … has created fear, anxiety, and uncertainty among plaintiffs … with respect to their exercise now and in the future of these constitutional rights." *Id.* at *11. *Save CCSF* supports the issuance of an injunction to protect the public's right to peacefully protest.

*City of Los Angeles v. Lyons*, 461 U.S. 95, 110 (1983) does not support defendants because there the court found that one person, Lyons, did not face a real or immediate threat of being subjected to an illegal police chokehold again. Here, the plaintiffs and class comprise thousands of people who are certain to continue protesting.

In *The Presbyterian Church (U.S.A.) v. United States,* 870 F.2d 518, 529 (9th Cir. 1989), the court remanded the question of standing back to the district court, finding that the issue of whether the Immigration and Naturalization Service would spy on churches again was not fully briefed. Here, defendants are committed to the continued use of excessive force, including tear gas.

In *Cuviello v. City & Cty. of San Francisco,* 940 F. Supp. 2d 1071, 1083 (N.D. Cal. 2013), the court did not find allegations that plaintiffs would conduct similar demonstrations to the ones at issue in the case. Here, APTP has declared that it will continue to conduct protests, and the parties do not appear to dispute that these protests will continue. (ECF No. 26, ¶ 5.) In *Gest v. Bradbury*, 443 F.3d 1177, 1182 (9th Cir. 2006), laws were implemented to stop the Secretary of State from applying unwritten rules to reject petition signature sheets, and thus the harm had become too speculative. Here, defendants show no intention to cease using chemical weapons against peaceful protestors and engage in other excessive force.

///

///

///

**CONCLUSION**

Plaintiffs have more than met their burden for the issuance of a preliminary injunction. Even if defendants could show that an injunction would be superfluous and unnecessary, which they have not, they cannot show that they would be harmed by its issuance.

Dated:  June 29, 2020

SIEGEL, YEE, BRUNNER & MEHTA

By: ___*/s/ Dan Siegel*___
     Dan Siegel

Attorneys for Plaintiffs
ANTI POLICE-TERROR PROJECT,
COMMUNITY READY CORPS,
AKIL RILEY, IAN McDONNELL, NIKO
NADA, AZIZE NGO, and JENNIFER LI