UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANTI POLICE-TERROR PROJECT, et al.,

Plaintiffs,

v.

CITY OF OAKLAND, et al.,

Defendants.

Case No.  20-cv-03866-JCS

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION**

Re: Dkt. No. 13

## I.    INTRODUCTION

This case arises in the midst of ongoing demonstrations and protests sparked by the killing of George Floyd by a Minneapolis police officer.  In Oakland, these demonstrations began on May 29, 2020.  Plaintiffs allege that starting on that date, and "[o]ver the course of several days, OPD deployed constitutionally unlawful crowd control tactics including kettling,[1] indiscriminately launching . . .  tear gas and flashbangs into crowds and at individuals, and shooting projectiles at demonstrators."  According to Plaintiffs, OPD "did not act alone[,]" "call[ing] on its mutual aid network of police departments from other municipalities to further carry out its constitutionally violative tactics."  Plaintiffs filed this action on June 11, 2020, requesting that the Court enter a temporary restraining order and then a preliminary injunction that would be in place during the pendency of this case.  Based on the agreement of the parties, the Court on June 18, 2020 entered a temporary restraining order ("TRO") limiting the crowd control tactics and munitions OPD would

---

[1] According to Plaintiffs, "kettling" derives from a "military term referring to an army that is completely surrounded by a much larger force."  Complaint  ¶ 66.

be permitted to use.

Although the parties subsequently negotiated in good faith in an effort to agree on the terms of a preliminary injunction to replace the TRO, they were unable to resolve certain fundamental disagreements.  Accordingly, on July 29, 2020 the Court held a hearing to address Plaintiffs' request for a preliminary injunction and entered a preliminary injunction on the same date.  Dkt. No. 52 ("Preliminary Injunction").  In the Preliminary Injunction, the Court granted some but not all of the injunctive relief requested by Plaintiffs.  This Order sets forth the reasons for granting in part and denying in part Plaintiffs' preliminary injunction motion ("Motion").[2]

## II.     BACKGROUND

### A.     Allegations in the Complaint

Plaintiff Anti Police-Terror Project ("APTP") is a "Black-led, multi-racial, intergenerational coalition that seeks to build a replicable and sustainable model to eradicate police terror in communities of color." Complaint ¶ 16.  Plaintiff Community Ready Corps ("CRC") is "an Oakland-based community organization that combats white supremacy and actively builds and supports Black liberation." *Id*. ¶ 18.   Both APTP and CRC "frequently organize[ ] and lead[ ] protests against police misconduct."  *Id*. ¶¶ 16, 18.  Plaintiffs allege that "[m]embers and/or supporters of plaintiffs APTP and CRC participated in the protests on May 29, 2020 and June 1, 2020."  *Id*. ¶ 71.  Plaintiffs Akil Riley, Ian McDonnell, Nico Nada, Azize Ngo and Jennifer Li are residents of Oakland who allege that they participated in the protests that began May 29, 2020 and were subjected to unconstitutional crowd control measures.  *Id*. ¶¶ 20-24, 73-79.

Plaintiffs bring a putative class action on behalf of "[a]ll demonstrators who participated and/or intended to participate in the protests beginning on May 29, 2020 in Oakland," *id*. ¶ 81, against the City of Oakland, OPD Police Chief Susan Manheimer, OPD Sergeant Patrick Gonzales, and OPD Officers Maxwell D'Orso and Casey Fought.  Plaintiffs allege that the City of Oakland was and is "responsible for supervising, enacting, and enforcing the OPD's conduct,

United States District Court
Northern District of California

---

[2] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

policies, and practices; the absence of needed policies and practices; and for the hiring, retention, supervision, and training of employees and agents of the OPD, including" Chief Manheimer, Sergeant Gonzales, Officers D'Orso and Fought, and others yet to be identified.  *Id*. ¶ 26. Plaintiffs further allege that the City of Oakland is responsible for the "actions of the to-be-identified members of their mutual aid network including all assisting officers from Contra Costa County Sheriff's Department, Alameda County Sheriff's Department, San Mateo County Sheriff's Department, San Bruno Police Department, Redwood City Police Department, Menlo Park Police Department and California State University Police Department."  *Id*. ¶ 27.

In the Complaint, Plaintiffs allege that over the course of several days, OPD and its mutual aid partners used a variety of impermissible tactics against peaceful protesters, often without adequate warnings, causing physical injuries and trauma and "discourag[ing] members of the Oakland community from participating in lawful protest activities."  *See id.* ¶¶  17, 19 (alleging that OPD crowd control tactics have had and continue to have a chilling effect on the participation of APTP and CRC members and the Oakland community in peaceful protests);  ¶¶ 42-51 (alleging that on May 29, 2020 OPD declared a peaceful protest an unlawful assembly through a loudspeaker that was inaudible, threw a flash bang grenade without warning that hit a protestor and injured her, "threw tear gas canisters and additional flashbang grenades into the crowd, and shot rubber bullets at the demonstrators," "used stun guns and batons," and targeted journalists and medics); ¶ 52 (alleging that on May 30, 2020 near the corner of Broadway and 14th Street in Oakland a police officer shot a protestor in the eye with a rubber bullet);  ¶¶ 54-65 (alleging that on June 1, 2020 a group of demonstrators who had participated in a peaceful protest that began at the Oakland Technical High School were "kettled" at Washington Street and 8th Street in Oakland, near the Police Administration Building; that their egress was blocked and that OPD police officers "outfitted in full riot gear" "[w]ithout warning and before the curfew went into effect, . . . tear gassed, threw flashbangs, and started shooting rubber bullets at the confined demonstrators";   that "[m]any demonstrators were shot in the back as they were fleeing the violent measures employed by police, only to be impeded by police lines kettling them from all directions"; that the "indiscriminate use of tear gas continued for an hour or so, forcing

United States District Court
Northern District of California

demonstrators to intermittently remove their masks to breathe and to clean their faces, making them more vulnerable and susceptible to COVID-19 infections"; that "OPD then arrested demonstrators and applied zip ties to their wrists in lieu of handcuffs" and cited demonstrators "for breaking curfew, including those who otherwise intended to comply but were trapped by OPD"); ¶ 64-65 (alleging that OPD officers were not wearing masks despite being in close contact with demonstrators).

Plaintiffs allege that in using these tactics, OPD "knowingly created a danger to public health by forcing demonstrators to break social distancing rules that are currently in place due to the COVID-19"  and "made [them] more vulnerable and susceptible to COVID-19 infections" by using chemical irritants that forced the demonstrators to remove their masks and cough.  *Id*. ¶¶ 5, 48.  They also allege that while OPD justified these tactics by "claim[ing] demonstrators were inciting violence, throwing Molotov cocktails, assaulting officers, throwing rocks and bottles at officers, and destroying property," these claims were false and there is "[n]o evidence" to support them.  *Id. ¶* 10.  Instead, they allege that this conduct was aimed at "discourag[ing] participation by the public" in the demonstrations.  *Id*.

Plaintiffs assert claims under 42 U.S.C. § 1983 based on alleged violations of the First Amendment rights to freedom of speech and assembly; the Fourth Amendment right to be free from the use of excessive force and unlawful seizure; and the Fourteenth Amendment right to substantive due process.  *Id. ¶¶* 94-102.  In addition, Plaintiffs bring a claim for supervisory liability under *Monell* against the City of Oakland and Chief Manheim based on alleged unconstitutional customs and practices, namely, failure to adequately supervise and train police officers under their control or to hold them accountable for "interfering with people's First Amendment rights to freedom of speech, assembly, and association[,]" "punishing people in retaliation for the exercise of" their First Amendment rights and "engaging in excessive force against people exercising their First Amendment rights."  *Id*. ¶¶ 103-108.

United States District Court
Northern District of California

**B.   Events of May 29 through June 1, 2020**

**1.   Plaintiffs' Evidence**

In support of their request for a temporary restraining order and preliminary injunction, Plaintiffs submitted numerous sworn declarations describing encounters they and other protestors had with police while they were participating in protests in downtown Oakland between May 29 and June 1, 2020.  These declarations are summarized below.

**a.   May 29, 2020**

Several declarations offered by Plaintiffs are by individuals who participated in a demonstration that began at Frank Ogawa Plaza, at Broadway and 14th Street, on May 29, 2020 at 8:00 p.m. and proceeded to the Police Department Headquarters on Broadway and 7th Street.  *See generally,* Declaration of Ian McDonnell ("McDonnell Decl."); Declaration of Anne Kelson ("Kelson Decl.");  Declaration of Melissa Miyara ("Miyara Decl.").  Demonstrators held up signs and chanted the names of victims of police violence.  Kelson Decl. ¶ 9; Miyara Decl. ¶ 11. They wore masks and attempted to maintain social distance.  McDonnell Decl. ¶  4; Kelson Decl. ¶ 24. Despite what these individuals describe as a peaceful protest, *see* McDonnell Decl. ¶ 6;   Kelson Decl. ¶ 3;  Miyara Decl. ¶ 11,  OPD "kettled" the demonstrators by tear gassing parallel streets, McDonnell Decl., ¶ 7, and began launching concussion grenades into the crowd.  Kelson Decl. ¶¶ 8, 10-11.  OPD gave a dispersal order, giving demonstrators three minutes to disperse, Kelson Decl. ¶ 13, but the announcement was difficult to hear because the loudspeaker was bad and OPD was still launching concussion grenades into the crowd. Kelson Decl. ¶ 14; Miyara Decl. ¶¶ 12-14; McDonnell Decl. ¶ 20.  One demonstrator stated in her declaration that even though she was at the front of the demonstration and could hear that an announcement was being made, she could not make out the words of the announcement because the amplification was bad and people were booing.  Miyara Decl. ¶ 14.  Another never heard any warning.  McDonnell Decl. ¶ 20.

According to these declarants, police officers then began indiscriminately launching tear gas and flashbang grenades and shooting projectiles at the demonstrators.  McDonnell Decl. ¶ 8; Cain Decl. ¶ 5; Kelson Decl. ¶¶ 11, 16; Miyara Decl. ¶¶ 17-18.  One demonstrator who has asthma did not bring an inhaler because she did not expect to be tear gassed; she described being

5

1    "terrified" and unable to breath as she sprinted down Broadway.  Miyara Decl. ¶¶ 18-41.  Another

2    described the amount of tear gas used as "immense" and described the scene at the lobby of an

3    apartment building where she and other protestors went, "choking for air, applying water and

4    Maalox to wash away the tear gas."  Kelson Decl. ¶¶ 17-23. She states that she "would have likely

5    not attended the protest if [she] thought [she] would be tear gassed" *id.* ¶ 7, and that she is still

6    "shocked to the core."  *Id.* ¶ 18.   Yet another stated that he was "traumatized" and that the

7    experience discouraged him from participating in protests the following day.  McDonnell Decl. ¶

8    21.

9          Plaintiffs submitted video footage from this incident showing police officers throwing

10   flashbang grenades and tear gas towards the protestors.  Kim Decl. ¶ 4(a)-(c), (f).  Time stamps on

11   one of the videos indicate that this occurred before 9:24 p.m.

12         Plaintiffs also submitted evidence that at 10:28 p.m., a Black couple was forced by police

13   to be fully prone on the sidewalk at the corner of Franklin and 7th Streets. Kim Decl. ¶ 4(h).   In

14   addition, they submitted video footage of police using tear gas and flash bang grenades at 10:28

15   p.m. and 11:08 p.m. on Broadway between 7th and 8th Streets, Kim Decl. ¶¶ 4(d) & (e), and again

16   shortly after midnight (on May 30) on 7th Street between Broadway and Franklin.  Kim Decl. ¶

17   4(b).

18              b.   May 30, 2020

19         Plaintiffs offer a declaration by a journalist who states that on May 30, 2020 she went to a

20   protest at Latham Square Plaza to "document events on [her] cell phone and DSLR camera."

21   Declaration of Sarah Belle Lin ("Lin Decl.") ¶¶ 5-6.  According to Lin, she had a press pass and

22   was obviously carrying a camera.  *Id.* at ¶ 7.  Lin heard what sounded to her like rubber bullets

23   being shot by police and then was hit by one on her inner thigh, causing "intense pain."  *Id.* ¶¶ 13-

24   20; *see also* Lin Decl. ¶ 28 (picture of large bruise on Lin's thigh).  At the time she was hit, she

25   states, there was no one near her.  *Id.* ¶ 19.  A few minutes later, when she could stand, she went to

26   the sidewalk opposite Latham Square Plaza to recuperate.  *Id.* ¶ 22.  According to Lin, "[w]ithin

27   one minute, [she] was being roughly shoved by the police using their riot shields against [her]."

28   *Id.* ¶ 23.  She yelled that she was a journalist and asked why she had been shot but received no

United States District Court
Northern District of California

response.  *Id.* ¶¶ 25-26.

### c.   May 31, 2020

Plaintiffs offer a declaration by Plaintiff Ian McDonnell describing the police response to a protest in which he participated that began as a car caravan at the Port of Oakland and culminated in a demonstration at Frank Ogawa Plaza.  *See* McDonnell Decl. ¶¶ 23-36.  They have also submitted video footage from that event. *See* Kim Decl. ¶ 4(i).  According to McDonnell, the crowd included many families with young children and the atmosphere was "chill" with "music and nice speeches."  *Id.* ¶¶ 24-25.  Even though everything had been peaceful, however, at mid-day about 20 police vans full of police officers and tactical trucks drove "recklessly" into a crowd of people.  *Id.*  ¶¶ 26- 27.  McDonnell states that the police officers "jumped out of the vans and started tear gassing the crowd" and throwing flash bang grenades without giving any warnings. *Id.*  ¶¶ 29-31.  He states that he assisted some of the demonstrators who had been tear gassed because he had brought eyewash and bandages with him.  *Id.* ¶¶ 32-34.

### d.   June 1, 2020

Plaintiffs have offered the declarations of numerous individuals who participated in a youth-organized protest that occurred on June 1, 2020, beginning at the Oakland Technical High School at 4 p.m.  *See generally* Declaration of Christa Artherholt ("Artherholt Decl.');  Declaration of Erica Hruby ("Hruby Decl.");  Declaration of Jennifer Li ("Li Decl."); McDonnell Decl.;  Declaration of Leila Mottley ("Mottley Decl."); Declaration of Niko Nada ("Nada Decl.");  Declaration of Qiaochu Zhang ("Zhang Decl.").  According to their accounts, at around 5 p.m., the demonstrators received a notification through their phones advising them that the County of Alameda issued a curfew order for 8 p.m.  Hruby Decl. ¶ 5; Mottley Decl. ¶ 5.   They state that even before that curfew went into effect, however, OPD started kettling demonstrators. McDonnell Decl. ¶¶ 45-46; Hruby Decl. ¶ 32.  Demonstrators were wearing masks and attempting to maintain social distance, but because of the kettling, they were unable to maintain social distancing.  Nada Decl. ¶ 8; Hruby Decl. ¶¶ 38-39; Artherholt Decl. ¶¶ 49-51.  Many police officers at the scene were not wearing masks. Zhang Decl. ¶ 5.

At some point OPD made an announcement, but the declarants state that it was muffled

United States District Court
Northern District of California

and hard to hear.  Nada Decl. ¶ 9; Li Decl. ¶ 8; Mottley Decl. ¶¶ 10-11; Zhang Decl. ¶¶ 10, 21. They recount that at around 7:40 p.m., OPD fired tear gas, flashbang grenades and projectiles at the demonstrators.  McDonnell Decl. ¶ 46; Nada Decl. ¶ 13; Li Decl. ¶¶ 6-9; Artherholt Decl. ¶¶ 10-11; Hruby Decl. ¶ 9; Mottley Decl. ¶¶ 12-13.  Participant Jennifer Li states in her declaration that she was hit by a stinger ball and by a flashbang grenade, which exploded on her back and perforated her eardrum, causing her to experience high levels of anxiety and to be scared to participate in further protests.  Li Decl. ¶¶ 9-14, 23-24. Plaintiffs have submitted video footage that shows these tactics being used, including footage taken from a helicopter.  Artherholt Decl. ¶ 17; Kim Decl.  ¶ 4(k); Hruby Decl. ¶¶ 10, 22; Zhang Decl. ¶ 10. According to one participant, even after the majority of demonstrators left the area, OPD fired more tear gas into the small and peaceful crowd of protestors. Artherholt Decl. ¶¶ 12-18.   Artherholt submitted video footage of this.  *Id*. ¶ 25.

According to the accounts of the participants, demonstrators who had fled the earlier use of tear gas were peacefully gathered at Frank Ogawa Plaza around 8:00 p.m.  Artherholt Decl. ¶ 30; Hruby Decl. ¶¶ 23-26.  At that point, police made an announcement that there was a curfew and if demonstrators did not leave, they would be arrested.  Artherholt Decl. ¶ 32.  They state that as demonstrators attempted to comply and leave, police kettled them between 14th and 15th Streets on Broadway. Artherholt Decl. ¶¶ 33-34; Hruby Decl. ¶¶ 28-32;  *see also* Artherholt Decl. ¶ 40 (video footage).  The Officers then arrested demonstrators by tackling them and/or touching them. Kim Decl. ¶ 4(h); Hruby Decl. ¶¶ 32-37; Artherholt ¶¶ 33-47.

The declaration of Plaintiff Nada indicates that at some point during these events, he heard demonstrators calling for help and that when he tried to pull an officer off a "helpless demonstrator" he was placed in a chokehold by Officer Fought (a defendant in this case), who pushed Nada to the ground and put his knee in Nada's back using all his weight.  *Id*. ¶¶ 26-29. Nada further states that Officer Fought incorrectly used zip-ties on him that went over his thumb and knuckle and were too tight, "roughhoused him," and did not give Nada his badge number.  *Id.* ¶¶ 30-40.

 During these arrests, the police were not wearing masks or facial coverings. McDonnell

8

Decl. ¶¶ 56-59; Nada Decl. ¶¶ 26-27, 41; Hruby Decl. ¶¶ 35-36, 40.  According to McDonnell, he was arrested by Defendant Officer D'Orso; when McDonnell commented that Officer D'Orso was not wearing any facial covering, Officer D'Orso laughed.  McDonnell Decl. ¶ 58.  The declarants state that demonstrators were cited and released for breaking curfew. McDonnell Decl. ¶ 60; Nada Decl. ¶ 39; Hruby Decl. ¶¶ 34, 37.

The declarants who described the events of June 1 stated that when these police tactics were used the protestors were peaceful; many explicitly stated that they observed no illegal activity, including anyone making or throwing Molotov cocktails.  Zhang Decl. ¶ 3;  Nada Decl. ¶¶ 14-16, 42; Mottley Decl. ¶¶ 9-14 ; Li Decl. ¶¶ 6-7;  McDonnell Decl. ¶ 62; Hruby Decl. ¶¶ 9, 15, 19, 26; Artherholt Decl. ¶¶ 6, 16, 54.

### 2.  Defendants' Evidence

Defendants have offered two declarations in support of their Opposition to the Motion, one by their attorney, David Pereda, and another by Darren Allison, Interim Assistant Chief of Police at OPD.  Neither declaration specifically addresses the incidents described by Plaintiffs in their complaint and in the declarations described above.  However, Assistant Chief Allison has submitted activity logs from the Oakland's Emergency Operations Center covering the period between May 29, 2020 and June 8, 2020.  Declaration of Darren Allison ("Allison Decl.") ¶ 16 & Ex. H ("Activity Logs").  The Activity Logs contain reports by OPD officers of activity related to demonstrations in Oakland, as well as reports of looting, Molotov cocktails being thrown and other illegal activities.  Below, the Court summarizes the activity described in the logs for the relevant days:

**May 29**: At 8:58 p.m., there was a report that approximately 3,000 demonstrators were congregating near the Oakland Police Headquarters at Broadway and 7th Street and that some demonstrators were throwing bottles at officers. Allison Decl., Ex. H at 2. At 9:04 p.m., there was a report that demonstrators at Broadway and 10th Street were throwing bottles and rocks at officers. *Id.*  At 9:21, there was a report that the group of demonstrators had grown to between 5,000 and 6,000, demonstrators and that demonstrators continued to throw rocks and bottles at officers. *Id.* Officers then declared an unlawful assembly and made announcements for the group

9

to disperse. *Id.* Around this time, there was a report that an additional group of 1,500 to 2,000 protestors approached the main group of demonstrators. *Id*. At 9:24 p.m., there was a report that officers announced additional unlawful assembly orders in English and Spanish. *Id*. at 3. At 9:27 p.m., there was a report that officers deployed tear gas at Broadway and 7th Street and the demonstrators scattered north and east. *Id*. At 9:33 p.m., there was a report that additional tear gas was deployed and demonstrators returned to Frank Ogawa Plaza. *Id.* Officers received reports of vandalism at 9:36 p.m. *Id*. At 9:42 p.m., there was a report that an OPD officer was injured by fireworks. [3] *Id*. At 9:48 p.m., there was a report that two Federal Protective Service officers were shot at the federal building at Jefferson Street and 12th Street. *Id*. At 9:57 p.m., there was a report that approximately 1,000 demonstrators remained near Oakland Police Headquarters. *Id*. There were reports of vandalism at City Hall at 10:07 p.m. There were reports that Molotov cocktails were thrown at officers at Franklin and 7th Streets at 10:09 p.m. and at Broadway and 8th Streets at 10:34 p.m. *Id.* Until approximately 1:00 a.m., there were continued reports of vandalism, looting, and fires in Chinatown, City Center, and the Broadway and Telegraph corridors. *Id*. At 12:59 a.m., there was a report that one person had been taken into custody for assaulting an officer with a vehicle. *Id.*

**May 30**: On May 30, 2020, there were reports of looting in Emeryville that began around 7:30 p.m. and continued until at least 10:00 p.m. *Id*. at 4-5. There was a report after 9:00 p.m. that around 500 demonstrators were gathered near Henry J. Kaiser Park and Broadway and 14th Street. *Id*. at 5. At 9:14 p.m., there was a report that demonstrators threw rocks at officers at Broadway and 12th Street. *Id.* There was a report that a group of demonstrators was moving southbound on Market Street around 9:40 p.m. *Id*. There was at least one report of looting near Broadway and 17th Street at 9:48. *Id.* There was a report that in Emeryville, shots were fired near the Decathlon at 9:55 p.m. *Id*. At 10:09 p.m., California Highway Patrol officers reported taking rocks, bottles, and explosives at Market Street and 6th Street. *Id*. There were reports that at 10:15 p.m., demonstrators had moved into Frank Ogawa Plaza and at 10:28 p.m., some demonstrators

---

[3]At the July 29, 2020 hearing, Defendants' counsel stated that he believed this injury occurred near Oakland Police Headquarters.

began to throw bottles and rocks at officers.  *Id*. at 6. There were reports that from approximately

10:30 to 11:45 p.m., groups of demonstrators dispersed in the streets surrounding Frank Ogawa

Plaza, and there were reports of fires, looting, and rock, brick, and bottle throwing in the area. *Id*.

There were reports that similar unrest along Telegraph and Broadway continued until

approximately 2:00 a.m.  *Id*. at 6-8.

   **May 31**: There were reports that between noon and 1:30 p.m., demonstrators gathered at

Lake Merritt for a protest that remained peaceful.  *Id*. at 9.  There were reports that around 1:40

p.m., a caravan of vehicles gathered in a parking lot near Middle Harbor Shoreline Park in the Port

of Oakland.  *Id*.  There were reports that this caravan grew to approximately 5,000 vehicles by

2:23 p.m. and remained peaceful.  *Id*.  There were reports that around 3:00 p.m., the caravan

moved into downtown Oakland and some groups separated from the main caravan and peacefully

gathered at Frank Ogawa Plaza.  *Id*. at 10.[4]

   **June 1**: There were reports that from 4:00 to 5:00 p.m., a crowd of demonstrators at

Oakland Technical High School grew from 2,000 to approximately 5,000 individuals.  *Id*. at 15.

There were reports that at around 5:20 p.m., the crowd began marching towards Frank Ogawa

Plaza and that by 5:34 p.m., the group had grown to approximately 10,000.  *Id*.  There were

reports that by 6:00 p.m. the demonstrators had reached Frank Ogawa Plaza and by 6:30 p.m. the

crowd had grown to 15,000 individuals.  *Id*.  There were reports that at around 7:00 p.m. the

demonstrators numbered around 8,000, split into three groups, and at 7:16 p.m. 1,000

demonstrators approached the Police Headquarters.  *Id*.  There were reports that at 7:36 p.m., the

protestors near Police Headquarters began throwing rocks and bottles.  *Id*.  There were reports that

officers then made dispersal announcements and deployed tear gas.  *Id*.  There were reports that

the crowd dispersed in two directions and at around 7:45 p.m. there were reports of an individual

---

[4] Later that day, there were reports that groups protested on I-580, near the Oakland Police
Headquarters, and other parts of downtown Oakland.  *Id*.  There were reports that the
demonstrations were sometimes peaceful, but other times included violence and agitators.  *Id*.  In
addition, there were reports of widespread looting and sporadic fires in Emeryville and Oakland
and reports of gunfire that evening.   *Id*. at 11-12.  All of these activities occurred after the events
and alleged police misconduct described by Plaintiffs in their complaint and declarations.

United States District Court
Northern District of California

with Molotov cocktails at Washington Street and 8th Street.  *Id.*  There were reports that by 8:02

p.m., around 200 demonstrators had retreated to Frank Ogawa Plaza and another 400

demonstrators had returned to Oakland Technical High School.  *Id.* at 15-16.  Over the next hour,

there were reports that officers detained demonstrators for curfew violations as groups generally

dispersed.  *Id.* at 16.  Police reported that by 9:05 p.m. they could not locate any large crowds.  *Id.*

After this point, there were various reports of looting, gunshots, and violence, including one

Richmond police officer assaulted by a vehicle at Hilltop Mall in Richmond, that continued until

approximately 1:00 a.m.  *Id.* at 16-17.

Assistant Chief Allison has also supplied the munitions logs for May 29, 2020 through

June 4, 2020, which OPD is required to maintain under its Crowd Control Policy, discussed

below.  Allison Decl. ¶ 17 & Ex. I.  These logs show that OPD used some of the listed items

during the period discussed above, but they do not contain information about the deployment of

munitions by mutual aid partners.

**C.    OPD Crowd Control Policy**

OPD's crowd management policy is set forth in Training Bulletin III-G.  Allison Decl. ¶ 4

& Ex. A (OPD Crowd Control and Crowd Management Policy (hereinafter, "OPD Crowd Control

Policy")).  It is mandated under the settlement agreements and orders in *Spalding  v. City of

Oakland*, No. 11-cv-02867 TEH ("*Spalding*"), United States District Court for the Northern

District of California and *Campbell,  v. City of Oakland*, No. 11-cv-05498 JST ("*Campbell*"),

United States District Court for the Northern District of California. [5]

---

[5] In *Spalding*, the plaintiffs sued the City of Oakland and the County of Alameda, along with
various individual defendants, for alleged constitutional violations based on mass arrests at a
protest against police misconduct related to the killing of Oscar Grant by a BART police officer.
It was undisputed that the individuals had not been given warnings or an opportunity to disperse.
*See* Case No. 11-cv-05498 JST, Docket No. 86-1 (*Spalding* Settlement Agreement) at 1.  In the
*Spalding* Settlement Agreement, the parties agreed that the Oakland defendants would continue to
abide by the crowd control and crowd management policy adopted in two earlier cases, *Coles v.
City of Oakland*, No. 03-cv-02961 TEH and *Local 10 ILWU v. City of Oakland*, No. 03-cv-02962
TEH ("the *Coles/Local 10* Settlement Agreement"), which the *Spalding* plaintiffs alleged had been
violated by OPD.  *Id.* at 7 & Ex. A thereto (*Coles/Local 10*  Settlement Agreement); *see also* 03-
cv-02961, Docket No. 41 (*Coles/Local 10*  Settlement Agreement).  The parties in *Spalding* also
agreed that the meet-and-confer requirement for amending the policy under the *Coles/Local 10*
Settlement Agreement would be satisfied if "[b]efore making any material change to the Crowd

United States District Court
Northern District of California

One of the stated policies that underpins the OPD Crowd Control Policy is to "[u]phold constitutional rights of free speech and assembly while relying on the minimum use of physical force and authority required to address a crowd management or crowd control issue."   Allison Decl., Ex. A (Crowd Control Policy) § I.   The Crowd Control Policy sets forth general principles aimed at meeting this objective in the area of planning, deployment and policing of crowds.  *Id*. § III.   These general principles include making efforts to establish and maintain contact and communication with event or demonstration planners and considering the type of crowd involved in making crowd control decisions.  *Id*. § III.B. The Crowd Control Policy instructs that

---

Control Policy  . . . or the associated Training Bulletin (OPD TB III-G, issued 28 Oct. 2005), or to associated training outlines, the Oakland Police Department and its counsel will meet and confer with representatives of the National Lawyers Guild - SF Bay Area Chapter, and the ACLU of Northern California, in a good faith effort to reach agreement on such changes."  Case No. 11-cv-05498 JST, Docket No. 86-1 (*Spalding* Settlement Agreement) at 7.

In *Campbell*, the plaintiffs were participants in the Occupy Oakland protests in the fall of 2011 who alleged that OPD had violated their constitutional rights and the terms of the crowd control policy adopted in the *Coles/Local 10* Settlement Agreement by using excessive force against peaceful protestors. No. 11-cv-05498 JST, Docket No. 1 (Complaint) at 2. The settlement agreement in *Campbell* incorporated the provisions of the *Spalding* Settlement Agreement addressing OPD's crowd control policy.  No. 11-cv-05498 JST, Docket No. 86.  In particular, under the *Campbell* settlement agreement, the parties agreed that OPD would continue to abide by the crowd control policy adopted under the *Coles/Local 10* Settlement Agreement and that OPD would meet and confer with National Lawyers Guild and the ACLU before making any material changes to the crowd control policy "and its associated Training Bulletin (OPD TB III-G, issued 27 Oct. 2005)."  *Id*. at 5.  The parties further stipulated "to the Court's retention of jurisdiction to enforce these terms for a four year period, extendable by an additional three years as provided in [the *Spalding*  Settlement Agreement], Paragraph III.J.8, and request[ed] that the Court appoint Magistrate Judge Laurel Beeler, who ha[d] overseen settlement in both this matter and *Spalding*, for resolution of any disputes, to facilitate the meet and confer process referenced above, and to issue all appropriate orders concerning the *Spalding* Settlement Agreement and the implementation and enforcement thereof."  *Id*. at 5-6.  Paragraph III.J.8 of the *Spalding* Settlement Agreement provides that if there is a material breach of the settlement agreement within the initial four-year period, any party may move the court to extend the period of its jurisdiction for an additional three years.  There is nothing on the *Campbell* docket indicating that such an extension was ever requested.

The parties have also acknowledged that this Court has ongoing oversight of OPD's policies and conduct in *Allen v. City of Oakland*, 00-cv-4599 WHO.   That case was brought by a group of African American plaintiffs against the City of Oakland and various individual police officers who were members of a group that called themselves "the Riders" and who were assigned to patrol neighborhoods in West Oakland. The plaintiffs alleged that the Riders engaged in repeated and serious civil rights violations against African American residents and that high-level officials were aware of this misconduct but took no remedial action.  That case settled in 2003 but the Court continues to supervise the enforcement of that agreement, holding a status conference as recently as May 27, 2020.

"[o]rganized demonstrations in which some engage in coordinated, nonviolent civil disobedience should be distinguished, to the extent possible, from crowds in which substantial numbers of people are engaged in other types of unlawful acts." *Id*. § III.B.7.  Likewise, the policy provides that "[i]t is essential to recognize that all members of a crowd of demonstrators are not the same." *Id*. § III.C.7.  It recognizes that "[o]nce some members of a crowd become violent, the situation often turns chaotic, and many individuals in the crowd who do not want to participate in the violent or destructive acts may be blocked from leaving the scene because the crowd is so large or because they are afraid they will move into a position of heightened danger." *Id*.  In that context, the Crowd Control Policy instructs that "OPD shall seek to minimize the risk that force and arrests may be directed at innocent persons." *Id*.

Under the Crowd Control Policy, OPD uses the Incident Command System to plan for demonstrations and manage crowds and acts of civil disobedience. *Id*. § III.A.3.  "Decisions about crowd dispersal and general strategies about crowd containment or crowd redirection, multiple simultaneous arrests, planned individual arrests, or planned use of force [are to] be made at the level of the Incident Commander or higher. *Id*. § III.B.1.  However, this requirement does "not preclude individual commanders, supervisors, and officers from defending themselves or others from imminent danger when the delay in requesting permission to take action would increase the risk of injury." *Id*.  In addition, the Watch Commander may fill the role of the Incident Commander where it is necessary to respond to "spontaneous events," at least until relieved by a "ranking officer." *Id*. § IV.A.1.

The Crowd Control Policy provides that "[s]ufficient resources to make multiple simultaneous arrests should be available at demonstrations where such arrests are a reasonable possibility." *Id*. § III.C.1.  It recognizes, though, that "this need must be balanced against the fact that a large and visible police presence may have a chilling effect on the exercise of free speech rights." *Id*.  Therefore, officers are instructed that they should arrive at the location before event participants, if possible, and that "officers should be positioned at a reasonable distance from the crowd to avoid a perception of intimidation." *Id*. § III.C.2.  The Crowd Control Policy also requires "[e]ach officer [to] wear a badge, nameplate, or other device on the outside of his or

14

her uniform or on his or her helmet which bears the identification number or the name of the officer, as required by Penal Code § 830.10." *Id*. § III.C.4.  In addition, officers are required to "activate their [Personal Digital Recording Devices] whenever taking any enforcement action during a crowd control situation." *Id*. § X.A.1.

The Crowd Control Policy enumerates "[p]ermissible crowd control and crowd dispersal techniques." *See generally, id.* § V.  This section provides that "[t]he police may not disperse a demonstration or crowd event before demonstrators have acted illegally or before the demonstrators pose a clear and present danger of imminent violence," at which point the assembly may be declared unlawful. *Id*. § V.F.1.  "When the only violation present is unlawful assembly, the crowd should be given an opportunity to disperse rather than face arrest." *Id.* § V.G.1.  In particular, before using crowd dispersal techniques, OPD must make "repeated announcements" to the crowd, using "adequate amplification" "asking members of the crowd to voluntarily disperse and informing them that, if they do not disperse, they will be subject to arrest." *Id*. These announcements should continue even after the commencement of the dispersal operation and should "specify adequate egress or escape routes." *Id*.  Further, "[u]nless an immediate risk to public safety exists or significant property damage is occurring, sufficient time [must] be allowed for a crowd to comply with police commands before action is taken." *Id.* § V.G.2.

If orders to disperse and arrest do not result in "voluntary movement of the crowd," a police formation may be moved into the view of protestors to create a "forceful presence." *Id*. § V.H.1.  Officers may also use the technique of encirclement and arrest, encircling a portion of the crowd and simultaneously arresting them. *Id*. § V.H.2. The Crowd Control Policy recognizes that this approach "can be effective in dispersing the remaining crowd members wanting to avoid arrest." *Id*. § VII.A.  The policy explains that where this approach is used, there must be probable cause for each arrest and that "the only proper basis for a multiple simultaneous arrest of all the individuals encircled at a demonstration is failure to disperse (Pen. Code §409), when the dispersal was properly ordered based on the existence of an unlawful assembly and adequate notice and opportunity to disperse has been given." *Id*. § VII.A.5.  Where such arrests are carried out, the arrestees are to be placed in handcuffs. *Id*. § VII.C.  Officers are to be "cognizant that flex-cuffs

1    may tighten when arrestees' hands swell or move, sometimes simply in response to pain from the

2    cuffs themselves" and "[w]hen arrestees complain of pain from overly tight flex cuffs]" they are

3    required to "examine the cuffs to ensure proper fit." *Id*.

4           Officer may also use police formations and batons if a crowd refuses to disperse, so long as

5    officers follow the OPD's policies governing use of force and use of batons and they do not

6    "intentionally strike a person with any baton to the head, neck, throat, kidneys, spine, or groin or

7    jab with force to the left armpit except when the person's conduct is creating an immediate threat

8    of serious bodily injury or death to an officer or any other person." *Id*. § V.H.3.

9           Further, the Crowd Control Policy allows for the use of non-hand held crowd control

10   chemical agents where "other techniques, such as encirclement and multiple simultaneous arrest or

11   police formations have failed or will not accomplish the policing goal as determined by the

12   Incident Commander." *Id*. § V.H.4.  The policy recognizes that such chemical agents can produce

13   "serious injuries or even death" and pose a particular threat to children, the elderly and people

14   with asthma.  *Id*.  Therefore, the policy requires that OPD use "the minimum amount of chemical

15   agent necessary to obtain compliance." *Id*.  In addition, such weapons may be used only with the

16   authorization of the Incident Commander except when there are "exigent circumstances," when a

17   supervisor or commander may authorize the immediate use of chemical agents.  *Id*.

18          Likewise, "[h]and-thrown chemical agents or pyrotechnic gas dispersal devices" may only

19   be used for crowd control when authorized by the Incident Commander, except when there are

20   exigent circumstances. *Id*. § V.H.5. a.  Because such devices "present a risk of permanent loss of

21   hearing or serious bodily injury from shrapnel" they are to be "deployed to explode at a safe

22   distance from the crowd." *Id*. § V.H.5. b.  Further, they are not to be used "for crowd control

23   without first giving audible warnings to the crowd and additional reasonable time to disperse" *id*.

24   § V.H.5. c, and should be used only "if other techniques such as encirclement and mass arrest or

25   police formations have failed or will not accomplish the policing goal as determined by the

26   Incident Commander." *Id*. § V.H.5.d.

27          The Crowd Control Policy also prohibits the use of certain types of weapons for crowd

28   control and crowd dispersal.  *Id*. § VI.  Among other things, canines and fire hoses may not be

United States District Court
Northern District of California

United States District Court
Northern District of California

1  used for crowd control; nor may OPD uses horses against a non-violent crowd.  *Id.* § VI.B - D.

2  Motorcycles and police vehicles may be used only for transportation, observation, traffic control

3  and visible deterrence; they may not be used for crowd dispersal.  *Id.* § VI.E. The policy also

4  prohibits the use of wooden dowels and stinger grenades.  *Id.*  § VI.F.1.  Direct Fired Specialty

5  Impact Less-Lethal Munitions ("SIM") may "not be used for crowd management, crowd control or

6  crowd dispersal during demonstrations or crowd events" "even if some members of the crowd or

7  group are violent or disruptive."  *Id.*  Direct Fired SIM may be used only against "a specific

8  individual who is engaging in conduct that poses an immediate threat of loss of life or serious

9  bodily injury to him or herself, officers, or the general public or who is engaging in substantial

10  destruction of property which creates an immediate risk to the lives or safety of other persons."

11  *Id.* § VI.F.2.a. Even in that scenario, "Direct Fired SIM shall be used only when other means of

12  arrest are unsafe and when the individual can be targeted without endangering other crowd

13  members or bystanders."  *Id.*

14      The Crowd Control Policy also prohibits the use of "[a]erosol, hand-held, pressurized,

15  containerized chemical agents that emit a stream" from "being used for crowd management, crowd

16  control, or crowd dispersal during demonstrations or crowd events."  *Id.*  § VI.H.   Like Direct

17  Fired SIM, such chemical agents may only be used "against specific individuals who are engaged

18  in specific acts of serious unlawful conduct or who are actively resisting arrest."  *Id.*   Further, they

19  may be used only by officers familiar with the training bulletin that addresses the use of Oleoresin

20  Capsicum ("OC").  *Id.*  "Aerosol chemical agents shall not be used in a demonstration or crowd

21  situation or other civil disorders without the approval of a supervisor or command officer."  *Id.*

22      The Crowd Control Policy recognizes that "[f]or large demonstrations and mass

23  gatherings, OPD may be required to rely on Mutual Aid agencies for assistance."  *Id.* § IX.  Such

24  requests are governed by the "protocols of the Mutual Aid Plan in accordance with the California

25  Emergency Services Act, commencing at Government Code Section 8550."  *Id.*   In addition,

26  where mutual aid agencies provide assistance, the Incident Commander is "responsible for

27  ensuring to the extent possible that mutual aid agencies:

28      1.  Are briefed and in agreement with OPD's Unity of Command

17

structure under which only OPD Commanders may authorize the use of less lethal munitions for crowd control and dispersal;

2. Are briefed on OPD's policy on prohibited weapons and force;

3. Do not bring or use any weapons or force that is prohibited under OPD's policy;

4. Are provided a copy of OPD's Crowd Control Policy and Use of Force policies;

5. Are not assigned to front-line positions or used for crowd intervention, control or dispersal unless there is a public safety emergency;

6. Complete required reports prior to being released from duty.

*Id.* However, "[t]hese provisions do not [prevent] an OPD or mutual aid officer from taking action or using force against an individual in self-defense or in defense of another person or officer." *Id.* § IX.7.

Finally, the Crowd Control Policy provides for the completion of an after-action report within thirty days of any incident in which: "1) Mutual Aid is requested;  2) An unlawful assembly is declared;  3) Arrests are made for acts of civil disobedience;  4) Significant police resources are used to control the event; or 5) Chemical agents or SIMS are used." *Id.* § XI.C.   The after-action report must include a copy of the inventory log showing which less lethal munitions were checked out and how many were used by which person during the relevant crowd control event(s).   *Id.* § VI.I.

According to Assistant Chief Allison, this after-action review is a "key part of OPD's crowd management policy."  Allison Decl. ¶ 6.   He states that pursuant to this section there will be "extensive review and investigations related to the recent mass protests," "which will include, among other things, 'lessons learned and training opportunities, as well as an assessment of the effectiveness and quality of the Operations Plans,' pursuant to Training Bulletin III-G, and the resulting After-Action Report."  *Id.*   Assistant Chief Allison also states in his declaration that there will be a review of each use of force pursuant to General Order K-4 and K-4.1 and an Internal Affairs investigations of each complaint pursuant to General Order M-03.  Allison Decl. ¶ 6 & Exs. D (General Order K-4, Reporting & Investigating the Use of Force), E (General Order K-4.1, Force Review Boards & Executive Force Review Boards), F (General Order M-03,

18

Complaints Against Departmental Personnel or Procedures).  He further anticipates that "the Court's Independent Monitoring Team in *Allen v. City of Oakland* will observe at least a sample of these processes and resulting reports."  *Id*.

### D.  Involvement of Mutual Aid Partners

"The California Emergency Services Act ['ESA'] recognizes and responds to a fundamental role of government to provide broad state services in the event of emergencies resulting from conditions of disaster or of extreme peril to life, property, and the resources of the state. Its purpose is to protect and preserve health, safety, life, and property."  *Martin v. Mun. Ct*., 148 Cal. App. 3d 693, 696 (1983) (citing Cal. Gov't Code §§ 8550 et seq.).   The ESA "provide[s] for the rendering of mutual aid by the state government and all its departments and agencies and by the political subdivisions" of State and establishes an Office of Emergency Services ("OES") within the Governor's office to assist in the organization and assistance of emergency programs, including California's mutual aid plan.  Cal. Gov't. Code § 8550.  Among other thing, the OES publishes manuals for law enforcement agencies describing policies and procedures related to the rendering of mutual aid.  *See. e.g.,* Dkt. Nos. 50-1 (Law Enforcement Mutual Aid Plan (2019 Ed.)) ("Blue Book"); 50-2 (Law Enforcement Guide for Emergency Operations (2019 Ed.) ("Red Book").

The ESA provides that "[u]nless otherwise expressly provided by the parties, the responsible local official in whose jurisdiction an incident requiring mutual aid has occurred shall remain in charge at such incident, including the direction of personnel and equipment provided him through mutual aid." Cal. Gov't Code § 8618.   Defendants have not argued or offered any evidence suggesting that the agencies that offered mutual aid in connection with the events described above have entered into any agreements with OPD or the City of Oakland that modifies this general rule.

There is no dispute that OPD received "crowd control assistance" from its mutual aid partners.  *See* Complaint ¶ 70.  According to Assistant Police Chief Allison, "[e]specially during the first four days of protests—May 29, 2020 through June 1, 2020—the City relied heavily on mutual aid from the Alameda County Sheriff's Office, the California Highway Patrol, the U.S.

Marshals Service, and police departments from across the Bay Area and state." Allison Decl. ¶ 11. Assistant Chief Allison states that "[t]he City has around 733 law enforcement personnel and can deploy only so many of them at any given time. On nights such as May 29 and June 1, when the OPD is at once attempting to facilitate mass protests and to respond to mass looting and violence throughout the City, mutual aid is critical." *Id*. A chart in his declaration reflects that on the night of May 29, 2020, 215 OPD officers and 508 mutual aid officers were deployed. *Id*. ¶ 13. On May 30, 2020, the number of OPD officers deployed had increased to 380 but they were still outnumbered by mutual aid officers, whose numbers had also increased, to 550. *Id*. On May 31 and June 1, OPD maintained the number of officers deployed at 380 while the number of mutual aid officers dropped to 200 (May 31) and 222 (June 1). *Id*.

Assistant Chief  Allison states that "OPD attempts to deploy its officers on the front lines when managing crowds along with mutual aid within the City [but that] [t]his becomes challenging when there are multiple events happening at once, in various locations, and circumstances are rapidly changing." *Id*.  ¶ 12. Further, Defendants concede that "[d]uring these days, mutual aid partners reported that among other force options, they deployed CS blasts, Sting balls, smoke, and projectiles." *Id. ¶* 14.

According to Assistant Chief Allison, two of OPD's "[m]utual aid partners have informed the City that if crowd control techniques—including chemical agents—are prohibited, these partners will no longer provide mutual aid." *Id*. ¶ 15 & Ex. K (emails from Alameda County Sheriff and U.S. Marshal Donald O'Keefe in response to a letter that was sent to the mayor of Oakland, the City Council and Chief Manheimer urging OPD to "immediately halt the use of tear gas for crowd control.").

Plaintiffs allege that on June 3, 2020, at a press conference, Chief Manheimer "stated that OPD briefed, instructed, and otherwise controlled the assisting officers, but refused to hold them accountable to Oakland and OPD's policies." Complaint ¶ 70.

### E.    Health Risks Associated With OPD Crowd Control Tactics Related to COVID-19 Pandemic

Plaintiffs have submitted the declaration of a specialist in pulmonary disease, Dr. Peter

United States District Court
Northern District of California

Sporn, addressing the health risks associated with the use of chemical agents, including tear gas and pepper spray. *See* Declaration of Dr. Peter Sporn in Support of Memorandum of Points and Authorities in Support of Plaintiffs' Application for a Temporary Restraining Order and/or Order to Show Cause and Preliminary Injunction ("Sporn Decl.").   According to Dr. Sporn, "[w]hile it has been claimed that [tear gas, containing chloroacetophenone (CN) or chlorobenzylidene malonontrile (CS), and pepper spray or pepper balls, containing oleoresin capsicum (OC)] produce only temporary irritation and discomfort, recent studies document that they can cause serious and long-lasting lung problems, skin burns, eye injuries and even death." Sporn Decl. ¶ 14.  In particular, "[a] recent review [that] compiled the results of 31 studies including 5,131 people who suffered 9,261 injuries from exposure to tear gas or pepper spray (Haar et al, BMC Public Health 17:831, 20 17) [showed that] 8. 7% of the injuries were severe and required professional medical attention, 17% were moderate, and 74% were mild, 58 of the individuals suffered permanent disability and two died of injuries due to the chemical agents." *Id*. ¶ 15. Furthermore, studies show that "pepper spray is not less harmful or less potentially lethal than tear gas." *Id*. ¶ 16 (citing Toprak, *et al.,* Journal of Forensic and Legal Medicine 29:36-42, 2015) (autopsies performed on 10 individuals who died as a result of acute exposure to riot control agents showed that the most common mode of death was respiratory failure; that three died after exposure to combinations of tear gas and pepper spray, and that seven died following exposure to pepper spray alone).

Dr. Sporn states that tear gas and pepper spray cause acute respiratory symptoms, posing a particular danger to individuals with asthma. *Id*. ¶ 17.  He notes that 8% of the overall U.S population suffers from asthma and that asthma is "more common and often more severe in African Americans than the majority population in the U.S." *Id*.  Consequently, "launching tear gas or pepper spray at large crowds inevitably places dozens or hundreds of individuals with asthma and other respiratory conditions in grave danger" and "places [B]lack individuals in targeted crowds at especially high risk of respiratory harm." *Id*.

Further, the use of tear gas and pepper spray is particularly dangerous during the COVID-19 pandemic, according to Dr. Sporn.  He explains:

Because exposure to tear gas and pepper causes severe irritation of the eyes, nose, mouth and respiratory system, exposed individuals rub their eyes, hypersalivate, cough uncontrollably, and hyperventilate. This typically forces people to take off the masks they are wearing in order to be able to breathe. By damaging the respiratory epithelium, tear gas and pepper spray increase susceptibility to respiratory infection. All of this greatly increases the risk of disseminating the novel corona virus and of contracting COVID-19. Because African Americans and Latinx individuals experience disproportionately high rates of respiratory failure and death due to COVID-19 (Yancy, JAMA 323:1891-2, 2020), use of tear gas and pepper spray further increases the risk of serious harm to the health of individuals in these groups.

*Id.* ¶ 18.  It is for this reason that the American Thoracic Society issued a statement on June 11, 2020 "stating that the use of tear gas and similar chemical agents by law enforcement during the COVID-19 pandemic is irresponsible and calling for a moratorium on their use."  *Id*. ¶ 20.[6]

---

[6] The June 11, 2020 Statement of the American Thoracic Society states as follows:

June 11, 2020 -- The American Thoracic Society calls for a moratorium on the use of tear gas and other chemical agents deployed by law enforcement against protestors participating in demonstrations, including current campaigns sparked by the death of George Floyd.

"The use of chemical crowd control agents is outlawed in the time of war. They cause significant short- and long-term respiratory health injury and likely propagate the spread of viral illnesses, including COVID-19," said ATS President Juan C. Celedón, MD, DrPH, ATSF.

"Recent research calls into question the assumed safety of tear gas such as 2-chlorobenzalmalononitrile (CS), and the highly concentrated pepper oil used in exploding shells and grenades," said Sven-Eric Jordt, PhD, a leading researcher in tear gas and related lung injury. Those studies have identified chronic bronchitis, compromised lung function, and acute lung injury (in military recruits) as consequences of tear gas exposure.

The airborne nature of tear gas also makes it impossible to use in a manner that doesn't endanger uninvolved persons such as innocent bystanders and the media. Tear gas is also a concern to medical personnel exposed when treating protestors, since the agents can contaminate clothing and medical equipment.

In addition to questions about safety, the ATS is concerned that exposure to tear gas may affect COVID-19 transmission.  A tear gas- exposed person with asymptomatic COVID-19 would be unable to maintain a safe distance and is likely to spread the virus much more efficiently to bystanders, increasing the risk of infection. Protective masks would have to be discarded due to tear gas contamination, further increasing risks of spreading or contracting the infection.

Outcomes of a study by the U.S. military are a clear warning sign. Recruits exposed to CS tear gas in training just once had a strongly increased likelihood to develop respiratory illnesses such as influenza, pneumonia, or bronchitis, conditions often caused by viral infections. This may also apply to COVID-19. Reactive chemicals such as 2-chlorobenzalmalononitrile, and the combustion products and solvents produced by tear gas shells and grenades, are known to degrade the lungs' antiviral defenses. COVID-19 patients often report loss of their sense of smell. COVID-19 patients

United States District Court
Northern District of California

Defendants do not directly challenge Dr. Sporn's opinions about the dangers of exposure to chemical agents during the pandemic or present any evidence contradicting his opinions.  They also acknowledge that on June 16, 2020 the Oakland City Council "passed a resolution urging OPD and mutual aid partners to stop using tear gas for crowd control during the COVID-19 pandemic" and that this resolution has raised "important questions about the unknown relationship between chemical agents and COVID-19."  Response to Motion for Preliminary Injunction ("Opposition") at 16, 23; *see also* Pereda Decl., Ex. Q (June 16, 2020 "Resolution Urging The City Of Oakland To Immediately Halt The Use Of Tear Gas For Crowd Control During The Covid-19 Pandemic And Requesting The Oakland Police Commission To Immediately Review And Propose Changes To The Oakland Police Department's Policy In Order To Halt Such Use"). However, they point out that the Health Officer of the Alameda County Health Office has not banned the use of chemical agents, which they insist is notable because of the strict measures that the Alameda County Public Health Department has taken to control the spread of COVID-19.  *Id.* at 23.

### F.    The Motion

Plaintiffs contend OPD's aggressive and dangerous tactics in dealing with recent and ongoing demonstrations makes it essential that the Court enter a preliminary injunction prohibiting

---

were also found to lose their capability to sense irritants, increasing their risk of inhaling tear gas and developing chemical injuries.

Current events in the U.S. provide evidence of tear gas use escalation domestically. Inadequate training, monitoring, and accountability in use of these weapons contribute to misuse and risk of injury. If used at all, tear gas should be a last resort.

The industry manufacturing tear gas systems have developed advanced launching technologies allowing deployment of much higher amounts of tear gas over longer distances. Much of what we currently know about the health effects of exposure to tear gas and other chemical agents is based on military research conducted in the 50s, 60s, and 70s using young healthy male research participants.  These studies do not address the potential health effects for vulnerable populations who are exposed, including children, older adults, and people with underlying health conditions.

Based on the lack of crucial research, the escalation of tear gas use by law enforcement, and the likelihood of compromising lung health and promoting the spread of COVID-19, the American Thoracic Society calls for a moratorium on CS tear gas and OC pepper weapons use", said Dr. Celedón.

Sporn Decl. ¶ 20 (quoting June 11, 2020 Statement of American  Thoracic Society).

the use of certain tactics and munitions, including tear gas and other chemical agents, by OPD and any officers called in to assist OPD with crowd control under a mutual aid agreement.[7]

Defendants point to incidents of looting and violence during the relevant period to show that its crowd control tactics were justified and that the injunctive relief Plaintiffs seek is inappropriate. At the same time, they argue that Oakland's policies already emphasize de-escalation and the use of the minimum force necessary for crowd control. *See* Allison Decl. ¶ 8 & Exs. B (General Order K-3) (instructing that "[m]embers are required to de-escalate the force when the member reasonably believes a lesser level or no further force is appropriate."), A (Crowd Control Policy). Moreover, they contend OPD's Crowd Control Policy has been successful over the last five years, with OPD facilitating thousands of events, including mass protests and demonstrations, largely without incident. *See* Allison Decl., Ex.G (Crowd Management Reports, 2015-2019).

Defendants acknowledge that chemical agents have been used by OPD on occasion over the last five years but they represent that they have uncovered no "assembly-related" lawsuit filed against the City of Oakland during that period. Opposition at 5. Defendants further contend that any changes to OPD's policies with respect to crowd control, including whether the use of tear gas should be banned, should be made through the political and administrative review processes that are already underway. Finally, they warn that if the Court prohibits the use of tear gas and other

---

[7] In their Proposed Order, Plaintiffs ask the Court to prohibit the following:

> 1. Using tear gas or any other chemical weapons against persons taking part in a protest or demonstration;
> 2. Firing rubber bullets or similar projectiles at persons taking part in a protest or demonstration;
> 3. Firing flash bang grenades at persons taking part in a protest or demonstration;
> 4. Failing to maintain their body worn cameras in the "on" position while engaged in policing public protests and demonstrations;
> 5. Failing to display their name and department badges while engaged in policing public protests and demonstrations; and
> 6. Kettling persons taking part in or observing public protests and demonstrations.

Proposed Order, Docket No. 13-1.

1    chemical agents outright some mutual aid partners will likely refuse to offer assistance, posing a

2    threat to Oakland's ability to ensure adequate crowd control policing in the face of ongoing

3    demonstrations and unrest.

4    **III.    ANALYSIS**

5        **A.    Legal Standards Governing Entry of Preliminary Injunctions**

6        Plaintiffs seeking a preliminary injunction must establish that they are likely to succeed on

7    the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that

8    the balance of equities tips in their favor, and that an injunction is in the public interest.  *Winter v.*

9    *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citation omitted).  When the government is a

10   party, consideration of the balance of the equities and the public interest merge.  *Drakes Bay*

11   *Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418,

12   435 (2009)).

13       "Under *Winter*, plaintiffs must establish that irreparable harm is likely, not just possible, in

14   order to obtain a preliminary injunction."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

15   1131 (9th Cir. 2011).  In reaching this conclusion, the Supreme Court "disagreed with one aspect

16   of [the Ninth Circuit's] approach to preliminary injunctions[,]" namely, its holding that "the

17   'possibility' of irreparable harm was sufficient, in some circumstances, to justify a preliminary

18   injunction."  *Id.*  The *Winter* decision did not, however, eliminate the "sliding scale" approach to

19   preliminary injunctions employed by the Ninth Circuit.  *Id.* at 1134.  Rather, the Ninth Circuit has

20   found that *Winter* left in place "the 'serious questions' version of the sliding scale test for

21   preliminary injunctions[,]" which provides that "[a] preliminary injunction is appropriate when a

22   plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of

23   hardships tips sharply in the plaintiff's favor." *Id.* at 1134-35 (citation omitted).  Similarly, "a

24   stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of

25   success on the merits." *Id.* at 1131.

26       "Due to the urgency of obtaining a preliminary injunction at a point when there has been

27   limited factual development, the rules of evidence do not apply strictly to preliminary injunction

28   proceedings." *Herb Reed Enterprises, LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n. 5

United States District Court
Northern District of California

(9th Cir. 2013) (citing *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988)).

### 1.  Likelihood of Success on the Merits

Plaintiffs assert their claims under the First, Fourth and Fourteenth Amendment.  The Court finds that they have established serious questions going to the merits on all three claims.

#### a.   Fourth Amendment Claim (Excessive Force)

Excessive force claims are governed by the reasonableness standard of the Fourth Amendment.  *Graham v. Connor*, 490 U.S. 386, 395 (1989). "In determining reasonableness, 'the nature and quality of the intrusion on the individual's Fourth Amendment interests must be balanced against the 'countervailing government interests at stake.'" *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994) (quoting *Graham*, 490 U.S. at 396)). "In evaluating the government's interest in the use of force we look to: '(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.'" *Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1163 (9th Cir. 2011) (quoting *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003)).  The ultimate inquiry is not limited to these three factors however, requiring courts to "'addresses whether the totality of the circumstances justifie[s] a particular sort of . . . seizure.'" *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).

The types of force that was used by OPD against protesters in this case –  chemical agents, less lethal projectiles such as rubber bullets and flashbang grenades – constitute significant force. *See Young*, 655 F.3d. at 1161 (pepper spray is "'intermediate force' that, while less severe than deadly force, nonetheless present a significant intrusion upon an individual's liberty interests."); *Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001) (holding that beanbag projectile "akin to a rubber bullet" is not deadly force but is "much greater than the force" associated with the use of pepper spray and is "permissible only when a strong governmental interest compels the employment of such force").  Consequently, such force must be justified by a significant government interest.   Based on the current record, there are serious questions as to whether that

United States District Court
Northern District of California

1    standard is met.

2         Plaintiffs have submitted sworn declarations and video footage showing that some of the

3    force used by OPD officer, or OPD's mutual aid partners, was aimed at peaceful protestors who

4    did not pose a threat to the officers or the public at large and were not engaging in illegal activity.

5    As to a number of the incidents described in Plaintiffs' declarations, it is not clear that the crowd

6    was refusing to disperse as there is evidence that they may have been given insufficient time to

7    respond or no warnings at all, or they could not hear the warnings.  There is also evidence that

8    some demonstrators were unable to disperse in order to comply with officers' commands and/or to

9    avoid violating curfew because they were trapped in an area with no accessible means of egress.

10        Defendants have countered with evidence that there was looting and violence occurring in

11   Oakland during this period.   They have not, however, offered evidence that links the incidents

12   Plaintiffs contend involved inappropriate officer conduct with the looting and violence that is

13   described in the Police Activity Logs.[8]  Moreover, the Court has carefully reviewed the logs and

14   finds that as to at least some of the aggressive crowd control tactics described in Plaintiffs'

15   declarations and shown in the video footage, the timing and locations of the incidents on the logs

16   does not match the timing and locations of the events described by Plaintiffs and therefore does

17   not establish that the force used by OPD officers was reasonable as to those incidents.

18        Therefore, the Court finds that Plaintiffs have demonstrated that there are serious questions

19   going to the merits with respect to Plaintiffs' Fourth Amendment excessive force claim.

20

21   _____

[8] The Court notes that while Defendants confirmed at the hearing that all of the entries on the
22   Activity Logs were called in by OPD officers, it appears that at least some of the entries describe
reports received by OPD officers from third parties rather than activities that the officers
23   themselves observed, raising the possibility that some of the reports in the log may not be
accurate.  In addition, these second-hand reports from sources other than OPD officers raise
24   questions of admissibility. *Colvin v. United States*, 479 F.2d 998, 1003 (9th Cir. 1973) ("Entries in
a police report based on an officer's observation and knowledge may be admitted, but statements
25   attributed to other persons are clearly hearsay[ ] and inadmissible[.]").  Further, certain reports –
such as reports of Molotov cocktails being thrown – are hotly contested by Plaintiffs and to date
26   have not been documented with a sworn declaration by a first-hand witness.  At this stage of the
case, when no discovery has occurred, the Court declines to make factual findings as to whether
27   any particular report of looting or violence reflected in the Activity Logs is accurate.  Rather, the
Court relies on the Activity Logs only to the extent that they reflect that on the dates at issue OPD
28   was facing disturbances in multiple locations that potentially posed a threat to public safety.

United States District Court
Northern District of California

b.   First Amendment Claim (Freedom of Speech and Assembly)

The First Amendment "safeguards an individual's right to participate in the public debate through political expression and political association." *McCutcheon v. Fed. Election Com'n*, 572 U.S. 185 203 (2014).  The Supreme Court has observed that "[t]he constitutional right of free expression is . . . designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests."  *Cohen v. California*, 403 U.S. 15, 24 (1971).  Thus, "[t]hat the air may at times seem filled with verbal cacophony is, in this sense not a sign of weakness but of strength."  *Id.* at 25.  "[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983)  (quoting *N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (internal quotations and citation omitted)).

"In order to demonstrate a First Amendment violation, a plaintiff must provide evidence showing that 'by his actions [the defendant] deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct.'" *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (quoting *Sloman v. Tadlock*, 21 F.3d 1462, 1469 (9th Cir.1994) (alterations in original)).  There is significant evidence in the record that the tactics used against protestors in Oakland, including the use of projectiles and tear gas, had a chilling effect on the political speech of the protestors and likely deterred some of them from engaging in further protests.  They describe being terrified, traumatized and suffering physical injuries and panic attacks.  Some said they would not have participated if they had known tear gas would be used against them.  In addition, some of the aggressive conduct described in the declarations, such as shooting a reporter with a rubber bullet even though it does not appear she was engaged in illegal activity or posed a threat of any kind, raises a serious question as to whether some of the uses of force described in those declarations was in reaction to the anti-police message of the protests and aimed at intimidating protesters to

1    deter such speech.

2          Therefore, the Court finds that there are serious questions going to the merits with respect

3    to Plaintiffs' First Amendment claim.

4                    c.   Fourteenth Amendment Claim (Substantive Due Process)

5          "It is well established that the Constitution protects a citizen's liberty interest in her own

6    bodily security."  *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (citing

7    *Ingraham v. Wright*, 430 U.S. 651, 673–74 (1977); *Wood v. Ostrander*, 879 F.2d 583, 589 (9th

8    Cir.1989)).  Further, "although the state's failure to protect an individual against private violence

9    does not generally violate the guarantee of due process, it can where the state action 'affirmatively

10   place[s] the plaintiff in a position of danger,' that is, where state action creates or exposes an

11   individual to a danger which he or she would not have otherwise faced."  *Id.* (citing *DeShaney v.*

12   *Winnebago County Dep't of Soc. Serv.*, 489 U.S. 189, 197, 201 (1989); *Wood*, 879 F.2d at 589–

13   90).  Thus, for example, in *Wood,* an officer left the plaintiff stranded in a known high-crime area

14   late at night after arresting the driver and impounding the car and she was later raped when she

15   accepted a ride from a stranger.  879 F.2d  at 586.  The court found that the officer had been

16   deliberately indifferent to the plaintiff's interest in personal security under the Fourteenth

17   Amendment.  *Id.*;  *see also Penilla v. City of Huntington Park*, 115 F.3d 707, 709-710 (9th Cir.

18   1997) (holding the plaintiff had stated a claim for violation of Fourteenth Amendment due process

19   based on deliberate indifference to medical needs where police officers, after finding a man in

20   grave need of medical care, cancelled a request for paramedics and locked him inside his house);

21   *Munger v. City of Glasgow*, 227 F.3d 1082 (9th Cir. 2000) (holding that police officers could be

22   held liable for violation of Fourteenth Amendment right to due process where they had ejected the

23   plaintiff from a bar on a bitterly cold night and he later died of hypothermia).

24         The evidence presented by Plaintiffs supports a likelihood of success on this claim.

25   Despite acknowledging the strict guidance of the Alameda County Public Health Department with

26   respect to the dangers of COVID-19 and offering assurances that OPD takes those dangers

27   seriously, there is no evidence in the record that the OPD took these dangers – and in particular,

28   the danger that chemical agents pose with respect to the spread of COVID-19 – into account in

United States District Court
Northern District of California

29

planning for or carrying out its crowd control strategies between May 29 and June 1, or that it has adopted any new policies to mitigate those dangers.  In addition, there can be no doubt that by the time of the protests the OPD was aware of the mask requirement that was adopted by the Alameda County Health Department in April 2020.  Yet all of the declarations and the video footage submitted by both sides are remarkably consistent in showing that officers did not wear masks when conducting crowd control unless they were wearing gas masks.  Officer can be seen in close proximity to demonstrators, issuing spoken commands (often loudly) and in some cases placing protestors in handcuffs as they arrested them, all without masks.  According to one account, Officer D'Orso laughed when asked about his failure to wear a mask.  The Court is also concerned by the accounts of numerous protesters that they were trapped by police officers and unable to either disperse or maintain social distance.  Again, there is no evidence that the OPD took into account the heightened danger posed by COVID-19 in using crowd control tactics that did not ensure adequate means of egress.

Based on this conduct, the Court finds that it is reasonably likely that Plaintiffs will be able to show that Defendants acted with deliberate indifference to their personal security under the Fourteenth Amendment.

### 2. Irreparable Harm

The Court also finds that Plaintiffs have made a strong showing of irreparable harm. "The loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  Plaintiffs have offered evidence that the protests that began on May 29, 2020 are ongoing;  unless Defendants are enjoined from engaging in the aggressive crowd control tactics described by Plaintiffs it is likely that Plaintiffs and other members of the public who wish to participate in these protests will be deterred from doing so out of fear that they will be subjected to such tactics.  Further, while Defendants urge the Court to allow the various administrative review processes to take their course, that approach does not adequately address the extreme urgency created by the COVID-19 pandemic as every protest in which OPD must manage the crowd presents a danger of fueling the spread of COVID-19.  Therefore, this factor supports

United States District Court
Northern District of California

1   the entry of a preliminary injunction.

2          **3.   Balance of the Equities and the Public Interest**

3        The Court concludes that the balance of the equities tips sharply in Plaintiffs' favor and

4   that injunctive relief is in the public interest.   As the court in *Black Lives Matter Seattle-King Cty.*

5   *v. City of Seattle, Seattle Police Dep't*, noted, "'serious First Amendment questions compel[ ]' a

6   finding that the 'balance of hardships tips sharply in [the plaintiffs'] favor[.]'"  No. 2:20-CV-

7   00887-RAJ, 2020 WL 3128299, at *5 (W.D. Wash. June 12, 2020) (quoting *Cmty. House, Inc. v.*

8   *City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (second alteration in original) (internal

9   quotations and citations omitted)).   "And as to public interest, 'it is always in the public interest to

10   prevent the violation of a party's constitutional rights.'"  *Id*. (quoting *Melendres v. Arpaio*, 695

11   F.3d 990, 1002 (9th Cir. 2012)).

12         **B.   Scope of Preliminary Injunction**

13        Having found that a preliminary injunction is warranted, the Court turns to the scope of the

14   injunctive relief.  As is reflected in the parties' July 26, 2020 Status Report, Dkt. No. 47, the

15   parties were able to reach agreement as to many of the provision of the preliminary injunction.

16   Except with respect to whether the Preliminary Injunction would cover officers of mutual aid

17   partners, the parties agreed that officers should be bound by Oakland's Crowd Control Policy, that

18   officers should be required to wear badges identifying them, that officers should be required to

19   have their body cameras on when engaged in crowd control activities, that police vehicles may not

20   be used to disperse crowds, and that special training with respect to OPD's Crowd Control Policy

21   should be conducted by November 1, 2020.  Dkt. No. 47.   With respect to face masks and gloves,

22   the parties' disagreement was only a matter of degree: Defendants agreed to a provision that

23   would have required officers to wear face masks and gloves when interacting with the public "to

24   the extent reasonably possible" whereas Plaintiffs advocated for a requirement that did not include

25   this qualifying language.  *Id*.

26        The primary disagreements related to: 1) the degree to which the mutual aid partners

27   would be bound by the preliminary injunction; 2) the substantive limits that would placed on OPD

28   tactics and munitions in conducting crowd control; and 3) whether there should be a provision

requiring that protesters who are arrested during protests must be cited and released in Oakland rather than being sent to the County jail.

Because no mutual aid partners have been named as defendants, the Court does not have the authority to issue injunctive relief that is binding on the mutual aid partners.  Nonetheless, California law provides that when OPD requests assistance from mutual aid partners, OPD officers are to "remain in charge . . .  including the direction of personnel and equipment provided him through mutual aid." Cal. Gov't Code § 8618. The evidence submitted by the parties shows that mutual aid partners played a significant role in crowd control in Oakland during the relevant period, with the number of officers from mutual aid partners sometimes outnumbering OPD officers.  In light of this evidence, the effectiveness of the injunctive relief awarded by the Court will depend to a large degree on whether officers of mutual aid partners abide by the terms of the preliminary injunction that apply to OPD with respect to the crowd control tactics and munitions they use.  Therefore, the Court has included in the Preliminary Injunction provisions designed to ensure that OPD officers will, in fact, remain in charge of the incident, including ensuring that the mutual aid partners do not use tactics or munitions that are inconsistent with the terms of the preliminary injunction or Oakland's Crowd Control Policy.

With respect to the tactics and munitions that OPD may use for crowd control, the Court finds that the evidence in the record provides a sufficient basis for prohibiting outright the use of stinger grenades, wooden bullets, rubber or rubber coated bullets, pepper balls, and similar munitions.   As discussed above, many of these are already prohibited under Oakland's Crowd Control Policy.   The Court has also placed strict limits on the use of chemical agents, flashbang grenades and foam projectiles.  It has not banned them outright because Defendants have presented evidence that there may be situations where there is an imminent threat of physical harm to a person or significant destruction of property and where use of these munitions may pose less of threat to the public than physical force by police officer aimed at addressing that threat, such as use of batons.   Based on the current record, the Court concludes that there is at least a possibility that banning these munitions could not only endanger public safety in general but also increase the dangers faced by protestors.  The Court may revisit this question at a later stage of the case,

however, after the parties have had an opportunity to conduct discovery.   As noted in the

preliminary injunction, the Court does not conclude that the use of these tactics and munitions in

the limited circumstances permitted under the Preliminary Injunction is either lawful or advisable.

The Court did not include a provision in the preliminary injunction addressing cite-and-

release requirements because there was not sufficient evidence in the record to guide the Court's

decision as to whether such an injunction was warranted.  Likewise, the Court declined to include

the qualifying language proposed by Defendants in the provision requiring that officers wear

masks and gloves when interacting with the public because Defendants presented no evidence that

imposing such requirements would hamper OPD officers in any way with respect to carrying out

their duties.  Nor did they raise any arguments that they would.

## IV.     CONCLUSION

For the reasons stated above, the Motion is GRANTED in part and DENIED in part.

**IT IS SO ORDERED.**

Dated:  August 10, 2020

_____
JOSEPH C. SPERO
Chief Magistrate Judge