1    BARBARA J. PARKER, City Attorney, CABN 069722
     MARIA BEE, Chief Assistant City Attorney, CABN 167716
2    DAVID A. PEREDA, Special Counsel, CABN 237982
     BRIGID M. MARTIN, Special Counsel, CABN 231705
3    One Frank H. Ogawa Plaza, 6th Floor
     Oakland, California  94612
4    Telephone:  (510) 238-6520, Fax:  (510) 238-6500
     Email: dpereda@oaklandcityattorney.org
5
     Attorneys for Defendants
6    CITY OF OAKLAND, et al.

7

8                **UNITED STATES DISTRICT COURT**

9             **NORTHERN DISTRICT OF CALIFORNIA**

10               **SAN FRANCISCO DIVISION**

11

12    ANTI POLICE TERROR PROJECT, et al.      Case No. 20-cv-3866 JCS (LB)

13            Plaintiffs,             **CITY OF OAKLAND'S BRIEF**
                                         **CONCERNING MUTUAL AID**
14       v.

15    CITY OF OAKLAND, et al.,             **Re Dkt. No. 52**

16            Defendant(s).

17

18

19

20

21

22

23

24

25

26

27

28

**OVERVIEW**

Citing the preliminary injunction, OPD's mutual aid partners informed the City that they can no longer provide mutual aid during protests in Oakland.  This poses a significant risk of avoidable harm to the people of Oakland, protestors, and officers.  The City's priorities are always to promote the exercise of free speech— consistent with Oakland's long and proud tradition of social activism—and to protect public safety.  The City has attempted to meet these goals with minimal police intervention and work through its mutual aid partners' concerns about the order. Yet as things stand, mutual aid remains unavailable, the elections loom, and the City should be prepared for potential mass protests next month.

The City thus respectfully requests that the Court modify the preliminary injunction by striking—or at least suspending for next month—Section VI(i)-(vi), and allowing *Training Bulletin III-G,* as it stands, to govern mutual aid requests. Alternatively, the City respectfully requests an order finding that a memorandum of agreement between OPD and mutual aid partners—with key terms laid out in this brief—would (1) not violate the preliminary injunction, and (2) pursuant to Cal. Gov't Code § 8618, make the mutual aid agency *not bound* by preliminary injunction. Option two is a new idea, which the City *has not* proposed to anyone.

The City is open to yet any other idea, guidance, or order to help resolve this issue.  The City appreciates the Court's ongoing, thoughtful consideration of all the issues in this case.  The City also appreciates its law enforcement partners' willingness to generously provide mutual aid in the past.  To facilitate free speech and protect the people of Oakland, protestors, and officers, the City seeks to make mutual aid again available.

**FACTUAL BACKGROUND**

**I.    THE PRELIMINARY INJUNCTION**

On July 29, 2020, the Court issued a preliminary injunction concerning crowd control during protests in Oakland.  Dkt. No. 52.  Before then, the parties negotiated

1 | in good faith about the terms of a preliminary injunction and found some common

2 | ground.  Dkt. No. 54, at 2.  But the parties fundamentally differed on "the

3 | substantive limits that would be placed on OPD tactics and munitions in conducting

4 | crowd control" and "the degree to which the mutual aid partners would be bound by

5 | the preliminary injunction." *Id.* at 31.

6 | After carefully considering these issues and others, the Court ordered that

7 | OPD officers "are prohibited from using stinger grenades, wooden bullets, rubber or

8 | rubbercoated bullets, pepper balls, or similar munitions." Dkt. No. 52, at 2.  Mutual

9 | aid officers are bound by the terms of the preliminary injunction, the Court further

10 | ordered.  *Id.* at 3-4.

## II.    MUTUAL AID PARTNERS' RESPONSE

12 | Two days later, OPD sent the Regional Mutual Aid Coordinator the order

13 | along with a cover letter summarizing key terms.  Yu Decl., ¶ 3 & Ex. A (OPD

14 | letter).  In response, OPD's mutual aid partners informed the City that they will no

15 | longer provide mutual aid during protests.  *Id.* at ¶¶ 4-5 & Exs. B through G.

16 | On August 63, 2020, for instance, the Alameda County Sheriff's Office, which

17 | coordinates mutual aid for the region and supplies its own officers, sent the City a

18 | letter on this issue.  Yu Decl., Ex. B.  "I am writing to you today with a heavy heart,

19 | to advise you that I will not be providing mutual aid assistance to the City of

20 | Oakland through the deployment of members of the Alameda County Sheriff's

21 | Office," Sheriff Ahern wrote.  *Id.*

22 | Sheriff Ahern explained his decision as follows:

> The inability to utilize effective and safe less-lethal munitions, places all peace officers at risk, and reduces the options available to deal with violent incidents. Peace officers would be limited, essentially, to hand-to-hand combat with specific individuals within potentially large crowds. I am not willing to expose my staff to this degree of danger without providing them with the proper equipment and support, most of which is prohibited by the Preliminary Injunction.
>
> Our units are trained in crowd control and response to

unlawful assemblies. They are trained to utilize widely accepted munitions and less-lethal tools to protect the lives of residents, the lives of sworn staff and other individuals on scene. Our units are trained with the FN303, stingball grenades, and 37 mm launchable rubber .60 caliber pellets, along with 40 mm launchable rubber .60 caliber pellets. Our units also utilize tear gas to disburse unlawful riot activities when violence and extreme vandalism is the crowd's intent or to create a safe distance between Law Enforcement and those committed to assaulting them.

The use of these less lethal tools, in combination, is what allows our units to be successful. The elimination of these widely accepted tools and methods places my members at risk. The only available tool that my deputies are trained with, and would be allowed to utilize, is the 40 mm exact sponge impact munitions. This less lethal tool alone is easily defeated by any type of makeshift shield. In my opinion, this alone would not be sufficient to protect my deputies from injury, nor would it be effective in stopping a crowd from continuous illegal activities.

In recent mutual aid responses, several of my sworn personnel have been injured. One Command Staff member, [redacted], was struck in the head with a brick thrown from a distance of over twenty yards. One detective, [redacted], sustained second degree bums from an ignited Molotov cocktail thrown from a distance of about ten yards. This attack also burned two other sworn members who were positioned next to [redacted]. Another sworn member, [redacted], was doused in the face with an accelerant, in an apparent attempt to burn and disfigure her. Officers and deputies assigned to these events were subjected to having fireworks launched at them from among the crowds. These attacks took place even with our members deploying some of the tools prohibited by the Injunction. The cowards that utilized these dangerous weapons against my staff concealed themselves in a riotous crowd, or from behind barricades, to prevent identification and utilized the element of surprise to further their violent agenda.

I want to make it clear that my staff does not use force against those lawfully exercising their First Amendment rights. While it is not possible to predict when, or if, a peaceful protest will devolve into a riot, it is generally conceded that some individuals and groups may utilize the cover of a peaceful protest to foment violence and chaos. The Preliminary Injunction was apparently crafted with the intent to protect individuals engaged in peaceful protests, however, a possibly unintended consequence appears to provide exactly the type of support necessary for violent, destructive behaviors to occur almost virtually unchecked. I cannot, in good conscience, assign members

1
2

> of my agency to participate in the efforts to reduce or
> eliminate the chaos and violence which may occur, under
> the conditions imposed by the Preliminary Injunction.

3   *Id*. at 2-3.

4       Consistent with the preliminary injunction, the Sheriff's policies on less-lethal

5   munitions require targeted deployment by specially trained deputies.  Pereda Decl.,

6   Ex. A, ACSO General Orders 1.21 and 3.02.  Further, deputies must report the use

7   of these tools.  *Id*.

8       Like the Sheriff's Office, Fremont, San Leandro, Union City, Newark, and San

9   Mateo County have concluded that they can no longer provide aid during protests.

10  Yu Decl., ¶ 5.  One of these agencies said this:

11
12          [I]f the "protest" event turns into a "riot" our
            deputies/officers will not have immediate access to their
13          needed munitions to deal with the quickly evolved event.
            Per the court order, and the comments attached below, if
14          the event changes deputies/officers would have the
            opportunity to make independent decisions per our own
15          policies.  However, they would be without the appropriate
            gear to support changing event (Protest to Riot).

16          I would also like to add, we are a multiple agency Mutual
            Aid team, responding for Mutual Aid per Oakland's
17          request. San Mateo County would need the support and
            buy in from all chiefs in our county to support this request,
18          which has a court order limiting the decision making of
            our deputies/officers.
19

20  Yu Decl., Ex. F.

21      All combined, these agencies supplied approximately 55% of the mutual aid

22  officers on May 29, 2020 and 40% of the mutual aid officers on May 30, 2020.  *Id* at ¶

23  6.  This data excludes the California Highway Patrol, which addresses activity on

24  state highways.  *Ibid.*

25      No agency has notified OPD that it would provide mutual aid during protests.

26  *Id*. at ¶ 7.

27      Hoping to resolve or narrow this issue, the City Attorney's Office has

28  conferred with counsel for some of these agencies, including counsel for the Sheriff's

1  Office.  Pereda Decl., ¶ 2.  These agencies' position—including the Sheriff's—have
2  not changed.  *Id.*

3      The Sheriff and others have raised similar worries in the past.  Dkt. No. 36-
4  13.  The U.S. Marshal, for instance, explained that mutual aid was needed to
5  preserve the crime scene at the federal courthouse.  *Id.*  Further, he said this:

> If the City of Oakland refuses to allow the use of chemical
> agents as a last resort to quell rioting and violence, I will
> advise the Chief Judge and United States Attorney,  that
> the Oakland Court House & Federal Building, and it's
> occupants, cannot be sufficiently protected during civil
> unrest, and recommend that all court proceedings be
> transferred to San Francisco or San Jose Court Houses for
> an indeterminate period.    Employees in the Oakland
> Federal building and United Court House rely on our
> Federal Protective Service, and the Oakland Police
> Department as first responders.   The safety of our
> employees, and members of the public is paramount.
> Banning the use of chemical agents/tear gas hampers our
> efforts to protect our employees and members of the public
> from rioters and violence.  It also undermines the rule of
> law and administrator [sic] of justice.

15  *Id.*

16  ## III.   MUTUAL AID IS ESSENTIAL

17      Mutual aid is essential for enabling protests and ensuring public safety.  Dkt.
18  No. 36-1, at ¶¶ 11-13.  To meet these objectives, OPD must constantly assess a crowd
19  and be prepared to utilize various methods, such as quickly increasing or reducing
20  officers' presence.  Allison Decl. ¶ 5.

21      Crowds vary widely.  *Id.* at ¶ 6.  A crowd may be peaceful and require a small
22  officer presence to help facilitate the crowd's First Amendment activity.  *Ibid.*  Or a
23  large crowd may require a larger officer presence to help facilitate the crowd's
24  movement or to address individuals or subgroups within the crowd who are risking
25  the safety of protestors, officers, or other members of the public.  *Ibid.*  Further, a
26  small crowd could require a large officer presence if, for example, persons among the
27  crowd are acting destructively.  *Ibid.*  At any moment, a crowd may splinter or
28  change dramatically in tone and temperament.  *Id.* at ¶ 7.

To assess a crowd—and thus assess the best approach for facilitating the exercise of free speech and protecting public safety—officers must observe the crowd, attempt to coordinate with the crowd's leaders, and gather information.  *Id.* at ¶ 8. During a crowd event, law enforcement may have to adjust its approach according to the evolving crowd dynamics and activity.  *Ibid.*

Having mutual aid present or at least available at the outset of protests—especially when large crowds or destructive subgroups are anticipated—is the most efficient way to use mutual aid and best manages risk.  *Id.* at ¶ 9.  This allows for staging, better coordination, deterrence of criminal activity, less officer fatigue, and quicker responses.  *Ibid.*  It is suboptimal for mutual aid to arrive only after a riot or widespread criminal activity has erupted.  *Ibid.*

The City has attempted to minimize the need for officer intervention and mutual aid during protests by, among other things, erecting barriers and removing potential vandalism targets at various locations, including at the Police Administration Building.  *Id.* at 10.  Further, many businesses and residents have boarded up their doors and windows.  *Ibid.*  In recent protests, these protective items have still been targeted and damaged.  *Ibid.*

To respond to recent protests—knowing that mutual aid is unavailable—OPD has widely cancelled officers' days off.  *Id.* at ¶ 11.  This practice can lead to harmful officer fatigue and reduce resources for other service needs.  *Ibid.; see also* Bryan Vila, Tired Cops: The Importance of Managing Police Fatigue, (Washington, DC: Police Executive Research Forum, 2000); Mora L. Fiedler, Officer Safety and Wellness: An Overview of the Issues (Washington, DC: Office of Community Oriented Policing Services, 2011), 4, (http://cops.usdoj.gov/pdf/OSWG/e091120401-OSWGReport.pdf).

In future protests, there is a risk that the people of Oakland could suffer loss and damage that could be prevented if mutual aid were available.  Allison Decl., ¶ 12.

1

**IV.   THE CITY RELIES ON MUTUAL AID**

2

As the Court summarized, the City relied heavily on mutual aid during

3

protests from May 29, 2020 through June 1, 2020:

4

5

> According to Assistant Police Chief Allison, "[e]specially
> during the first four days of protests—May 29, 2020

6

> through June 1, 2020—the City relied heavily on mutual
> aid from the Alameda County Sheriff's Office, the

7

> California Highway Patrol, the U.S. United States
> District Court Northern District of California Marshals

8

> Service, and police departments from across the Bay Area
> and state." Allison Decl. ¶ 11.   Assistant Chief Allison

9

> states that "[t]he City has around 733 law enforcement
> personnel and can deploy only so many of them at any

10

> given time. On nights such as May 29 and June 1, when
> the OPD is at once attempting to facilitate mass protests

11

> and to respond to mass looting and violence throughout
> the City, mutual aid is critical." Id.   A chart in his

12

> declaration reflects that on the night of May 29, 2020, 215
> OPD officers and 508 mutual aid officers were deployed.

13

> Id. ¶ 13.   On May 30, 2020, the number of OPD officers
> deployed had increased to 380 but they were still

14

> outnumbered by mutual aid officers, whose numbers had
> also increased, to 550. Id.   On May 31 and June 1, OPD

15

> maintained the number of officers deployed at 380 while
> the number of mutual aid officers dropped to 200 (May 31)
> and 222 (June 1). Id.

16

17

Dkt. No. 54, at 19-20 (citing Dkt. No. 32-1, Allison Decl. (June 24, 2020)).

18

**V.    OAKLAND HAS SUFFERED HARM**

19

Over the same days, two Federal Protective Service officers were shot (by a

20

man with suspected ties to the boogaloo movement).  Dkt. No. 54, at 10.  Over 200

21

businesses suffered vandalism, theft, or other damage.  This occurred all throughout

22

Oakland, including in East Oakland, Chinatown, the Lake Merritt area, Downtown,

23

and Uptown.  Hinkle Decl., ¶ 4.  East Oakland—which is home to some of the City's

24

most vulnerable communities with the fewest resources—was hard hit.  For

25

instance, due to looting and vandalism, La Clinica de La Raza was unable to provide

26

certain essential services to the community.  Dkt. No. 36-15.  In short, the City and

27

its officers faced extraordinarily challenging conditions.  Dkt. No. 54, at 9-12.

28

1    So, too, during recent nighttime protests.[1]  For instance, the City's

2  Department of Economic & Workforce Development received reports of the following

3  damage at local businesses and residential units, including affordable housing,

4  during protests on August 26, 2020: several fires, including inside a state courthouse

5  and at a construction site; seventy punctured or broken building windows; twelve

6  broken doors; and theft and vandalism within businesses.  Hinkle Decl., ¶ 5.  The

7  event started at City Hall and continued through Downtown Oakland and the Lake

8  Merritt area.  People at the front of the crowd had shields, which were used to block

9  officers from making targeted arrests and to assault officers.  "SOLIDARITY

10  MEANS ATTACK," was the message urged by the large, lead banner. *See* Pullen

11  Decl., Ex. A

12  (https://www.dropbox.com/s/6kuipwa6fsjhmmo/ProtestVideoClips%2026Aug20%2020

13  -042337%20%281%29.mp4?dl=0).

14                                          **DISCUSSION**

15    It is prudent for the City to anticipate and prepare for significant, extended

16  protests next month.  To begin with, there are widespread reports that due to delays

17  caused by the pandemic or legal challenges, the election's outcome may not be

18  certain for some time.  Further, President Trump's tweets and remarks about the

19  elections and his acceptance of their results—such as his comments at the recent

20  debate—are of concern and could incite mass protests.

21    Further, the people of Oakland have suffered harm in protests this year.  *See*

22  Section V above.  And as Assistant Chief Allison and others have explained, mutual

23  aid is essential.  Allison Decl., ¶¶ 2-12.

24  **I.     RESTORING TRAINING BULLETIN III-G**

25    Against that backdrop, the City seeks to make mutual aid available.   OPD's

26  mutual aid partners will not come if the preliminary injunction applies to them.  At

27  ---

[1] The City strongly disagrees with Plaintiffs' characterizations of recent events and
28  OPD's response, Dkt. No. 63; the City will address Plaintiffs' allegations in the City's
its filing due on October 19, 2020.

this point, the City thus respectfully requests that the Court modify the preliminary injunction by striking—or at least suspending for next month—Section VI(i)-(vi), and allowing *Training Bulletin III-G,* as it stands, to govern mutual aid requests.

## II. MEMORANDUM OF AGREEMENT

Alternatively, the City respectfully requests an order finding that a memorandum of agreement between OPD and mutual aid partners would (1) not violate the preliminary injunction, and (2) pursuant to Cal. Gov't Code § 8618, make the mutual aid agency *not bound* by the preliminary injunction.

The Emergency Services Act provides that "[u]nless otherwise expressly provided by the parties, the responsible local official in whose jurisdiction an incident requiring mutual aid has occurred shall remain in charge at such incident, including the direction of personnel and equipment provided him through mutual aid." Cal. Gov't Code § 8618.

Citing this law, the Court held that "[b]ecause no mutual aid partners have been named as defendants, the Court does not have the authority to issue injunctive relief that is binding on the mutual aid partners. Nonetheless, California law provides that when OPD requests assistance from mutual aid partners, OPD officers are to "remain in charge . . . including the direction of personnel and equipment provided him through mutual aid." Dkt. No. 54, at 32 (citing Cal. Gov't Code § 8618).

But if different terms about equipment and direction were "expressly provided by the parties," then, by the same authority and reasoning, the preliminary injunction would not apply to mutual aid officers.

In thinking through this new, potential solution, the City has in mind the following terms:

Equipment

- Pursuant to Cal. Gov't Code § 8618, each responding mutual aid agency shall decide the equipment the agency will bring to render mutual aid to OPD.

- ▪ Upon arriving to render mutual aid, the mutual aid agency's highest-ranking officer shall meet with the OPD Incident Commander or her designee and provide an inventory of any less-lethal munitions and chemical agents the agency brought.

OPD's Right to Decline Mutual Aid

- ▪ Before a mutual aid agency deploys into the field, OPD may decline mutual aid from that agency.  Further, once an agency deploys into the field, OPD may decline the agency's further rendering of mutual aid, at which point the agency will cease its law enforcement activities within Oakland in a manner that the mutual aid agency determines is safe for the public and officers.

Field Operations

- ▪ To the fullest extent possible, OPD will endeavor to assume frontline positions between protestors and law enforcement personnel.
- ▪ Pursuant to Cal. Gov't Code § 8618, except in self-defense situations, the highest-ranking officer of each agency providing mutual aid shall authorize the use of force according to that agency's policies.  Except in self-defense situations, the agency shall endeavor to notify the OPD Incident Commander or Operations Commander before using less-lethal munitions or chemical agents.

OPD Policies

- ▪ The mutual aid agency will endeavor to review Training Bulletin III-G and the Preliminary Injunction, *APTP, et al. v. City of Oakland, et al.*, C20-3866 JCS, Dkt. No. 52 (N.D. Cal. July 29, 2020), which applies to OPD and to mutual aid agencies that have not signed the memorandum of agreement. Pursuant to that order, OPD officers "are prohibited from using stinger grenades, wooden bullets, rubber or rubbercoated bullets, pepper balls, or similar munitions."
- ▪ In light of the mutual aid agency's policies, training, officer safety, information provided along with the request for mutual aid, and any other factor the mutual aid agency finds relevant, the mutual aid agency will consider the following: (i) not bringing any tools that OPD are prohibited from using, or (ii) bringing such tools but not immediately taking them into the field.  This provision does not preclude the mutual aid agency from bringing or using any tool.

## CONCLUSION

For the foregoing reasons, the City respectfully seeks the requested relief or any other guidance from the Court on making mutual aid available.

1   Dated: October 12, 2020                    Respectfully submitted,

2

3                                              BARBARA J. PARKER, City Attorney
                                               DAVID A. PEREDA, Special Counsel
4

5                                 By:          _____/s/ David Pereda___
                                               Attorneys for Defendant
6                                              CITY OF OAKLAND

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28