1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   ANTI POLICE-TERROR PROJECT, et al.,        Case No.  20-cv-03866-JCS

         Plaintiffs,                           **ORDER DENYING PLAINTIFFS'**
8                                              **MOTION TO ENFORCE AND**
      v.                                       **MODIFY, AND GRANTING IN PART**
9                                              **DEFENDANT CITY OF OAKLAND'S**
                                               **CROSS-MOTION TO MODIFY,**
10  CITY OF OAKLAND, et al.,                   **PRELIMINARY INJUNCTION**
         Defendants.                           Re: Dkt. Nos. 63, 66
11

12

13  **I.   INTRODUCTION**

14         This case arises out of ongoing demonstrations in Oakland against police brutality and

15  racial injustice in the United States.  After being sparked by the killing of George Floyd by a

16  Minneapolis police officer on May 25, 2020, these demonstrations were rekindled by the shooting

17  of Jacob Blake by a Kenosha police officer on August 23 and the lack of a grand jury indictment

18  of any Louisville police officers for the death of Breonna Taylor on September 25.

19         On June 11, Plaintiffs filed a complaint alleging that, between May 29 and June 1, the

20  Oakland Police Department ("OPD") "deployed constitutionally unlawful crowd control tactics

21  including kettling, indiscriminately launching . . . tear gas and flashbangs into crowds and at

22  individuals, and shooting projectiles at demonstrators."  Compl. (dkt. 1) ¶ 2.  According to

23  Plaintiffs, OPD "did not act alone[,]" "call[ing] on its mutual aid network of police departments

24  from other municipalities to further carry out its constitutionally violative tactics."  *Id.* ¶ 8.

25  Plaintiffs moved for a temporary restraining order ("TRO") and a preliminary injunction.  *Id.* at

26  17–18; dkt. 13 (motion for TRO and preliminary injunction); dkts. 14–28 (documents in support

27  of motion for TRO and preliminary injunction).  On June 18, based on the agreement of the

28  parties, the Court entered a TRO that restricted the crowd control tactics and munitions that OPD

United States District Court
Northern District of California

United States District Court
Northern District of California

was permitted to use.  TRO (dkt. 34); *see* dkts. 31–33.  On July 29, after receiving written and oral

arguments and evidence from the parties, the Court entered a preliminary injunction (the

"Injunction").  Injunction (dkt. 52).  On August 10, the Court issued an opinion explaining its

reasoning for granting the Injunction.  Opinion (dkt. 54).[1]

On October 7, Plaintiffs filed the present motion to enforce and modify the Injunction (the

"motion").  Mot. (dkt. 63); *see* Plaintiffs' Proposed Order (dkt. 73).  On October 12, Defendant

City of Oakland (City) filed the present cross-motion to modify the Injunction (the "cross-

motion").  Cross-Mot. (dkt. 66); *see* Status Rpt. (dkt. 75).  Given the potential for large-scale

demonstrations related to the upcoming election, the Court received briefing on an expedited

schedule and held a hearing on the motions on October 27, 2020 at 3:00 p.m.  On Wednesday,

October 27, the Court issued an amended injunction (the "Amended Injunction"), making some

but not all of the modifications requested by the City.[2]  Amended Injunction (dkt. 82).  In this

order, the Court denies Plaintiffs' motion to enforce the Injunction and sets forth its reasons for

denying Plaintiffs' motion to modify the Injunction and for granting in part and denying in part the

City's cross-motion to modify the Injunction.[3]

## II.  BACKGROUND

### A.    Allegations in Plaintiffs' Complaint and Evidence Previously Submitted

In the Court's opinion explaining its reasoning for granting the Injunction, the Court

described the allegations in Plaintiffs' Complaint and the evidence previously submitted by the

parties.  *See generally* Opinion.

Plaintiffs allege that on May 29, 2020 and several days thereafter, "OPD and its mutual aid

partners used a variety of impermissible tactics against peaceful protesters, often without adequate

warnings, causing physical injuries and trauma and 'discourag[ing] members of the Oakland

---

[1]  *Anti Police-Terror Project v. City of Oakland*, __ F. Supp. 3d __, No. 20-cv-03866-JCS, 2020
WL 4584185 (N.D. Cal. Aug. 10, 2020).  For ease of reference, the Court uses the ECF page
numbering when citing the contents of the opinion.
[2]  In this order, the Court uses the present tense when referring to provisions of the Injunction that
remain unchanged in the Amended Injunction, and the Court only includes citations to the
Amended Injunction when referring to provisions that have changed in some respect.
[3]  The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28
U.S.C. § 636(c).  Dkts. 7, 9, 11, 74.

United States District Court
Northern District of California

1  community from participating in lawful protest activities.' "  *Id.* at 3 (quoting Compl. ¶ 19); *see id.*

2  at 2–4; *see generally* Compl.  They have brought "a putative class action on behalf of '[a]ll

3  demonstrators who participated and/or intended to participate in the protests beginning on May 29,

4  2020 in Oakland,' against the City of Oakland (the "City"), OPD Police Chief Susan Manheimer,

5  OPD Sergeant Patrick Gonzales, and OPD Officers Maxwell D'Orso and Casey Fought," asserting

6  claims under 42 U.S.C. § 1983 for violations of the First, Fourth, and Fourteenth Amendments.

7  Opinion at 3 (quoting Compl. ¶ 81); *see id.* at 26–28 (discussing claims).

8      In support of their motion for a temporary restraining order and preliminary injunction,

9  "Plaintiffs submitted numerous sworn declarations describing encounters they and other protestors

10  had with police while they were participating in protests in downtown Oakland between May 29

11  and June 1, 2020." *Id.* at 5; *see id.* at 5–9; *see generally* dkt. 13-28.  Additionally, Plaintiffs

12  presented a declaration by a specialist in pulmonary disease "addressing the health risks associated

13  with the use of chemical agents, including tear gas and pepper spray" and explaining the view that

14  "the use of tear gas and pepper spray is particularly dangerous during the COVID-19 pandemic."

15  Opinion at 20–21, 21; *see id.* at 19–23; *see generally* Sporn Decl. (dkt. 23); *id.* ¶ 20 (quoting a

16  statement of the American Thoracic Society).

17      In opposition to Plaintiffs' motion, Defendants offered two declarations, "one by their

18  attorney, David Pereda, and another by Darren Allison, Interim Assistant Chief of Police at OPD."

19  Opinion at 9; *see generally* dkts. 36-1, 36-2.  Although "[n]either declaration specifically

20  addresse[d] the incidents described by Plaintiffs in their complaint and in the declarations,"

21  Defendants also supplied the Court with activity logs for May 29 through June 8 that contained

22  "reports by OPD officers of activity related to demonstrations in Oakland, as well as reports of

23  looting, Molotov cocktails being thrown and other illegal activities."  Opinion at 9; *see id.* at 9–12;

24  *see generally* dkt. 36-10.  Additionally, Defendants supplied the munitions logs for May 29

25  through June 4, which contained information about munitions deployed by OPD, but not by its

26  mutual aid partners.  Opinion at 12; *see generally* dkt. 36-11.

27      According to Defendants' declarations, " 'Especially during the first four days of

28  protests—May 29 through June 1—Oakland relied heavily on mutual aid from the Alameda

County Sheriff's Office, the California Highway Patrol, the U.S. Marshals Service, and police departments from across the Bay Area and state.' " Opn. at 19–20 (quoting dkt. 36-1 at ¶ 11). " 'During these days, mutual aid partners reported that, among other force options, they deployed CS blasts, Sting balls, smoke, and projectiles.' " *Id.* at 20 (quoting dkt. 33-1 at ¶ 14).

Defendants also submitted Training Bulletin III-G, OPD's Crowd Control and Crowd Management ("Training Bulletin III-G" or "Crowd Control Policy") that is mandated under the settlement agreements and orders in *Spalding v. City of Oakland*, No. 11-cv-02867 TEH (N.D. Cal.), and *Campbell v. City of Oakland*, No. 11-cv-05498 JST (N.D. Cal.). Opinion at 12 n.5 (describing settlement agreements and orders); *see* Training Bulletin III-G (dkt. 36-3). As the Court observed, "One of the stated policies that underpins the OPD Crowd Control Policy is to 'uphold constitutional rights of free speech and assembly while relying on the minimum use of physical force and authority required to address a crowd management or crowd control issue.' " Opinion at 13 (quoting Training Bulletin III-G, § 1). To meet this objective, the policy contains specific provisions relating to crowd management and control, use of chemical agents and less lethal munitions, and mutual aid. *See id.* at 12–19. Defendants' opposition also recognized that, on June 16, the Oakland City Council "passed a resolution urging OPD and mutual aid partners to stop using tear gas for crowd control during the COVID-19 pandemic." *Id.* at 23 (quoting dkt. 36 at 16); *see generally* dkt. 36-18.

**B.    The Preliminary Injunction**

Even before the Court entered the Injunction, the parties agreed to many of its provisions. Opinion at 31 (citing July 26 Status Report (dkt. 47)). The parties' primary disagreements included "the degree to which the mutual aid partners would be bound by the preliminary injunction" and "the substantive limits that would [be] placed on OPD tactics and munitions in conducting crowd control." *Id.*

On July 29, after considering the parties' arguments and evidence, the Court entered the Injunction. As is relevant here, Sections I, V, VI, and VIII of Injunction provide:

I.    TRAINING BULLETIN III-G

Except as modified in this order, OPD shall adhere to Training Bulletin III-

4

G, OPD Crowd Control and Crowd Management (2013), attached as Exhibit A. . . .

V.   TACTICS AND LESS LETHAL MUNITIONS

1.   OPD officers are prohibited from using stinger grenades, wooden bullets, rubber or rubber- coated bullets, pepper balls, or similar munitions.

2.   Chemical agents (including orthochlorobenzalmalononitrile), flashbang grenades, and foam-tipped projectiles shall be deployed only when (a) there is an imminent threat of physical harm to a person or significant destruction of property; and (b) other techniques, such as simultaneous arrests or police formations, have failed or are not reasonably likely to mitigate the threat. The use of such munitions must be authorized by an OPD Operations Commander or Incident Commander. None of these devices shall be deployed on peaceful protestors or indiscriminately into a crowd. They may only be targeted at the specific imminent threat justifying the deployment. Flash bang grenades and gas canisters must be deployed at a safe distance from the crowd to minimize the risk that individuals will be struck and injured by those devices. When chemical agents are used, only the minimum amount of chemical agent necessary to obtain compliance may be used, in accordance with OPD's Department General Order K-3, USE OF FORCE.

3.   Except where an immediate risk to public safety or of significant property damage makes it impossible to do so, before any of the devices listed in Section V(2) are deployed to disburse a crowd, OPD must have made at least two announcements to the crowd asking members of the crowd to voluntarily disperse and informing them that, if they do not disperse, they will be subject to arrest. These announcements must be made using adequate sound amplification equipment in a manner that will ensure that they are audible to the crowd and must identify at least two means of escape/egress. OPD must also allow the crowd sufficient time to disperse after making these announcements before deploying any of the devices in Section V(2).

VI.  MUTUAL AID

The OPD Incident Commander shall be responsible for ensuring that the requirements listed below are met by mutual aid agencies providing assistance to OPD under a mutual aid agreement, unless exigent circumstances prevent the fulfillment of these obligations:

i.    The Incident Commander shall ensure that the mutual aid agency has been briefed and is in agreement with OPD's Unit of Command structure under which only OPD Commanders may authorize the use of less lethal munitions for crowd control and dispersal;

ii.   The Incident Commander shall ensure that the mutual aid agency has been briefed on OPD's policy on prohibited weapons and force;

iii.  The Incident Commander shall ensure that the officers of the mutual aid agency who provide assistance to OPD do not bring or use any weapons

or force prohibited under OPD's policy;

    iv.    The Incident Commander shall ensure that the mutual aid agency has been provided a copy of OPD's Crowd Control Policy and Use of Force policies;

    v.    The Incident Commander shall ensure that officers of the mutual aid agency who provide assistance to OPD are not assigned to front-line positions or used for crowd intervention, control or dispersal unless there is a public safety emergency;

    vi.    The Incident Commander shall ensure that the officers of the mutual aid agency who provide assistance to OPD complete required reports prior to being released from duty. Agencies should provide the following documents/reports when they are applicable: Use of force report, arrest report, crime report, injury report, equipment damage report and list of responding personnel.

These provisions do not prohibit an OPD or mutual aid officer from taking reasonable action or using reasonable or necessary force as allowed by law against an individual in self-defense or in defense of another person or officer. OPD personnel shall endeavor to assume front line positions between mutual aid officers and demonstrators. . . .

VIII.  FACE MASKS AND GLOVES

During the pendency of the state of emergency declared by either the President of the United States, or the Governor of the State of California, due to the COVID-19 pandemic, all OPD officers and employees deployed to demonstrations in Oakland must wear face masks and gloves whenever they interact with members of the public.

And, as is relevant to the City's present cross-motion, the Court's subsequent opinion explained:

Because no mutual aid partners have been named as defendants, the Court does not have the authority to issue injunctive relief that is binding on the mutual aid partners. Nonetheless, California law provides that when OPD requests assistance from mutual aid partners, OPD officers are to "remain in charge . . . including the direction of personnel and equipment provided him through mutual aid."  Cal. Gov't Code § 8618.  The evidence submitted by the parties shows that mutual aid partners played a significant role in crowd control in Oakland during the relevant period, with the number of officers from mutual aid partners sometimes outnumbering OPD officers. In light of this evidence, the effectiveness of the injunctive relief awarded by the Court will depend to a large degree on whether officers of mutual aid partners abide by the terms of the preliminary injunction that apply to OPD with respect to the crowd control tactics and munitions they use.  Therefore, the Court has included in the Preliminary Injunction provisions designed to ensure that OPD officers will, in fact, remain in charge of the incident, including ensuring that the mutual aid partners do not use tactics or munitions that are inconsistent with the terms of the preliminary

injunction of Oakland's Crowd Control Policy.

Opinion at 32.

**C.      Plaintiffs' Motion and Evidence**

**1.      Plaintiffs' Motion**

After the shooting of Jacob Blake by a Kenosha police officer on August 23 and the lack of a grand jury indictment of any police officers for the death of Breonna Taylor on September 25, large demonstrations were held in Oakland.  On August 26, August 28, August 29, and September 25, Plaintiffs allege that "OPD responded to [the demonstrators'] calls for accountability" by violating Sections I, V, and VII of the Injunction "by deploying chemical agents and projectiles in a prohibited manner, kettling peaceful protestors, and failing to maintain safe social distancing measures." Mot. at 2.

In support of their motion, Plaintiffs offer declarations by several demonstrators who participated in these events.  Plaintiffs also supply the Court with links to tweets that include photos and videos of the August 28, August 29, and September 25 demonstrations and with a link to an article by the San Francisco Chronicle regarding the September 25 demonstration.  Kim Decl (dkt. 64).  Finally, Plaintiffs submit a probable cause declaration that was filed by OPD in support of a charge against a demonstrator who participated in the August 28 demonstration.  PC Decl. (dkt. 64-1).  The Court summarizes these materials below.

**2.      Events on Wednesday, August 26**

Plaintiffs allege that Defendants violated the Injunction on August 26 by kettling peaceful demonstrators, by displaying their weapons to control demonstrators' movements, and by failing to wear face masks and gloves.  Mot at 3, 8–9.  In support of these allegations, Plaintiffs submit declarations by Cat Sorokin and Ella Hansen, who participated in the demonstrations as medics to provide aid to anyone who should need it.  Sorokin Decl. (dkt. 63-2) ¶¶ 3, 8–10; Hansen Decl. (dkt. 63-5) ¶¶ 3–6.

Around 7:00 or 7:30 p.m., demonstrators gathered for a march starting from Oscar Grant Plaza.  Hansen Decl. ¶ 5.  Ms. Sorokin and Mx. Hansen drove behind the demonstrators in a van visibly marked with "big 'First Aid,' letters above the windshield," "big red crosses on the sides

and rear," and the letters " 'QUICC,' which stands for Queers United in Community Care." Hansen Decl. ¶¶ 7–10; Sorokin Decl. ¶¶ 4–6. Ms. Sorkin declares that, during the demonstration, officers "kettled and closely followed protestors, including immersing themselves in the protest." Sorokin Decl. ¶ 11. "Near the end of the night," Mx. Hansen declares, the demonstrators "were blocked in by OPD and only had one way to go, which was into a residential neighborhood." Hansen Decl. ¶ 13. Then, they "ended up at a 'T' intersection, but the police barricaded both exits." *Id.* ¶ 14. When the demonstrators turned around, officers "rushed at the crowd." *Id.* Mx. Hansen and the other occupants of the medic van "were trying to leave but the police targeted and surrounded the medic van" and "pulled" the occupants out. *Id.* ¶¶ 16, 18. Mx. Hansen was "tackled," "shov[ed]," and "push[ed] . . into the ground" by five OPD officers who "forc[ed] [Mx. Hansen] down." *Id.* ¶ 19. Ultimately, Mx. Hansen was handcuffed and transported to the Santa Rita Jail. *Id.* ¶¶ 20, 44. "Throughout these events," Mx. Hansen declares, "many officers were not wearing masks or practicing any social distancing." *Id.* ¶ 49.

### 3. Events on Friday, August 28

Plaintiffs allege that Defendants also violated the Injunction on August 28 by deploying chemical agents without justification, without warning, and in an unsafe manner; by kettling peaceful demonstrators; by displaying their weapons to control demonstrators' movements; by corralling demonstrators such that they could not keep physical distance from each other; and by failing to wear face masks and gloves. Mot at 3–4, 7–9. In support of these allegations, Plaintiffs submit declarations by the following demonstrators: Alex Lapierre, Chris Munevar, Ian McDonnell, Jennifer Li, and Killian Clancy. *See* Mot. at 3–4; Lapierre Decl. (dkt. 63-1); Munevar Decl. (dkt. 63-3); McDonnell Decl. (dkt. 63-6); Li Decl. (dkt. 63-7); Clancy Decl. (dkt. 63-9).

Between 7:00 and 8:00 p.m., demonstrators gathered at Oscar Grant Plaza. Munevar Decl. ¶ 2; McDonnell Decl. ¶ 4; Li Decl. ¶¶ 4–6; Clancy Decl. ¶ 5. From the declarations, it appears that many demonstrators marched west to the Federal Building, south to the Oakland Police Administration Building, and then north back to Oscar Grant Plaza, but it is not clear whether Mr. Lapierre, Mr. McDonnell, Ms. Li, and/or Mr. Clancy were marching in the same crowd the entire time. Lapierre Decl. ¶ 3; McConnell Decl. ¶10; Li Decl. ¶¶ 8–12; Clancy Decl. ¶ 5. Meanwhile,

Mr. Munevar's declaration indicates that he was in a crowd of demonstrators that marched "almost to North Berkeley and . . . back." Munevar Decl. ¶ 3.

According to Mr. Clancy, officers "surrounded the crowd and walked along the sidewalks and the back of the crowd." Clancy Decl. ¶ 9. "[F]ollow[ing] the back of the crowd closely," officers "t[old] people that they had to . . . keep moving," and they "kept the crowd compact so that physical distancing was not possible." *Id.* ¶¶ 9, 10. They also "shov[ed] people off the sidewalks into the street." *Id.* ¶ 9. Similarly, Mr. Lapierre recalls that officers "walk[ed] on both sides of the sidewalk" and "pushed some demonstrators back onto the street." Lapierre Decl. ¶ 4. Further, Mr. Munevar recalls that officers were "armed with really big guns," told people to "move faster or you will be arrested," and "stepped on the back of [his] shoes and [his] girlfriend's shoes." Munevar Decl. ¶¶ 4, 5, 6.

Sometime between 9:06 p.m. and 9:11 p.m., a crowd of demonstrators including Mr. McDonnell and Ms. Li reached the intersection of Franklin Street and 15th Street, where officers deployed "smoke bombs" without warnings audible to Ms. Li or Mr. McDonnell. McDonnell Decl. ¶¶ 11–15; Li Decl. ¶¶ 17–18. Officers then grabbed and handcuffed two demonstrators without explaining the causes for their arrests. McDonnell Decl. ¶¶ 16–19; Li Decl. ¶ 20. Additionally, Ms. Li saw some OPD officers without face coverings, and she saw others remove their face coverings, including one with an arrestee in his vehicle. Li Decl. ¶¶ 21–22. Shortly after an officer kicked Mr. Lapierre's bicycle near the Federal Building around 9:00 p.m., he also observed officers "throw smoke bombs at the demonstrators." Lapierre Decl. ¶ 3. Based on the timing and location of the events in Mr. Lapierre's declaration, it seems he witnessed the same deployment as Ms. Li and Mr. McDonnell.

Mr. Clancy also states that after marching for 45 to 60 minutes, he "noticed the police throw a smoke grenade into [a] crowd," without warning. Clancy Decl. ¶¶ 12, 13. Based on the timing and location of the events described in officer reports submitted by Defendants, it seems that Mr. Clancy witnessed a different deployment than Mr. McDonnell, Ms. Li, and Mr. Lapierre. While moving away from the smoke, Mr. Clancy tripped over a median into the middle of the street and an officer "dove onto [him] and slammed [his] face into the ground, causing [him] to

9

bleed from [his] head" and leaving him with scrapes and bruises.  Clancy Decl. ¶¶ 15, 17; *see id.* ¶ 18 (photos of dark red bruises across Mr. Clancy's forehead).  Mr. Clancy was arrested and transported to the Santa Rita Jail.  *Id.* ¶¶ 20–21.

Plaintiffs also supply links to a tweet by the San Francisco Chronicle and a tweet by Ronald Li, a reporter for the Chronicle.  Kim Decl. ¶ 3(a) (link to a tweet by the San Francisco Chronicle ("Chronicle Tweet"));[4] *id.* ¶ 3(b) (link to a tweet by Roland Li ("Li Tweet")).[5]  The Chronicle's tweet includes four photos.  Chronicle Tweet.  One shows a demonstrator staring at a line of officers with a cloud of a substance that looks like smoke in the foreground.  *Id.*  Another shows an officer forcibly arresting a protestor; in the background are other officers and protestors and a cloud of a substance that looks like smoke.  *Id.*  Mr. Li's tweet includes a video.  Li Tweet. At the beginning, there are flashes and noises that seem to be from the explosion of munitions.  *Id.* Several protestors face a line of officers, but they slowly retreat as a cloud of a substance that looks like smoke expands towards them.  *Id.*  The tweet reads, "Tear gas used as Oakland protest walks up Broadway."  *Id.*

#### 4.  Events on Saturday, August 29

Plaintiffs allege that Defendants again violated the Injunction on August 29 by deploying chemical agents without justification, without warning, and in an unsafe manner; by kettling peaceful demonstrators; by displaying their weapons to control demonstrators' movements; and by declaring the demonstration an unlawful assembly without justification.  Mot at 4–5, 8–9.  In support of these allegations, Plaintiffs submit declarations by the following demonstrators: Mr. Lapierre, Ms. Sorokin, Mr. Munevar, Danielle Gaito, and Katherine Sugrue.  Lapierre Decl.; Sorokin Decl.; Munevar Decl.; Gaito Decl. (dkt. 63-4); Sugrue Decl. (dkt. 63-8).

The demonstrators began with a candlelight vigil at Lake Merritt at the park across the street from Grand Lake Theater.  Sorokin Decl. ¶¶ 18, 20, 22; Munevar Decl. ¶¶ 8, 10–11; Gaito Decl. ¶ 2; Sugrue Decl. ¶¶ 1–2.  At the vigil, Ms. Gaito observed that "only a few officers were

---

[4] San Francisco (@sfchronicle), TWITTER (Aug. 28, 2020, 9:53 PM), https://twitter.com/sfchronicle/status/1299570972169850880.
[5] Roland Li (@roldandlisf), TWITTER (Aug. 28, 2020, 9:25 PM), https://twitter.com/roldandlisf/status/1299563796273324034.

United States District Court
Northern District of California

wearing masks, not all."  Gaito Decl. ¶ 8.  Between 9:00 p.m. and 9:30 p.m., the demonstrators marched north up Grand Avenue.  Lapierre Decl. ¶ 5; Munevar Decl. ¶ 12; Gaito Decl. ¶¶ 9–10; Sugrue Decl. ¶ 3.  Officers were on both sides and behind the march "in a U shape."  Sorokin Decl. ¶ 25.  They were "pushing the march at the tail end and on both sides," being "aggressive to people who were slowly walking," and telling demonstrators to "[w]alk faster or get out the way." Munevar Decl. ¶¶ 13, 15, 17, 18; *see* Gaito Decl. ¶ 12.  Officers kettled demonstrators into a residential neighborhood on Mandana Boulevard, making it "difficult to maintain physical distance."  Sugrue Decl. ¶ 3; *see* Munevar Decl. ¶¶ 15, 19–20; Gaito Decl. ¶¶ 10, 12.  Suddenly, officers began "attacking" demonstrators; "running into" them; and "body checking" them. Sugrue Decl. ¶ 4; Gaito Decl. ¶ 13; Lapierre Decl. ¶ 5.  Mr. Lapierre was "knocked down," and Ms. Sugrue was shoved.  Lapierre Decl. ¶ 5; Sugrue Decl. ¶ 3.

Without warnings audible to Mr. Lapierre or Ms. Gaito, OPD deployed cannisters with chemical agents[6] directly at and into the crowd of demonstrators.  Lapierre Decl. ¶ 5; Munevar Decl. ¶ 22–27; Gaito Decl. ¶ 14; Sugrue Decl. ¶ 4.  Mr. Munevar specifically declared that he "saw police shoot [a] smoke grenade at [him] at close range, about 20 yards away," and it "hit [him] in the head."  Munevar Decl. ¶¶ 23, 24; *see id.* ¶ 25 (photo of slightly discolored and slightly raised skin on forehead).  Ms. Gaito also declared that cannisters were "shot at protestors" and "into the center of the crowd."[7]  Gaito Decl. ¶ 14.  Meanwhile, Ms. Sugrue observed officers hit demonstrators with batons and throw her friend to the ground to arrest him.  Sugrue Decl. ¶¶ 3–5. OPD declared the demonstration an unlawful assembly, but continued to surround demonstrators, making it difficult to leave.  Munevar Decl. ¶¶ 31–36; Gaito Decl. ¶¶ 17–18.  As Mr. Lapierre was walking back toward the lake, "the police shoved [him] without warning" and hit him in the head several times with an officer's face shield, causing a mild concussion and an enduring headache.

[6]  The demonstrators described the dispersal devices as "smoke cannisters," Lapierre Decl. ¶ 5; "tear gas and smoke grenades," Munevar Decl. ¶ 22; "tear gas cannisters," Gaito Decl. ¶ 14; anf "smoke bombs and flash bombs," Sugrue Decl. ¶ 4.

[7]  Ms. Gaito also saw "an OPD officer aim something that looked like a shotgun and shoot a projectile at a man's torso," causing him to "f[all] to the ground."  Gaito Decl. ¶ 16.  OPD officers then "grabbed him and took him into an unmarked white vehicle."  *Id.*  Plaintiffs do not mention this incident in their motion and, to the Court's knowledge, it is not addressed anywhere else in the record.

United States District Court
Northern District of California

1    Lapierre Decl. ¶ 6.

2        Plaintiffs supply links to one tweet by an Oakland resident and another tweet by OPD.

3    Kim Decl. ¶ 3(c) (link to at tweet by Allison Brown ("Brown Tweet"));[8] *id.* ¶ 3(d) (link to retweet

4    of a tweet by OPD ("First OPD Tweet")).[9]  The resident's tweet includes a video taken from her

5    balcony overlooking demonstrators marching and officers following on foot and in police

6    vehicles.  Brown Tweet.  At the beginning, there is a cloud of a substance that looks like smoke,

7    and there are noises that seem to be the explosion of munitions.  *Id.*  At the rear of the protest,

8    there is a line of demonstrators who are holding shields and walking backwards.  *Id.*  A line of

9    officers is walking forwards, and there are a series of clashes between the two lines.  *Id.*  The

10   officers stop moving, and the demonstrators keep backtracking, which allows a gap to form.  *Id.*

11   A green laser pointer shines in the officers' direction.  *Id.*  The tweet reads, "Tonight in #Oakland

12   on my street in #LakeMerritt @oaklandpoliceca fired #teargas on approximately 150 peaceful

13   protestors and arrested and cited 2 nonviolent civilians."  *Id.*  OPD's tweet also includes a video.

14   First OPD Tweet.  It depicts officers declaring the demonstration an unlawful assembly and

15   instructing demonstrators to disperse northbound on Erie Street or eastbound on Mandana

16   Boulevard.  *Id.*  Finally, Plaintiffs submit a probable cause declaration filed by OPD which states

17   that officers "deployed smoke munitions in order to disperse the crowd" on August 29, 2020.  PC

18   Decl.

19               **5.  Events on Friday, September 25**

20       Finally, Plaintiffs allege that Defendants violated the Injunction on September 25 by

21   deploying chemical agents without justification, without warning, and in an unsafe manner.  Mot.

22   at 5, 8–9.  In support of these allegations, Plaintiffs supply links to an article by the San Francisco

23   Chronicle and to four tweets.

24       The Chronicle article includes "live updates" on the demonstrations.  Kim Decl. ¶ 3(e)

25   (link to Michael Williams and Lauren Hernández, *Live updates on Breonna Taylor case:*

26

27   [8] Allison Brown (@allisonbrown08), TWITTER (Aug. 29, 2020, 11:09 PM),
     https://twitter.com/alisonbrown08/status/1299952270864297985.

28   [9] Oakland Police Department (@oaklandpoliceca), TWITTER (Aug. 29, 2020, 9:51 PM),
     https://twitter.com/oaklandpoliceca/status/1299932791254130688.

United States District Court
Northern District of California

*Hundreds of demonstrators march through Oakland*, S.F. CHRONICLE (Sep. 25, 2020, 11:21 PM),

https://www.sfchronicle.com/bayarea/article/Live-updates-on-Breonna-Taylor-case-Protest-

15592633.php) ("Chronicle Article")).  The relevant updates are as follows:

> 9:20 p.m.   Police appear to deploy irritant at crowd:  Police appeared to deploy an irritant at the crowd at 14th and Harrison streets in Oakland shortly after protests moved construction barriers into the street."

> 9:22 p.m.   Oakland police says some in crowd "throwing bottles:"  Oakland police said on Twitter that some people in the swelling crowd marching westbound on 14th street toward City Hall were "throwing bottles and other objects" at officers.  "Please be mindful when traveling in and around our city," police said.

> 9:55 p.m.   One arrested in Oakland: At least one person was arrested by police in Oakland.  About 15 minutes after deploying an irritant toward the crowd, a group of police officers ran toward a protester and detained them.  Loud crowd-control devices and breaking glass could be heard as police deployed more smoke.

> 11:15 p.m. 'Multiple people' arrested for assault, police say: Oakland police said on Twitter that they arrested "multiple people arrested for assault on officers" on Friday night and deployed "minimal smoke" in response to conduct from people in the crowd. Police said there were no reports of damage to local businesses.

*Id.*  Plaintiffs also submit two tweets from Michael Williams, one of the authors of the Chronicle

article.  Kim Decl. ¶ 4(g) ("Second Williams Tweet");[10] *id.* ¶ 4(h) ("First Williams Tweet").[11]  The

tweet from 9:29 p.m. includes a video in which demonstrators move quickly to avoid a cloud of a

substance that looks like smoke.  First Williams Tweet.  Two burning objects are seen in the

center of the street.  *Id.*  The tweet reads, "More gas deployed.  Not sure if tear gas, but definitely

some sort of irritant. #Oakland." *Id.*  The 9:50 p.m. tweet includes a video in which officers and

demonstrators move quickly, and a cloud of a substance that looks like smoke begins to rise from

a munition on the street.  Second Williams Tweet.  A smoking object flies across the screen and

there are sounds that seem to be gas being emitted from a cannister, a glass bottling hitting the

---

[10] Michael Williams (@michaeldamianw), TWITTER (Sept. 25, 2020, 9:50 PM), https://twitter.com/michaeldamianw/status/1309716852386324480.

[11] Michael Williams (@michaeldamianw), TWITTER (Sept. 25, 2020, 9:29 PM), https://twitter.com/michaeldamianw/status/1309711701164482560.

ground, glass shattering, and the explosion of a munition. *Id.* Officers arrest a demonstrator. *Id.* The tweet reads, "First major confrontation, at least one arrest #Oakland." *Id.* Lastly, Plaintiffs submit a tweet by OPD, which reads as follows:

> 250+ people took part in tonight's protest. The group was immediately violent throwing bottles & cans at officers. OPD deployed minimal smoke. Multiple people arrested for assault on officers. No reports of damage to businesses. OPD continues our efforts to protect our community.

Kim Decl. ¶ 3(f) ("Second OPD Tweet").[12]

### 6. Requested Relief

In their motion, Plaintiffs requested that the Court "grant [their] Motion for Enforcement and Modification of Preliminary Injunction and for Sanctions and Other Relief," but their motion did not describe any proposed modifications to the Injunction, and Plaintiffs did not submit a proposed order with their motion as required by Civil Local Rule 7-2(c). Mot. at 9. At the order of the Court, Plaintiffs later filed a proposed order on October 21, after Defendants filed their opposition. *See* Prehearing Order (dkt. 68); Plaintiffs' Proposed Order (dkt. 73). In their proposed order, Plaintiffs request that the Court order Defendants to pay $100,000 in monetary sanctions and that the Court make several modifications to Section V of the injunction.[13] Plaintiffs' Proposed Order.

---

[12] Oakland Police Department (@oaklandpoliceca), TWITTER (Sept. 25, 2020, 11:13 PM), https://twitter.com/oaklandpoliceca/status/1309737750866714624.

[13] Plaintiffs' proposed modifications are as follows: (1) modify Section V(1) to add "flashbang grenades" and "stun grenades" to the list of items that OPD officers are prohibited from using; (2) modify Section V(2) to expressly include "hexachloroethane" as a chemical agent and to expressly reference "CS Blast grenades" alongside "chemical agents" as items that OPD officers may use only in the specified circumstances and alongside "gas cannisters" as objects that must be deployed at a safe distance from the crowd; (3) modify Section V(2) to replace "shall be deployed only when (a) there is an imminent threat of *physical harm to a person or significant destruction of property* . . . " with "shall be deployed only when (a) *individuals are engaging in conduct that poses* an immediate threat of *loss of life or serious bodily injury to themselves, officers, or the general public or substantial destruction of property which creates an immediate risk to the lives or safety of other persons* . . . "; (4) add a new Section V(3) to provide that Section V.H.5 of Training Bulletin III-G applies to "CS Blast grenades and any similar devices that have an explosive or light and sound component"; (5) add a new Section V(4) to provide that Section VI.F.2 of Training Bulletin III-G applies to "form-tipped munitions as well as 'bean bags' " and to require officers to adhere to the October 2013 Chief's Memorandum; and (5) to modify current Section V(3) to replace references to "devices in Section V(2)" with "chemical agents." Plaintiffs' Proposed Order.

14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**D.    Defendants' Opposition and Evidence**

In their opposition to Plaintiffs' motion, Defendants argue that they have complied with the Injunction and that "Plaintiffs' conclusory claims are not backed by clear and convincing evidence."  Opp'n (dkt. 69) at 1.

For support, Defendants submit a declaration by Michael Beaver, a lieutenant who serves as Chief of Staff to the Chief of Police within OPD.  *See* Beaver Decl. (dkt. 69-1).  Lieutenant Beaver was "on duty as a commander during protests" and "participated in crowd management" on July 25, August 26, August 29, and September 25.  *Id.* ¶ 4.  He declares that "[f]or each event, OPD attempted to communicate with apparent organizers and participants, hoping to facilitate peaceful protests," but "[t]hese individuals declined to communicate with OPD officers."  *Id.* ¶ 9.  Additionally, "OPD's tactics on the dates referenced . . . did not include encircling the crowd"; rather "OPD left egress routes for the crowd."  *Id.* ¶ 15.  In some cases, however, "officers surrounded *individuals* they were attempting to arrest."  *Id.* (italics added).

Lieutenant Beaver's declaration's is accompanied by numerous materials.  First are copies of electronic flyers for nighttime demonstrations in Oakland on the dates in question; the flyers were circulated on social media websites such as Twitter and Instagram.  Flyers (dkt. 69-2).  In their opposition, Defendants' state that these flyers "discouraged 'peace policing' and 'snitches.' " Opp'n at 1.  Second are various officers' "crime reports," which describe these officers' use of munitions and/or force during the demonstrations.[14]  *See* Keating Rpt. (dkt. 69-3); Jimenez Rpt. (dkt. 69-4); Langlais Rpt. (dkt. 69–5); Gonzales Rpt. (dkt. 69-6); Brown Rpt. (dkt. 69-7); Alaura Rpt. (dkt. 69-8); Au Rpt. (dkt. 69-9); Thurston Rpt. (dkt. 69-10).  Third are six videos from officers' body-worn cameras.  Aug. 26 Video (Ex. E); Aug. 28 Video (Ex. G); Aug. 29 Video (Ex. K); Sept. 25-1 Video (Ex. M); Sept. 25-2 Video (Ex. N).[15]  Fourth is an e-mail chain of contemporaneous operations reports made by officers in the field and officers and monitoring video at the Emergency Activation Center on August 26, 2020.  Operations Log (dkt. 69-11).

---

[14]  For ease of reference, the Court uses the ECF page numbering when citing the contents of these reports.

[15]  These videos are available at the following link: https://www.dropbox.com/sh/sew5qc7fdb78sjr/AAADvxA1ibzHROA1FQoCBsN7a?dl=+0.

Defendants also reference two declarations submitted in support of the City's cross-motion, one by Officer David Pullen, who serves in OPD's Information Technology unit, and another by Micah Hinkle, the Deputy Director of Oakland's Department of Economic & Workforce Development.  Pullen Decl. (dkt. 66-10); Hinkle Decl. (dkt. 66-11).  Mr. Hinkle explains that the Department of Economic & Workforce Development has been "assisting local businesses, property owners, and tenants that have been impacted by vandalism and theft" during the ongoing demonstrations."  Hinkle Decl. ¶ 2.

**1.  Events on Saturday, July 25**

First, Defendants address a nighttime demonstration that occurred on Saturday, July 25—although this demonstration occurred before the Court issued the Injunction on July 29 and Plaintiffs do not address it in their motion.  Opp'n at 1.

The demonstration began shortly before 8:00 p.m. and drew up to 600 participants at its peak.  Beaver Decl. ¶ 7.  During the event, officers reported the following:

> [C]rowd members shattered windows at the federal building, the Police Administration Building, apartment buildings, and businesses; protestors who attempted to stop this activity and call for peace were intimidated by other crowd members; a fire was set inside a county courthouse; crowd members threw rocks, bottles, and fireworks at officers; they also pointed lasers at officers' faces.

*Id.*  While policing the demonstration, however, "OPD officers were at a distance from the crowd when it traveled," *id.*, and, according to OPD records, OPD "deployed no smoke, chemical agent, or less-lethal-impact munition," *id.* ¶ 16.

**2.  Events on Wednesday, August 26**

On August 26, another nighttime demonstration drew up to 700 participants after 8:00 p.m.  Beaver Decl. ¶ 8.  Although "many people engaged in peaceful protest," Defendants state that, "as the record shows, this was far from a peaceful night."  Opp'n at 3.

First, Lieutenant Beaver declares that he and other officers "observed crowd members break several apartment building and business windows; set fires, including at a courthouse and construction site; and throw projectiles at officers."  Beaver Decl. ¶ 10.  These activities are also described in the e-mail chain of contemporaneous reports made by officers, and some are depicted

United States District Court
Northern District of California

in video footage supplied by Defendants.  *See generally* Operations Log; Pullen Video (Pullen Decl., Ex. A).[16]  Further, Mr. Hinkle declares that, on August 26, the Department of Economic & Workforce Development received reports of "[s]everal fires, including a state courthouse and at a construction site," "[s]eventy punctured or broken building windows," "[t]welve broken doors," and "theft and vandalism within businesses" at "local businesses and residential units, including affordable housing."  Hinkle Decl. ¶ 5.  As with the July 25 event, however, "OPD officers were at a distance from the crowd when it traveled," Beaver Decl. ¶ 10, and, according to OPD records, OPD "deployed no smoke, chemical agent, or less-lethal-impact munition," *id.* ¶ 17.

Second, the City submits video footage of "various incidents that occurred within and around the protests" on August 26.  Pullen Decl. ¶ 2; *see* Pullen Video.  Although the footage does not contain a time stamp, the clips are compiled in "chronological order."  Pullen Decl. ¶ 2.  In the clip that begins at one minute and 57 seconds, at the intersection of Harrison Street and Grand Avenue, an officer who identifies herself as Officer Rhodes makes unlawful assembly announcements over a public address system.  *Id.*  She states, "You have five minutes to disperse, eastbound or northbound."  *Id.*  In the background, demonstrators are walking east on Grand Avenue, with officers following at a distance.  *Id.*  In the clip that begins at three minutes and two seconds, at the intersection of Park View Terrace and Grand Avenue, the same officer makes more unlawful assembly announcements over a public address system.  *Id.*  A line of officers walking east on Grand Avenue come upon several trash cans that have been set ablaze and laid across Grand Avenue.  *Id.*  In the clip that begins at three minutes and 46 seconds, at the intersection of Lee Street and Grand Avenue, Officer Rhodes makes more unlawful assembly announcements over a public address system.  *Id.*  She states, "You have two minutes to disperse, east or north." *Id.*  In the background, demonstrators are walking east on Grand Avenue and a large object has been set ablaze at the intersection of Perkins Street and Grand Avenue.  *Id.*

Third, the Operations Log contains the following relevant entries.  "[10:07 p.m.]  Part of

---

[16]  This video is available at the following link:
https://www.dropbox.com/s/6kuipwa6fsjhmmo/ProtestVideoClips%2026Aug20%2020-042337%20%281%29.mp4?dl=0.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    group is southbound on Harrison St[reet] and Grand Ave[nue].  Part of group is eastbound on

2    Grand Ave[nue].  TNT [i.e., Tactical Negotiations Team] requested to make unlawful assembly

3    announcements."  Operations Log at 4.  "[10:09 p.m.]  A debris field of trash cans and fires lit

4    across Grand Ave[nue] from the crowd going eastbound to block officers."  *Id.* at 3.  "[10:23 p.m.]

5    Front [of group] is approaching Euclid [Avenue].  TNT is making continuous announcements."

6    *Id.*  "[10:53 p.m.]  Someone threw a bottle towards officers at Grand Ave[nue]."  *Id.*  "[10:56

7    p.m.]  TNT to make announcements, [Quick Reaction Force] to make arrests."  *Id.*  "[10:57 p.m.]

8    Officers taking multiple bottles at Perkins [Street] and Belmont [Street]."  *Id.*  "[11:01]  Arrests

9    being made at Belmont [Street and] Perkins [Street] and vehicle that was blocking officers

10   stopped."  *Id.*

11        Fourth, Defendants submit reports by Officers John Keating, Amanda Jimenez, and Sarah

12   Langlais.  Keating Rpt.; Jimenez Rpt.; Langlais Rpt.  Officer Jimenez's report states that "[t]he

13   crowd was advised multiple times that their assembly was unlawful and subjects in the area would

14   be arrested if they failed to comply with the order to disassemble."  Jimenez Rpt. at 3; *see* Langlais

15   Rpt. at 3; Keating Rpt. at 3.  Subsequently, around 11:00 p.m., officers observed the medic van,

16   which had "intentionally block[ed] and slow[ed] OPD officers and vehicles," Keating Rpt. at 3,

17   and which had "consistently dr[iven] in the area with the crowd of protestors that was ordered to

18   disperse," Jimenez Rpt. at 3.  Officer Langlais saw "persons inside the van . . . handing out shields

19   and other unknown supplies" and other persons "throwing fireworks at officers after consulting

20   with persons inside the van."  Langlais Rpt. at 3; *see* Keating Rpt. at 3; Jimenez Rpt. at 3.

21   Additionally, Officer Keating's report states that there were "unknown persons wearing black and

22   tactical gear hanging off the van," and "[p]ersons in the crowd appeared to be coordinating with

23   the van, using the van as cover to throw objects at officers."  Keating Rpt. at 3.

24        At the intersection of Belmont Street and Perkins Street, Officer Jimenez, Officer Langlais,

25   and other officers ordered the van's driver, Mx. Hansen, to stop, but Mx. Hansen "ignored [their]

26   commands."  Jimenez Rpt. at 4; *see* Langlais Rpt. at 3; Keating Rpt. at 3.  Officer Jimenez

27   "observed [Mx. Hansen] continue to use her [*sic*] foot to push down on the gas and continue to

28   attempt to drive away," Jimenez Rpt. at 4, and Officer Langlais observed Mx. Hansen "beg[in]

18

steering their vehicle in an apparent attempt to collide with parked vehicles," Langlais Rpt. at 3. "Due to other officers in the area, near and in front of [Mx. Hansen's] vehicle," Officer Jimenez "elected to grab onto [Mx. Hansen's] left leg with both [her] arms and pull [Mx. Hansen] out of the vehicle," Jimenez Rpt. at 4, while Officer Langlais "took hold of [Mx. Hansen's] left arm" and "exerted force to pull [Mx. Hansen] away from the driver's seat," Langlais Rpt. at 3. Officers Jimenez and Langlais attempted to handcuff Mx. Hansen, with the former holding Mx. Hansen's left wrist and the latter holding their right wrist, but Mx. Hansen "resist[ed]" and "ignored . . . commands." Jimenez Rpt. at 4; *see* Langlais Rpt. at 4. At that point, other officers "conducted a takedown." Langlais Rpt. at 3; *see* Jimenez Rpt. at 4. Mx. Hansen was arrested for resisting peace officers and evading police. Jimenez Rpt. at 4. Meanwhile, other officers also detained "persons hanging outside and riding inside the van." Keating Rpt. at 3. Officer Keating "elected to detain [Ms. Sorokin] who was with the group in the van actively blocking OPD throughout the protest . . . and for failing to leave after unlawful assembly was declared . . . ." *Id.* Ms. Sorokin "was compliant and offered no resistance" and was ultimately "released without further action." *Id.*

Fifth, Defendants have submitted video footage of the incident—apparently from Officer Langlais's body-worn camera, which was "knocked from [her] body to the ground" during the "struggle" with Mx. Hansen. Langlais Rpt. at 3; *see* August 26 Video. The following can be discerned. According to the timestamp, the footage begins at 10:56 p.m. *Id.* A voice yells "move up, move up," and officers suddenly begin to sprint. *Id.* After they sprint for more than 20 seconds, the medic van comes into view. *Id.* While officers close in on the van, the driver is commanded to "stop the van." *Id.* As the van continues to slowly roll forward, officers open the driver door. *Id.* The driver says, "There's nothing in here"; and an officer commands the driver to "get out of the car." *Id.* Officers then forcibly pull the driver from the vehicle. *Id.* One officer (apparently, Officer Jimenez) holds the driver's left arm and another officer (apparently, Officer Langlais) holds the driver's right arm. *Id.* The camera falls to the ground. *Id.*

### 3.  Events on Friday, August 28

On August 28, the City had information that "there would be a protest that night involving the same organizers or participants as two nights earlier."  Beaver Decl. ¶ 12.  That night, a demonstration drew hundreds of participants after 8:00 p.m.  *Id.* ¶ 8; *see* Gonzales Rpt. at 2.

First, Defendants state that OPD's prior practice of keeping a distance from the crowd when it traveled had "prevented officers from making targeted arrests and minimizing harm to the community."  Opp'n at 2.  So, according to Lieutenant Beaver, OPD "deployed more officers" on August 28 and "adjusted its tactics" in order to "facilitate free speech and minimize further harm to the community."  Beaver Decl. ¶¶ 11, 13.  Officers "stay[ed] closer to the crowd and identif[ied] and arrest[ed] individuals who were committing crimes," but "[w]hen the crowd stopped moving, officers shrunk their presence and stood at a distance from the crowd."  *Id.* ¶ 13.  At the end of the night, there was "substantially less damage to the community than after the July 25 and August 26 protests."  *Id.*

Second, Defendants submit reports by Sergeant Patrick Gonzales and Officer Randall Brown.  Gonzales Rpt.; Brown Rpt.  According to these reports, Sergeant Gonzales deployed smoke at the intersection of 15th Street and Franklin Street around 9:08–9:10 p.m., and other officers deployed tear gas and smoke at the intersection of 24th Street and Broadway around 9:15–9:20 p.m.[17]  *See generally* Gonzales Rpt.; Brown Rpt.

Between 8:17 p.m. and 8:30 p.m., a crowd of protestors marched westbound on 14th Street and, once they reached the Federal Building, southbound on Clay Street.  Gonzales Rpt. at 3; Brown Rpt. at 3.  Sergeant Gonzales's "Tango Team, accompanied by the rest of Bravo company, formed a skirmish line behind the crowd and began to follow on foot in order to deter members in the crowd from committing acts of vandalism."[18]  Gonzales Rpt. at 3.  At 9:00 p.m., Captain

---

[17]  Although Defendants do not address these deployments of tear gas and smoke in their opposition, they are recorded in Sergeant Gonzales' report.  Gonzales Rpt. at 3.  The Court also observes that these deployments appear to be depicted in the video included in Mr. Li's tweet and one of the photos included in the Chronicle's tweet.  *See* Li Tweet; Chronicle Tweet.

[18]  Officer Au's report explains that a "Tango Team is a team consisting of at least . . . [three] officers and . . . [one] supervisor (Sergeant or above) specifically designated to utilize specialty impact and chemical munitions during crowd control events."  Au Rpt. at 3.

Bolton "directed Charlie company to trail the protesters and help create the 'U formation' around the march." Brown Rpt. at 4. Sergeant Gonzales observed individuals spray painting graffiti on the Federal Building and "pointing red and green laser lights in the faces of officers," which can "cause permanent retinal damage and is a violation of [the California Penal Code]." Gonzales Rpt. at 3; *see* Brown Rpt. at 3–4 (multiple reports of a subject pointing a laser at officers).

Sergeant Gonzales describes the incident at the intersection of Franklin Street and 15th Street as follows:

> At approximately [9:10 p.m.], we were in the 1500 Block of Franklin Street when officers moved in to arrest two individuals responsible for pointing laser lights in the faces of officers. As officers attempted to detain the two subjects, other individuals in the crowd turned and ran towards the officers making the detention. This was a clear attempt to interfere and remove the two suspects from police custody (violation of [the California Penal Code]). I deployed one (1) Saf-Smoke Han Ball munition in a clear area, on the street, next to the crowd attempting to free the two suspects from police custody. I did this to stop their action, to deter others from joining in, and to create distance between the crowd and the officers. The munition was effective, the crowd moved back, and the two individuals were safely detained. I attempted to recover the spent munition; however, it was picked up by a member of the crowd.[19]

Gonzales Rpt. at 3. Additionally, Lieutenant Beaver declares that, according to OPD's records, "no *chemical agent* was deployed at Franklin Street and 15th Street—or within the immediate vicinity." *Id.* ¶ 18 (italics added).

Third, Defendants have submitted video footage of the incident from an unidentified officer's body-worn camera. Aug. 28 Video. The following can be discerned. According to the timestamp, the video begins at 9:08 p.m. *Id.* Officers walk closely behind demonstrators, northbound on Franklin Street, while loud music plays. *Id.* On the north side of the intersection with 15th Street, officers form a line on the west side of the street and instruct demonstrators to

---

[19] Similarly, Officer Brown's report states:
> [9:08 p.m.], Officers arrested a subject who was pointing a laser at Officers. The arrest was made in the 1500 [block] of Franklin St[reet]. [Sergeant] Gonzales deployed a hand thrown smoke han-ball in the area during the arrest. Multiple subjects from the crowd began to encircle officers as they were making the arrest. The smoke created enough distance between the protestors and the officers to allow the officers to make the arrest safely and without further incident.

Brown Rpt. at 4.

"back up." *Id.*  The music quiets, and it sounds like gas is being dispersed from a cannister.  *Id.*  A cloud of a substance that looks like smoke appears, and demonstrators move away.  *Id.*  An officer's voice states, "One smoke round was deployed while we were making an arrest."  *Id.*  Officers and demonstrations resume marching.  *Id.*

The incident at the intersection of 24th Street and Broadway is also described in both officers' reports.  Between 9:15 and 9:20 p.m., the officers responded to a report of an individual with a bullhorn who was interfering with OPD's "Video Team."  Gonzales Rpt. at 3; Brown Rpt. at 4.  Officer Brown "moved towards" the suspect to make an arrest; when "[the suspect] started to run away," Officer Brown "grabbed him by the back of his hoodie to stop his flight," but he "continued to pull away . . . and tried to run."  Brown Rpt. at 4.  After other officers grabbed the suspect, demonstrators "began to encircle [the officers]," *id.*, and "began attacking officers," Gonzales Rpt. at 4.  Officer Brown deployed one "smoke han-ball on the west sidewalk in clear area."  Brown Rpt. at 4; *see* Gonzales Rpt. at 4.  Sergeant Gonzales observed other officers "deploy munitions in response"; afterwards, "Officer Albino advised [Sergeant Gonzales] that he had deployed one . . . CS Blast Munition," and Sergeant Gonzales "recovered three expended Saf-Smoke Han-Bal munitions from the street."  Gonzales Rpt. at 4.

At this time, Officer Brown noticed other officers "on the ground attempting to arrest a resisting suspect."  Brown Rpt. at 4.  A suspect later identified as Mr. Clancy was "hitting one officer in the back with his hands and a jacket that he was holding."  *Id.*  Officer Brown "immediately pursued Clancy on foot."  *Id.*  Mr. Clancy "stopped hitting the officers and began to run away," but "tripped over the center median."  *Id.*  Officer Brown caught up and "used both of [his] hands and pushed Clancy on his upper back, causing him to fall to the ground face first."  *Id.*  When "Clancy tried to get back to his feet," Officer Brown "held him on the ground with both of [his] hands near his upper back and head area."  *Id.*  Other officers handcuffed Mr. Clancy, who was arrested for battery on a peace officer and resisting arrest.  *Id.*

### 4.  Events on Saturday, August 29

On August 29, a demonstration drew up to 200 participants after 8:00 p.m.  Beaver Decl. ¶ 8; *see* Au Rpt. at 4.  OPD believed that "the same organizers or participants" were involved, and

it used the same tactics as it did to police the August 28 demonstration.  Beaver Decl. ¶ 14.  Again, there was "substantially less damage to the community than after the July 25 and August 26 protests."  *Id.*

First, Defendants submit reports by Sergeant Brian Alaura and Officer K. Au.  Alaura Rpt.; Au Rpt.  Early in the evening, the officers were informed that demonstrators were planning on "utilizing shields as a tactic against Officers."  Au Rpt. at 3; *see* Alaura Rpt. at 3.  Around 7:48 p.m., approximately ten demonstrators with shields gathered at the Pergola at Lake Merritt, and around 7:56 p.m., the Tactical Negotiations Team "attempted to make contact" with them, but they "refused to cooperate."  Au Rpt. at 4.  The group subsequently "practiced their movement[s] [and] tactics," and a speaker announced that they were "actively trying to recruit more people to carry shields."  *Id.*; *see* Alaura Rpt. at 4.  Around 9:25 p.m., the crowd began marching northbound on Grand Avenue; around 9:35 p.m., some demonstrators within the crowd pointed lasers at officers and others were "armed with sticks."  Au Rpt. at 4.  "Officers formed a skirmish line and followed the crowd.  The intent was to maintain close distance in order to ensure no violence or vandalism occurred."  *Id.*

Around 9:36 p.m., the crowd turned east on Mandana Boulevard.  Au Rpt. at 4.  Around 9:40 p.m., demonstrators "formed a line of shields facing towards Officers" and began "intentionally walking at a slower pace to separate Officers from the majority of the crowd."  *Id.*; *see* Alaura Rpt. at 4.  The officers believed that this was a tactic to "prevent Officers from identifying any subjects who intended to commit violations acts towards Officers and/or vandalism."  Au Rpt. at 4; *see* Alaura Rpt. at 4.  Despite orders to move out of the way, the demonstrators refused; some "push[ed] officers with their shields," Alaura Rpt. at 3; *see* Au Rpt. at 4–5, while others "us[ed] lights to prevent Officers from seeing," Au Rpt. at 5.  Because this part of the street was uphill, it "gave the crowd and shield holders an advantage over officers." Alaura Rpt. at 4.  Sergeant Alaura directed officers to "pull" the shields' holders to get them out of the way, but some demonstrators began "grabbing onto officers, in an apparent attempt to release shield holders" and others threw objects at officers.  *Id.*

Sergeant Alaura "deployed one Hanball smoke in order to distract the members of the

United States District Court
Northern District of California

crowd, who were attacking officers, so that [the officers] could gain an advantage.  [He] rolled the munition behind the shield holders which began releasing smoke."  *Id.*  "Based on the immediate threat of multiple subjects utilizing shields to push [and] strike Officers, the extreme close proximity between the violent crowd [and] officers, [and] multiple subjects utilizing blinding lights to prevent Officers from seeing which would prevent Officers from protecting themselves," Officer Au also "elected to deploy one . . . SAF-Smoke Han-Ball . . . directly in front of [him] on the ground."  Au Rpt. at 5; *see* Alaura Rpt. at 4.  When the officers continued eastbound on Mandala Boulevard, Officer Au "observed a SAF-Smoke Han-Ball munition thrown back towards the Officers," as well as "multiple large glass bottles."  *Id.*; *see* Alaura Rpt. at 4.  Consequently, Officer Au then deployed one "CS Blast" in an area where he "did not see anyone who may have been injured as a result of [the deployment]."  Au Rpt. at 5; *see* Alaura Rpt. at 4.  The deployment "appeared to have a positive effect," as Officer Au "did not see any additional dangerous items being thrown."  Au Rpt. at 5.  According to Officer Au's report, at 9:48 p.m., the Tactical Negotiations Team began making unlawful assembly announcements over a public address system.  *Id.* at 6.  "Clear directions were given to the crowd to disperse by leaving [eastbound] on Mandana [Boulevard] and [northbound on] Erie St."  *Id.*

Second, Defendants have submitted video footage of the incident—apparently from Sergeant Alaura's body-worn camera.  Aug. 29 Video.  The following can be discerned. According to the timestamp, the video begins at 9:42 p.m.  *Id.*  A line of demonstrators holding shields faces a line of officers.  *Id.*  One officer orders the demonstrators to "move back slowly" and another orders the demonstrators to "back the fuck up"; as the demonstrators walk backwards, the officers walk forwards.  *Id.*  The two lines clash, and the officers push against the shields.  *Id.* According to the time stamp, at 9:43:15 to 9:43:26, one device flies over the lines and Sergeant Alaura rolls another device under the lines.  *Id.*  A cloud of a substance that looks like smoke appears, and Sergeant Alaura yells, "Smoke deployed, smoke deployed."  *Id.*  There is a noise that sounds like a glass bottle shattering and officers' voices yell, "Bottle, bottle."  *Id.*  At 9:43:39, another officer appears to throw an object over the lines and there is a flash and a loud bang.  *Id.* The two lines make contact; the officers push against the shields again; and Sergeant Alaura yells,

"Pull 'em back." *Id.* Lights—apparently from demonstrators' headlamps—shine in officers' eyes, and an officer pulls a shield from away from a demonstrator. *Id.* An officer yells, "Get out of the way or you're gonna be arrested." *Id.* At 9:44:30, another officer (presumably Officer Au) informs Sergeant Alaura, "One smoke and one blast, Sergeant." *Id.*

The officers stop moving, but demonstrators keep backtracking, which allows a gap to form. *Id.* Demonstrators chant, "Who keeps us safe? We keep us safe!" *Id.* A green laser pointer shines in the officers' direction. *Id.* The officers begin moving again, with lights and the laser shining in their direction. *Id.* At 9:47:02, the lines again clash; Sergeant Alaura yells, "Get a smoke, smoke," and a cloud of a substance that looks like smoke appears. *Id.* Sergeant Alaura makes a takedown arrest of an individual for "rushing another officer," and other officers are conducting a separate arrest in the background. *Id.* At 9:48:01, the demonstration is declared an unlawful assembly and demonstrators are ordered to disperse over a public address system. *Id.* Sergeant Alaura and other officers discuss a demonstrator who threw a munition "back at [them]." *Id.*

### 5.  Events on Saturday, September 25

On September, a demonstration drew up to 250 participants after 8:00 p.m. Beaver Decl. ¶ 8. Again, OPD believed that "the same organizers or participants" were involved, and it used the same tactics as it did to police the August 28 demonstration. *Id.* ¶ 14. And again, there was "substantially less damage to the community than after the July 25 and August 26 protests." *Id.*

First, Defendants submit a report by Officer T. Thurston. Thurston Rpt. Around 8:50 p.m., a crowd gathered at Lake Merritt Amphitheater and began marching. *Id.* at 2. While the crowd was marching near 14th Street and Madison Street, demonstrators "began moving orange traffic barricades behind them to block [officers'] movement." *Id.* Some demonstrators threw items at officers, including "unopened, pressurized, full soda cans." *Id.* at 3. At that time, Officer Thurston observed Sergeant Alaura "deploy a smoke han-ball munition," which "land[ed] in a safe area," but a demonstrator picked it up and "thr[ew] it hard directly at Officers, in an apparent attempt to hit an Officer." *Id.* While officers were detaining the suspect, "several members of the crowd moved towards the Officer's [*sic*] backs, in an apparent attempt to prevent

25

Officer's [*sic*] from detaining the subject." *Id.* While Officer Thurston was providing security, he saw another smoke han-ball munition deploy, which "helped to encourage the crowd away from Officers." *Id.* Subsequently, at the area of 14th Street and Harrison Street, officers recognized a suspect "with an arrest warrant." *Id.* As the officers detained that suspect, Officer Thurston "was tasked with protecting those officers." *Id.* Meanwhile, several officers were detaining another suspect in a large crowd, and Officer Thurston "heard glass break close by." *Id.* As instructed by Sergeant Alaura, he "deploy[ed] a smoke SKAT-shell . . . . south of the crowd, clear of any protestors." *Id.* The deployment appeared to be effective because "the majority of the crowd fled . . . away from where the Officers detained the individuals." *Id.*

Second, Lieutenant Beaver declares that, according to OPD's records, "no *chemical agent* was deployed on September 25." Beaver Decl. ¶ 19 (italics added).

Third, Defendants have submitted two videos; the first is from an unidentified officer's body-worn camera, Sept. 25-1 Video, and second is apparently from Sergeant Alaura's body-worn camera, Sept. 25-2 Video. In the first video, which begins at 9:24 p.m. according to the timestamp, officers are walking behind and around demonstrators. Sept. 25-1 Video. Officers suddenly rush into the crowd and grab a demonstrator. *Id.* There is commotion among officers and demonstrators; a demonstrator grabs the arm of the officer wearing the body camera, but then backs away immediately; and a cloud of a substance that looks like smoke appears. *Id.* Two burning objects are seen on the street. *Id.* The officer wearing the body camera says, "1400 block of Jefferson; 2125 hours." *Id.*

In the second video, which begins at 9:49 p.m. according to the timestamp, officers are again walking behind and around demonstrators. Sept. 25-2 Video. Again, the officers suddenly rush into the crowd and grab a suspect. *Id.* There is the is a noise that seems to be the deployment of munitions, and a cloud of a substance that looks like smoke appears. *Id.* A smoking object flies towards officers who then rush towards a second suspect. *Id.* A glass bottle crashes on the street near the officers. *Id.* Sergeant Alaura yells, "Thurston, Thurston, deploy!" *Id.* There is a large bang. *Id.* Sergeant Alaura again yells, "Get one more ready!" *Id.* Sergeant Alaura then reports, "Alpha Tango, launch smoke deployed, 1400 block Harrison, during an arrest." *Id.* He

1   continues, "Alpha Tango, be advised, they're throwing larger bottles at us as well as the smoke

2   munition." *Id.*

3     **E. City's Cross-Motion to Modify**

4      **1. City's Motion**

5      In its cross-motion, the City stated that, after OPD informed its mutual aid partners of the

6   Injunction, the police agencies of Alameda County, Freemont, San Leandro, Union City, Newark,

7   and San Mateo County independently responded that they would no longer provide mutual aid

8   during demonstrations.  Cross-Mot. at 1–5; *see* Yu Decl. (dkt. 66-2) ¶¶ 4–5.  Excluding the

9   California Highway Patrol, which addresses activity on state highways, these agencies "supplied

10  approximately 55% of the mutual aid officers on May 29, 2020 and 40% of the mutual aid officers

11  on May 30, 2020."  Yu Decl. ¶ 6.  Meanwhile, "[n]o agency ha[d] notified [OPD] that it would

12  provide its officers as mutual aid for protests and demonstrations."  *Id.* at ¶ 7.

13     The City is currently preparing for "significant, extended protests next month."  Cross-

14  Mot. at 8.  Consequently, the City requested that the Court modify the Injunction (1) to strike or

15  suspend its mutual aid section (Section VI(i)–(vi)) to allow "Training Bulletin III-G . . . as it

16  stands to govern mutual aid requests," and (2) to clarify that the Injunction does not bind OPD's

17  mutual aid partners.[20]  *Id.* at 1, 8–9; *see* Status Rpt. at 1.

18     **2. Plaintiffs' Opposition**

19     In their opposition, Plaintiffs asserted that that state law requires mutual aid agencies to

20  (1) render mutual aid when such aid is requested and (2) to follow the local policies that govern

21  the host agency while rendering mutual aid.  Opp'n to Cross Mot. (dkt. 67) at 2, 4–11.  Plaintiffs

22  therefore contended that the mutual aid agencies were required to provide mutual aid in

23  accordance with the terms of the Injunction and Training Bulletin III-G.  *Id.*

---

[20]  In its cross-motion, the City alternatively requested that the Court issue an order concluding that (1) a "memorandum of agreement" between OPD and its mutual aid partners would not violate the Injunction and (2) the Injunction does not bind OPD's mutual aid partners.  Cross-Mot. at 1, 9.  In a subsequent status report and at the hearing, the City did not mention this alternate request—making clear that the City preferred modifications to the Injunction.  *See generally* Status Rpt.  Because the Court has partially granted the City's request to modify the Injunction, the Court does not address the parties' arguments regarding the City's alternative request.  *See generally* Amended Injunction.

*United States District Court*
*Northern District of California*

In support of their proposition that mutual aid agencies are required to render mutual aid when such aid is requested, Plaintiffs primarily relied on California Government Code sections 8616 and 8617.  Opp'n to Cross-Mot. at 2, 6.  Section 8616, which governs the rendering of mutual aid during "any state of war emergency or state of emergency," provides, in relevant part, that "when the need arises for outside aid in any county, city and county, or city, such aid shall be rendered in accordance with approved emergency plans" and that "[i]t shall be the duty of public officials to cooperate to the fullest possible extent in carrying out such plans."  Section 8617, which governs the rendering of mutual aid "[i]n periods other than a state of war emergency, a state of emergency, or a local emergency," provides that "state agencies and political subdivisions have authority to exercise mutual aid powers in accordance with the Master Mutual Aid Agreement and local ordinances, resolutions, agreements, or plans therefor."  Regarding the former, Plaintiffs read the phrases "such aid shall be rendered" and "duty . . . to cooperate" to mean that mutual aid must be provided "when the need arises."  Opp'n to Cross-Mot. at 6.  With respect to the latter, Plaintiffs argued that any mutual aid rendered "must conform to the Master Mutual Aid Agreement and local rules."[21]  *Id.*  Plaintiffs also referenced the following provisions of the Master Mutual Aid Agreement:

> Each party agrees. . . to render services to each and every other party to the agreement to prevent and combat any type of disaster in accordance with the duly adopted mutual aid operational plans, whether heretofore or hereafter adopted, detailing the method and manner by which such . . . services are to be made available and furnished, . . . provided, however, that no party shall be required to deplete unreasonably its own . . . services in furnishing such mutual aid.
>
> It is expressly understood that the mutual aid extended under this agreement and the operations plans adopted pursuant thereto shall be available and furnished in all cases of local peril or emergency and in all cases in which a *STATE OF EXTREME EMERGENCY* has been proclaimed.

Blue Book at 50, 51.  Because OPD's mutual aid partners had not claimed that rendering mutual aid would unreasonably deplete their own services, Plaintiffs argued that they were withholding

---

[21]  The California Disaster and Civil Defense Master Mutual Aid Agreement ("Master Mutual Aid Agreement") is located on pages 50 through 55 of the Law Enforcement Mutual Aid Plan (2019) ("Blue Book," dkt. 50-1).

mutual aid in violation of these provisions.  Opp'n to Cross Mot. at 1, 7.

Further, in support of their proposition that mutual aid agencies must follow the local policies that govern the host agency while rendering mutual aid, Plaintiffs primarily relied on the following authorities.  Opp'n to Cross Mot. at 4–5.  California Government Code section 8618 states:  "Unless otherwise expressly provided by the parties, the responsible local official in whose jurisdiction an incident requiring mutual aid has occurred shall remain in charge at such incident, including the direction of personnel and equipment provided him through mutual aid."  Plaintiffs contended that the phrase "[u]nless otherwise expressly provided" did not apply because there were no prior agreements between the City and its mutual aid partners that would have modified the general rule of the section.  Opp'n to Cross-Mot. at 5 (citing Opinion at 19).  Further, as Plaintiffs noted, the Master Plan also provides that "[i]t is expressly understood that . . . '[t]he responsible local official in whose jurisdiction an incident requiring mutual aid has occurred shall remain in charge at such incident including the direction of such personnel and equipment provided him through the operations of such mutual aid plans."  Blue Book at 51.  Based on these provisions and California Government Code section 8617 (discussed in the previous paragraph), Plaintiffs argued that, in rendering mutual aid, OPD's mutual aid partners were required to abide by the local policies that governed OPD—including the Court's Injunction and Training Bulletin III-G.  *Id.* at 6.

Finally, Plaintiffs argue that the City's proposal—suspending the mutual aid section of the Injunction—would violate the Mutual Aid section (Section IX) of Training Bulletin III-G.  *Id.* at 8.  That section provides that the "Incident Commander shall be responsible for ensuring to the extent possible" that, among other things, mutual aid agencies: "(1) Are briefed and in agreement with OPD's Unity of Command structure under which only OPD Commanders may authorize the use of less lethal munitions for crowd control and dispersal; (2) Are briefed on OPD's policy on prohibited weapons and force; [and] (3) Do not bring or use weapons or force that is prohibited under OPD's policy."  Training Bulletin III-G, § IX.1–3.

### 3.  Parties' Status Report

Prior to the hearing, the Court ordered the parties to meet and confer; the City to meet and

confer with its mutual aid partners; and the City to file a status report.  Prehearing Order (dkt. 68).

The City informed the Court that their mutual aid partners continued to have various concerns

about the Injunction's mutual aid section.  Status Rpt. (dkt. 68).  The City again requested that that

the Court issue "a temporary suspension" of the Injunction's mutual aid section and "expressly

stat[e] that the preliminary injunction does not apply to mutual aid agencies or their officers during

that time period."  *Id.* at 1.  If the Injunction "continue[d] to apply to mutual aid agencies or their

officers," the mutual aid agencies' decision to withhold aid was "unlikely to change."  *Id.*

      In the status report, the City stressed that mutual aid is voluntary, citing OPD General

Order L-3's definition of mutual aid as "the voluntary of sharing of personnel and resources when

an agency cannot sufficiently deploy its own resources to respond to an unusual occurrence."  *Id.*

at 2 (quoting Gen. Order L-3 (dkt. 50-3), § II.A).  While the Injunction "require[d] mutual aid

officers to follow OPD policies and command structure" and OPD to "ensure that they in fact do

so," the City argued that no policy—including Training Bulletin III-G—"grant[ed] OPD authority

over mutual aid agencies."  *Id.*  To the contrary, the City argued, General Order L-3 provides that

mutual aid "requests and deployments shall be made in accordance with" the Law Enforcement

Mutual Aid Plan (2019) ("Blue Book," dkt. 50-1) and the Law Enforcement Guide for Emergency

Operations (2019) ("Red Book," dkt. 50-2), and these documents state that mutual aid officers

should follow *their own* agencies' policies and command structure.  *Id.* at 3 (citing Gen. Order

L-3, § II).  Specifically, the Blue Book provides:

> Unless otherwise expressly provided, or later agreed upon, the responsible local
> law enforcement official of the jurisdiction requesting mutual aid shall remain in
> charge.  It is operationally essential that the local law enforcement official
> coordinate all actions with responding law enforcement agencies to ensure an
> effective application of forces.  [Cal. Gov. Code § 8618.]
>
> *The integrity of responding forces and the policies and procedures of their*
> *departments must be maintained.*  Exceptions will require approval of the
> concerned department.  Refer to the [Red Book] for further policy guidance.

*Id.* (quoting Blue Book at 18) (italics added by the City).  And, in turn, the Red Book states:

"Individual officers are bound by use of force policies of their employing agency.  However, use

of less-lethal devices (e.g., chemical agents, Tasers, ARWEN, Sting balls, or Stun bags) should be

used decisively when the situation dictates." *Id.* (quoting Red Book at 58) (City's italics removed). The City asserted, "These are the terms our region's agencies intend to govern their rendering of mutual aid." *Id.*

The City acknowledged that Training Bulleting III-G "requires OPD to keep its officers on the frontlines to the extent possible" and to "make its best effort to brief mutual aid agencies on OPD's policies and to request that these agencies do not bring or use tools prohibited under OPD policy." *Id.* (citing Training Bulletin III-G, § 9). But it emphasized that "OPD has no power to force mutual aid officers to comply with its tactics and toolboxes to which they have not been trained"; it only has the power to "decline mutual aid—at the risk of officer and public safety." *Id.* at 4.

In the Status Report, Plaintiffs observed that the Injunction "track[ed] the language of [Training Bulletin III-G] nearly verbatim, with slight alterations in that the Court command[ed] that the OPD Incident Commander fulfill his or her [mutual aid] obligations . . . 'unless exigent circumstances prevent the fulfillment of these obligations' rather than 'to the extent possible.' " *Id.* at 5 (quoting Injunction, § VI and Training Bulletin III-G, § IX). In other words, the Injunction only directed OPD to fulfill its obligations under Training Bulletin III-G. *Id.* Finally, Plaintiffs restated their view that "[t]he rendering of mutual aid is mandatory when the need for such aid arises." *Id.*

## III. ANALYSIS

### A. Plaintiff's Motion to Enforce

#### 1. Legal Standards

" 'Civil contempt . . . consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply.' " *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 945 (9th Cir. 2014) (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)). " 'The standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and convincing evidence that the [nonmoving party] violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate

United States District Court
Northern District of California

1   why they were unable to comply.' " *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th

2   Cir. 1999) (quoting *Stone v. City & Cty. of S.F.*, 968 F.2d 850, 856 n.9 (9th Cir. 1992)).

3   " 'Substantial compliance' with the court order is a defense to civil contempt, and is not vitiated

4   by 'a few technical violations' where every reasonable effort has been made to comply." *Dual-*

5   *Deck Video Cassette Recorder*, 10 F.3d at 695 (quoting *Vertex Distributing v. Falcon Foam*

6   *Plastics, Inc.*, 689 F.2d 885, 891 (9th Cir. 1982); *see also General Signal Corp. v. Donallco, Inc.*,

7   787 F.2d 1376, 1378-79 (9th Cir. 1986) ("If a violating party has taken 'all reasonable steps' to

8   comply with the court order, technical or inadvertent [*sic*] violations of the order will not support a

9   finding of civil contempt.") (internal quotation omitted).  Ninth Circuit authority suggests that the

10  issues of "substantial compliance" and "reasonable efforts" are "interrelated, and reasonable

11  efforts are in fact a necessary component of substantial compliance." *Dep't of Fair Housing &*

12  *Employment v. Law School Admission Council, Inc.*, 12-cv-01830-JCS, 2018 WL 1156605, at \*16

13  (N.D. Cal. March 5, 2018).

14  **2.   Whether Plaintiffs Have Shown that Defendants Violated the Injunction**

15  **i.   "Kettling" and Unlawful Assembly Declaration**

16        First, Plaintiffs allege that Defendants violated the Injunction on August 26, August 28,

17  and August 29 by indiscriminately kettling peaceful demonstrators without justification, without

18  making required announcements, without providing routes for egress, and while displaying their

19  weapons.  Mot at 2, 3–5, 8–9.  Plaintiffs also allege that Defendants violated the Injunction on

20  August 29 by declaring the demonstration an unlawful assembly without justification.  *Id.*

21  Defendants respond that officers sometimes surrounded the individuals they were arresting, but

22  their tactics "did not include encircling the crowd" of demonstrators, and they "always maintained

23  egress routes for the larger crowd."  Opp'n at 3 (citing Beaver Decl. ¶ 15).  According to

24  Lieutenant Beaver's declaration and Defendants' opposition, officers kept "a distance from the

25  crowd as it traveled" on August 26, Beaver Decl. ¶ 10, but this "prevented [them] from making

26  targeted arrests and minimizing harm to the community," Opp'n at 2 (citations omitted).  So,

27  during the August 28 and August 29 demonstrations, OPD "deployed more officers" who

28  "stay[ed] closer to the crowd" in order to "identify[] and arrest[] individuals who were committing

crimes." Beaver Decl. ¶ 13; *see id.* ¶ 14. "When the crowd stopped moving," however, Lieutenant Beaver declares that "officers shrunk their present and stood at a distance from the crowd." *Id.* ¶ 13; *see id.* ¶ 14.

As an initial matter, neither the Injunction nor Training Bulletin III-G use the term "kettling," which is defined by Plaintiffs in their complaint as a "military term referring to an army that is completely surrounded by a much larger force." Compl. ¶ 66. That said, Training Bulletin III-G does contain several relevant provisions governing crowd management, crowd control, and crowd dispersal.[22] *See generally* Training Bulletin III-G, § III.C.7., V. For example, the "General Principles" section states in relevant part:

> Even when some members of a crowd engage in violence or destruction of property, other members of the crowd are not participating in those acts. Once some members of a crowd become violent, the situation often turns chaotic, and many individuals in the crowd who do not want to participate in the violent or destructive acts may be blocked from leaving the scene because the crowd is so large or because they are afraid they will move into a position of heightened danger.
>
> This understanding does not mean OPD cannot take enforcement action against the crowd as permitted under this policy, but OPD shall seek to minimize the risk that force and arrests may be directed at innocent persons.

*Id.* § III.C.7. Additionally, the bulletin provides that any use of force "shall be restricted to circumstances authorized by law and to the degree reasonably necessary in light of the circumstances confronting members," but "[t]his directive does not preclude police officers from taking appropriate action to direct crowd and vehicular movement; enforce ordinances and statutes; and employ the physical force necessary to maintain the safety of the crowd, the general public, law enforcement personnel, and emergency personnel." *Id.* § III.C.12. Further, officers are prohibited from displaying their weapons "in non-violent crowd situations" before "a dispersal order is given or other enforcement action is implemented." *Id.* § III.C.10.

The "Permissible Crowd Control and Crowd Dispersal Techniques" section adds that the

---

[22] Again, Section I of the Injunction provides: "Except as modified in this order, OPD shall adhere to Training Bulletin III-G, OPD Crowd Control and Crowd Management (2013), attached as Exhibit A." *See* Amended Injunction, § 1.

United States District Court
Northern District of California

police "may not disperse a demonstration or crowd event before demonstrators have acted illegally

or before the demonstrators pose a clear and present danger of imminent violence." *Id.* § V.F.1.

(citing Cal. Penal Code § 407).  It also states:

> When the only violation present is unlawful assembly, the crowd should be given an opportunity to disperse rather than face arrest.
>
> Crowd dispersal techniques shall not be initiated until OPD has made repeated announcements to the crowd, asking members of the crowd to voluntarily disperse and informing them that, if they do not disperse, they will be subject to arrest.
>
> These announcements must be made using adequate sound amplification equipment in a manner that will ensure that they are audible over a sufficient area. Announcements must be made from different locations when the demonstration is large and noisy.  The dispersal orders should be repeated after commencement of the dispersal operation so that persons not present at the original broadcast will understand that they must leave the area.  The announcements shall also specify adequate egress or escape routes.   Whenever possible, a minimum of two escape/egress routes shall be identified and announced. . . . .
>
> Unless an immediate risk to public safety exists or significant property damage is occurring, sufficient time will be allowed for a crowd to comply with police commands before action is taken.

*Id.* § V.G.1, 2.  "If the crowd has failed to disperse after the required announcements," then

officers "may encircle the crowd or a portion of the crowd for purposes of making multiple

simultaneous arrests," or they may "use squad or platoon formations (skirmish line, wedge,

echelons, etc.) to move the crowd along."[23]  *Id.* § V.H.2., 3.a. (citation omitted).

---

[23] The Court acknowledges that several demonstrators have declared that officers used excessive force again them and/or others.  *See, e.g.*, Lapierre Decl. ¶ 6; Hansen Decl.; Gaito Decl. ¶ 16; Sugrue Decl. ¶ 5; McDonnell Decl. ¶¶ 16–17.  Additionally, Mx. Hansen declared that officers discriminated against them on the basis of their non-binary gender.  *See generally* Hansen Decl. Although Plaintiffs reference many of these incidents in their motion, they have not alleged that the relevant actions taken by officers violated any provision of the Injunction.

As the Injunction itself recognizes, its scope is limited; the Court was focused on the use of "certain crowd control tactics and munitions" to police demonstrations, and it expressly stated that it did not address "uses of force in specific instances," which "may or may not be lawful depending upon the circumstances at the time."  Injunction at 1; *see* Amended Injunction at 1. The Court's conclusion that these allegations of excessive force do not violate the Injunction is without prejudice to any other claim Plaintiffs might assert.

34

United States District Court
Northern District of California

### a.   Wednesday, August 26

For the demonstration on the night of August 26, Plaintiffs' allegations are supported by Ms. Sorokin's declaration that officers "kettled and closely followed protestors, including immersing themselves in the protest," Sorokin Decl. ¶ 11, and Mx. Hansen's declaration that "[n]ear the end of the night," officers "blocked" demonstrators into a " 'T' intersection" in a residential neighborhood where "police barricaded both exits" and "rushed at the crowd," Hansen Decl. ¶¶ 13, 14.

Neither Ms. Sorokin nor Mx. Hansen describe the exact time or location of these events. As described above, however, Defendants have submitted evidence that, shortly after 10:00 p.m., OPD made repeated unlawful assembly announcements over a public address system on Grand Avenue, between at the intersection with Harrison Street and the intersection with Lee Street.  *See* Operations Log at 3–4; Pullen Video; Jimenez Rpt. at 3; *see also* Langlais Rpt. at 3; Keating Rpt. at 3.  In the video footage of these announcements, officers follow demonstrators at a distance, and the announcements identify routes for egress.  Pullen Video.  Defendants have also submitted evidence that approximately an hour later, at the nearby intersection of Perkins Street and Grand Avenue, officers surrounded the medic van and ordered the driver, Mx. Hansen, to stop because the van had obstructed officers, aided demonstrators who were throwing objects at officers, and "consistently dr[iven] in the area with the crowd of protestors that was ordered to disperse." Jimenez Rpt. at 3; *see* Operations Log at 3; *see generally* Keating Rpt.; Jimenez Rpt.; Langlais Rpt.; Aug. 26 Video.

On this limited record, the Court finds that Plaintiffs have failed to prove by clear and convincing evidence that Defendants violated any of the above-quoted provisions of Training Bulletin III-G on August 26, or that any other provision of the Injunction or Training Bulletin III-G prohibited the conduct asserted in Plaintiffs' declarations.

### b.   Friday, August 28

For the demonstration on the night of August 28, Plaintiffs' allegations are supported by demonstrators' declarations that officers surrounded the crowd on three sides; blocked off roads; ordered demonstrators to move quickly; threatened to arrest demonstrators if they walked too

slowly; stepped on the backs of demonstrators' shoes; and shoved demonstrators off the sidewalks and into the street.  *See* Lapierre Decl. ¶ 4; Munevar Decl. ¶¶ 4–7; Clancy Decl. ¶¶ 6, 8–10.  Mr. Munevar also declared that the officers were "armed with really big guns."  Munevar Decl. ¶ 4. Other than the above-quoted statements of Lieutenant Beaver's declaration, Defendants do not offer any contradictory evidence.

Again, on this limited record, the Court finds that Plaintiffs have failed to prove by clear and convincing evidence that Defendants violated any provision of the Injunction or Training Bulletin III-G on August 28.  First, Plaintiffs have not identified any provision of the Injunction or Training Bulletin III-G that prohibits officers from walking alongside and behind a march, provided that the march can continue forwards and that there are adequate routes for egress. Given the damage to Oakland businesses and residences during prior nighttime demonstrations, *see generally* Hinkle Decl., OPD could have determined that officers should stay "closer to the crowd" to best "facilitate free speech and minimize further harm to the community." Beaver Decl. ¶¶ 11, 13; *see id.* ¶ 10.  Second, to the Court's knowledge, no parade permit was obtained and the demonstration did not have a pre-planned route, so officers could have determined that a march of this size should proceed in the street, with some roads closed to vehicular traffic and others closed to demonstrators in an attempt to "balance the level of disruption to traffic against the OPD policy of facilitating First Amendment activity."  Training Bulletin III-G, § III.C.6.  Third, Plaintiffs have not produced sufficient evidence from which the Court can determine, by clear and convincing evidence, that the degree of any "use of force" in policing the crowd was beyond that "reasonably necessary in light of the circumstances" and "to maintain the safety of the crowd, the general public, law enforcement personnel, and emergency personnel."  *Id.* § III.C.12.  Finally, officers are allowed to carry firearms, though they may not "display" them before "a dispersal order is given or other enforcement action is implemented."  *Id.* § III.C.10.

### c.    Saturday, August 29

For the demonstration on the night of August 29, Plaintiffs' allegations are supported by demonstrators' declarations that officers surrounded the crowd on three sides; blocked off roads; and ordered demonstrators to move quickly.  *See* Lapierre Decl. ¶ 5; Sorokin Decl. ¶ 25; Munevar

36

Decl. ¶¶ 13, 15–19; Gaito Decl. ¶¶ 10, 12, Sugrue Decl. ¶ 3.  Ms. Gaito, Ms. Sugrue, and Mr. Lapierre  also declared that, at the back of the march on Mandana Boulevard, officers began "attacking" demonstrators; "running into" them; and "body checking" them.  Gaito Decl. ¶ 13; Sugrue Decl. ¶ 4; Lapierre Decl. ¶ 5.  Additionally, an Oakland resident's twitter video depicted clashes between a line of demonstrators holding shields at the back of the march and a line of officers following closely.  Brown Tweet.

Defendants have submitted evidence that, around 9:40 p.m. on Mandana Boulevard, demonstrators with shields formed a line at the back of the march.  Alaura Rpt. at 3; Au Rpt. at 4; Aug. 29 Video.  According to Sergeant Alaura's and Officer Au's reports, despite officers' orders that these demonstrators either move faster or get out of the way, they continued to remain in formation, walking slowly.  Alaura Rpt. at 3; Au Rpt. at 4–5; Aug. 29 Video.  Additionally, these demonstrators pushed officers with their shields, while others shined bright lights in officers' eyes.  Alaura Rpt. at 4; Au Rpt. at 4–5.  The officers stated that they were concerned that these demonstrators were preventing them from staying close to the crowd, where they could identify and arrest individuals who had committed or who intended to commit unlawful acts.  Alaura Rpt. at 3; Au Rpt. at 4–5.  These events led to a series of clashes between the line of officers and the line of demonstrators with shields, as described above and below.  Aug. 29 Video.  Shortly thereafter, OPD declared an unlawful assembly.  *Id.*; *see* Au Rpt. at 6; *see also* OPD Tweet.

Again, on this limited record, the Court finds that Plaintiffs have failed to prove by clear and convincing evidence that Defendants violated any provision of the Injunction or Training Bulletin III-G on August 29 for the reasons explained in the section immediately prior and because Plaintiffs have failed to prove by clear and convincing evidence that demonstrators had not acted illegally or posed a threat of clear and present danger of imminent violence prior to the unlawful assembly declaration.

### ii.  COVID-19 Precautions

Second, Plaintiffs allege that Defendants violated the Injunction on August 26 and August 29 by failing to wear face masks and gloves.  Mot at 3, 5, 9.  Defendants respond that, "contrary to Plaintiffs' claims, all the footage in the record shows officers wearing masks."  Opp'n at 9.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

Under Section VIII of the Injunction, OPD officers are required "to wear face masks and gloves whenever they interact with members of the public" at demonstrations during "the pendency of the state of emergency declared by either the President of the United States or the Governor of State of California."

In support of Plaintiffs' allegations, Mx. Hansen declared that throughout their interaction with OPD officers on August 26, "many officers were not wearing masks," Hansen Decl. ¶ 49, and Ms. Li declared that she witnessed some OPD officers without face coverings and others remove their face coverings, including one with an arrestee in his vehicle on August 28, Li Decl. ¶¶ 21–22.[24]  Plaintiffs have not submitted any video or photo evidence of any officers failing to wear face masks or gloves, however, and the video footage submitted by Defendants does not depict officers failing to wear masks or gloves while interacting with demonstrators.  On this limited record, the Court finds that Plaintiffs have failed to prove by clear and convincing evidence that Defendant have violated the Injunction in this respect.[25]

Plaintiffs also allege that Defendants violated the inunction by "corrall[ing] demonstrators on each night of the demonstrations so that physical distancing was not possible."  Mot. at 9; *see id.* at 2, 3–4.  Although the Court previously observed that it is "concerned by the accounts of numerous protestors that they were trapped by police officers and unable to either disperse or maintain social distance," the Injunction does not include any physical distancing requirements related to the COVID-19 pandemic.[26]  Opinion at 30.  Plaintiffs' allegations therefore do not state a violation of the Injunction.

---

[24]  Plaintiffs did not submit any evidence in support of their allegations that officers failed to wear gloves.

[25]  The Court acknowledges that Mx. Hansen declares that officers took Mx. Hansen's face mask and "acted put out by [their] request" for a new mask.  Hansen Decl. ¶ 50.  Also, Mr. Clancy declares that he was transported to the Santa Rita Jail in a van with other arrestees, but the arrestees without face masks were not offered any.  Clancy Decl. ¶¶ 20–21.  Plaintiffs do not expressly reference these incidents in their motion, however, and they have not alleged that the relevant actions taken by officers violated any provision of the Injunction.

[26]  Additionally, Plaintiffs did not ask the Court to modify the Injunction to add physical distancing requirements related to the COVID-19 pandemic.  *See* Plaintiffs' Proposed Order.

### iii. Chemical Agents

Third, Plaintiffs allege that, on August 28, August 29, and September 25, Defendants deployed chemical agents in violation of the Injunction because (1) "there was no imminent threat of physical harm to a person or significant destruction of property at the time"; (2) OPD "did not exhaust other techniques to mitigate the threat"; (3) OPD "did not provide any warning prior to the deployment of the munitions"; and (4) OPD deployed the munitions directly into the crowd rather than at a safe distance." Mot at 7; *see id.* at 1, 4–5, 7–8. In response, Defendants take the position that smoke is *not* a "chemical agent" for purposes of Section V(2) of the Injunction. *See generally* Opp'n. Defendants also argue that the deployments of smoke and tear gas complied with Training Bulletin III-G and the Injunction. *Id.* at 9.

Section V of the Injunction provides in relevant part:[27]

1.  Chemical agents (including orthochlorobenzalmalononitrile), flashbang grenades, and foam-tipped projectiles shall be deployed only when (a) there is an imminent threat of physical harm to a person or significant destruction of property; and (b) other techniques, such as simultaneous arrests or police formations, have failed or are not reasonably likely to mitigate the threat. The use of such munitions must be authorized by an OPD Operations Commander or Incident Commander. None of these devices shall be deployed on peaceful protestors or indiscriminately into a crowd. They may only be targeted at the specific imminent threat justifying the deployment. Flash bang grenades and gas canisters must be deployed at a safe distance from the crowd to minimize the risk that individuals will be struck and injured by those devices. When chemical agents are used, only the minimum amount of chemical agent necessary to obtain compliance may be used, in accordance with OPD's Department General Order K-3, USE OF FORCE.

2.  Except where an immediate risk to public safety or of significant property damage makes it impossible to do so, before any of the devices listed in Section V(2) are deployed to disburse a crowd, OPD must have made at least

---

[27] Relatedly, Section V.H.4. of Training Bulletin III-G, which applies to the use "Non Hand-Held Crowd Control Chemical Agents," also provides that such agents "shall be used only if other techniques, such as encirclement and multiple simultaneous arrest or police formations have failed or will not accomplish the policing goal as determined by the Incident Commander"; that officers "shall use the minimum amount of chemical agent necessary to obtain compliance in accordance with Department General Order K-3, USE OF FORCE"; that such agents "shall not be used in demonstrations or other crowd events without the approval of the Incident Commander"; that supervisors or commanders may only authorize the use of such agents "under exigent circumstances"; and that such agents "shall not be used for crowd control or dispersal without first giving audible warning of their imminent use and giving reasonable time to the crowd, media, and observers to disperse." Training Bulletin III-G, § V.H.4.b., c., d., e., f.

United States District Court
Northern District of California

two announcements to the crowd asking members of the crowd to voluntarily disperse and informing them that, if they do not disperse, they will be subject to arrest. These announcements must be made using adequate sound amplification equipment in a manner that will ensure that they are audible to the crowd and must identify at least two means of escape/egress. OPD must also allow the crowd sufficient time to disperse after making these announcements before deploying any of the devices in Section V(2).

Injunction, § V(2), (3); *see* Amended Injunction, § V(2), (3).  Elsewhere, the Injunction also states that officers are not "prohibit[ed]" from "taking reasonable action or using reasonable or necessary force as allowed by law against an individual in self-defense or in defense of another person or officer."  Injunction § VI; *see* Amended Injunction, § VI.A.

Meanwhile, Section V.H.5. of Training Bulletin III-G, which governs the use of "[h]and-thrown chemical agents or pyrotechnic gas dispersal devices," provides:

Hand-thrown chemical agents or pyrotechnic gas dispersal devices shall not be used for crowd control or crowd dispersal without the approval of the Incident Commander.  Only under exigent circumstances may a supervisor or commander authorize the immediate use of hand-thrown chemical agents or pyrotechnic gas dispersal devices.  The Incident Commander shall be immediately notified when an exigent use of hand-thrown chemical agents or pyrotechnic gas dispersal devices has occurred.

Training Bulletin III-G, § III.H.5.a.  Further, hand-thrown chemical agents or pyrotechnic gas dispersal devices "shall be deployed to explode at a safe distance from the crowd to minimize the risk of personal injury and to move the crowd in the direction that will accomplish the policing objective"; "shall not be used for crowd control without first giving audible warnings to the crowd and additional reasonable time to disperse"; and "shall be used only if other techniques such as encirclement and mass arrest or police formations have failed or will not accomplish the policing goal as determined by the Incident Commander."  *Id*. § III.H.5.b., c., d.

### a.    Smoke Dispersal Devices

Although the parties disagree whether smoke (including the hexachloroethane, or "HC," devices used by OPD) is a "chemical agent" for purposes of Section V(2) of the Injunction, neither has offered arguments or evidence for their position.  In support of their motion for a preliminary injunction, Plaintiffs previously submitted a declaration by a specialist in pulmonary disease that

1    addressed the effects of tear gas (e.g., chloroacetophenone (CN) or chlorobenzylidene

2    malononitrile (CS)) and pepper spray (oleoresin capsicum (OC)), *see generally* Sporn Decl., but

3    that declaration did not address the effects of smoke generally or hexachloroethane specifically.

4    Meanwhile, Defendants previously submitted Training Bulletin V-F.2, OPD's training bulletin on

5    chemical agents, which states that smoke (e.g., hexachloroethane (HC)) "is *not* a chemical agent."

6    Training Bulleting V-F.2 (dkt. 36-5), § I.D.3.b. (italics added).

7          Because Plaintiffs have not submitted any arguments or evidence regarding the intended

8    use or effects of smoke dispersal devices (containing, e.g., hexachloroethane), the Court at this

9    time concludes that smoke is not a chemical agent for purposes of Section V(2) of the Injunction.

10   That said, the Court concludes that hand-held smoke dispersal devices deployed by OPD officers

11   are "pyrotechnic gas dispersal devices" for purposes of § III.H.5.a Training Bulletin III-G.

12                              **b.      Friday, August 28**

13         As described in Plaintiffs' declarations, shortly after 9:00 p.m. on August 28, at the

14   intersection of Franklin Street and 15th Street, officers deployed smoke without audible warnings.

15   McDonnell Decl. ¶¶ 11–15; Li Decl. ¶¶ 17–18; *see* Lapierre Decl. ¶ 3; Chronicle Tweet. Plaintiffs

16   have also submitted a declaration describing, and an image depicting, another deployment of

17   smoke and/or tear gas at the intersection of 24th Street and Broadway without audible warnings.

18   Clancy Decl. ¶¶ 12–14; Li Tweet.  But Plaintiffs' motion does not expressly differentiate these

19   two incidents.  *See* Mot. at 3–4; 7–8.

20         Defendants first respond that they deployed one handheld "Saf-Smoke Han Ball

21   munition"—but no "chemical agents"—at the intersection of Franklin Street and 15th Street.

22   Opp'n at 4–5 (quoting Gonzales Rpt. at 3; Beaver Decl. ¶ 18).  They argue that this smoke

23   deployment complied with Training Bulletin III-G because Sergeant Gonzales deployed the device

24   " 'in a clear area' when he saw members of the crowd 'attempting to free' two people whom the

25   officers were arresting."  *Id.* at 9 (quoting Gonzales Rpt. at 3 and citing Brown Rpt.).  According

26   to Sergeant Gonzales's report, around 9:10 p.m. at the intersection of Franklin Street and 15th

27   Street, while officers were attempting to arrest two individuals responsible for pointing lasers in

28   officers' faces, other individuals "ran towards the officers making the detention," and he deployed

the device "in a clear area, on the street" to "stop [these demonstrators'] action, to deter others from joining in, and to create a distance between the crowd and the officers." Gonzales Rpt. at 3. Similarly, Officer Brown's report states that "[m]ultiple subjects" had "beg[un] to encircle officers as they were making the arrest." Brown Rpt. at 4.

Defendants do not directly respond to Plaintiffs' evidence that officers deployed smoke and/or tear gas at the intersection of 24th Street and Broadway without audible warnings. *See* Opp'n at 4–5, 9. According to Officer Brown's report, however, shortly after 9:15 p.m. at the intersection of 24th Street and Broadway, when officers grabbed an individual who had interfered with officers and was resisting arrest, other demonstrators "began to encircle" the officers. Brown Rpt. at 4. So, Officer Brown deployed one "smoke han-ball on the . . . sidewalk in a clear area." *Id.* Likewise, Sergeant Gonzales's report states that demonstrators had "beg[un] attacking officers." Gonzales Rpt. at 4. Other officers "deploy[ed] munitions," including multiple "Saf-Smoke Han-Bal munitions" and one "CS Blast Munition." *Id.*

Regarding the deployments of smoke at the intersection of Franklin Street and 15th Street and the intersection of 24th Street and Broadway, the Court finds that, on this limited record, Plaintiffs have failed to prove by clear and convincing evidence that the handheld smoke dispersal devices were *not* deployed "under exigent circumstances" or "a safe distance from the crowd," or that "other techniques" would have "accomplish[ed] the policing goal." Training Bulletin III-G, § III.H.5.a., b, d. Also, with respect to the deployment of tear gas at the intersection of 24th Street and Broadway, the Court also finds that, on this limited record, Plaintiffs have failed to prove by clear and convincing evidence that there was not "an imminent threat of physical harm to a person" and that "other techniques" were "reasonably likely to mitigate the threat," or that the device was deployed "indiscriminately into a crowd." Injunction § V(2).

Defendants have not argued or produced any evidence that officers gave audible warnings and a reasonable amount of time to disperse prior the deployment of these smoke and tear gas dispersal devices, however, and the Court finds that defendants have violated Training Bulletin

United States District Court
Northern District of California

1    III-G in this respect.[28]  Training Bulletin III-G, § III.H.5.c.

2                            c.    **Saturday, August 29**

3            As described above, shortly after 9:40 p.m. on Saturday, August 29, there was a series of

4    clashes at the back of the march between a line of demonstrators carrying shields and a line of

5    officers.

6            According to Plaintiffs' declarations, officers then without warning deployed tear gas and

7    smoke dispersal devices directly into the crowd of demonstrators.  Lapierre Decl. ¶ 5; Munevar

8    Decl. ¶¶ 22–27; Gaito Decl. ¶ 14; Sugrue Decl. ¶ 4.  Mr. Munevar specifically declared that he

9    "saw police shoot [a] smoke grenade at [him] at close range, about 20 yards away," and it "hit

10   [him] in the head."  Munevar Decl. ¶¶ 23, 24; *see id.* ¶ 25 (photo of slightly discolored and slightly

11   raised skin on Mr. Munevar's forehead).  Ms. Gaito also declared that cannisters were "shot at

12   protestors" and "into the center of the crowd."  Gaito Decl. ¶ 14.  Plaintiffs have also submitted a

13   video with a cloud of a substance that looks like smoke and noises that seem to the explosion of

14   munitions, *see* Brown Tweet, and a probable cause declaration filed by OPD which states that

15   officers "deployed smoke munitions in order to disperse the crowd," *see* PC Decl.

16           Defendants respond that three officers "each deployed one handheld smoke (non-

17   flashbang) device" and another officer deployed a "CS Blast."  Opp'n at 7.  They argue that the

18   smoke deployments were justified because "the group holding shields continued to block and push

19   against officers" and "officers saw people grabbing officers and throwing objects at officers," *id.*

20   (citing Alaura Rpt.; Au Rpt.), and that the tear gas deployment was justified because officers were

21   "under attack—including by someone who threw a munition at officers," *id.* at 9 (citing Au Rpt.).

22   Defendants do not directly address whether two of the three deployments of smoke dispersal

23   devices met the deployment requirements of Training Bulletin III-G, but they argue that there is

24   "no foundation or support for Mr. Munevar's claim that he was hit in the head by a smoke

25

26

27   [28]  Plaintiffs have not expressly alleged that defendants violated Section V(3) of the Injunction,
     which requires at least two announcements of an unlawful assembly and sufficient time to disperse
28   prior to deploying any of the devices listed in Section V(2) to disperse a crowd, except where "an
     immediate risk to public safety or of significant property damage makes it impossible to do so."

United States District Court
Northern District of California

grenade."[29]  *Id.*  They also contend that the tear gas deployment complied with the deployment requirements of the Injunction because the officer " 'located a clear area in the street,' " " 'deployed the CS Blast . . . a safe distance from any person,' " and " 'did not see anyone who may have been injured as a result of [his] CS Blast deployment.' "  *Id.* at 6 (quoting Au Rpt. at 5).

According to Sergeant Alaura's report, around 9:40 p.m. on Mandana Boulevard, after he saw demonstrators "grabbing onto officers" and "throwing objects at officers," he "rolled" a "Hanball smoke" munition behind the demonstrators holding shields.  Alaura Rpt. at 3.  According to Officer Au's report, after observing demonstrators "actively pushing" officers and "utilizing blinding lights to prevent Officers from seeing," he deployed one "SAF-Smoke Han-Ball" munition "directly in front of [him] on the ground" a "safe distance from any person," and he did not see "anyone who appeared to be injured."  Au Rpt. at 5.  After Officer Au saw a smoke munition and "multiple large glass bottles" thrown towards officers, he deployed one "CS Blast towards the direction of where the dangerous objects were coming from," to "a clear area in the street" and a "safe distance from any person."  *Id.*  He did not see anyone who may have been injured as a result.  *Id.*

In the video footage that appears to be from Sergeant Alaura's body-worn camera, at 9:43 p.m., after a line of officers and a line of demonstrators holding shields clash, one device flies over the lines, and Sergeant Alaura rolls another device under the lines.  Aug. 29 Video.  Sergeant Alaura yells, "Smoke deployed, smoke deployed," and a cloud of a substance that looks like smoke appears.  *Id.*  After a noise that sounds like a glass bottle shattering and officers' voices yelling, "Bottle, bottle," another officer appears to throw an object over the lines and there is a flash and a loud bang.  *Id.*  At 9:44 p.m., another officer (presumably Officer Au) informs Sergeant Alaura, "One smoke and one blast, Sergeant."  *Id.*  And at 9:47 p.m., after another clash between officers and the demonstrators holding shields, Sergeant Alaura yells, "Get a smoke, smoke," and a cloud of a substance that looks like smoke appears.  *Id.*

Also, the Munitions Log does not indicate that any launched munitions were deployed on

---

[29] Defendants do not explain why Mr. Munevar's declaration describing his personal experience would require "foundation."

this date, so it seems that the smoke and tear gas dispersal devices were *hand-held*, not *launched*. Munitions Log (dkt. 77-1) at 5–7.

Regarding the deployments of smoke, the Court finds that, on this limited record, Plaintiffs have failed to prove by clear and convincing evidence that the handheld smoke dispersal devices were *not* deployed "under exigent circumstances" or that "other techniques" would have "accomplish[ed] the policing goal."  Training Bulletin III-G, § III.H.5.a., b, d.  Also, with respect to the deployment of tear gas, the Court finds that, on this limited record,  Plaintiffs have failed to prove by clear and convincing evidence that there was not "an imminent threat of physical harm to a person" and that "other techniques" were "reasonably likely to mitigate the threat."  Injunction, § 5(2).

That said, Defendants have not argued or produced any evidence that officers gave audible warnings and a reasonable amount of time to disperse prior the deployment of the smoke and tear gas dispersal devices.  Further, Sergeant Alaura's body-worn camera footage suggests that at least two dispersal devices were thrown into the middle of the crowd.  Aug. 29 Video.  Although it is not clear whether these devices contained smoke or tear gas, Section III.H.5.b. of Training Bulletin III-G requires hand-thrown smoke and tear gas dispersal devices to be "deployed to explode at a safe distance from the crowd to minimize the risk of personal injury" and Section V(2) of the Injunction requires "gas canisters" to be "deployed at a safe distance from the crowd to minimize the risk that individuals will be struck and injured by those devices."  The Court finds that defendants have violated the Injunction in these respects.[30]

### d.    Saturday, September 25

In the form of a news article and tweets with photos and videos, Plaintiffs submit evidence that officers deployed tear gas and/or smoke on Saturday, September 25.  Chronicle Article; First Williams Tweet; Second Williams Tweet; Second OPD Tweet.

---

[30]  Again, Plaintiffs have not expressly alleged that defendants violated Section V(3) of the Injunction, which requires at least two announcements of an unlawful assembly and sufficient time to disperse prior to deploying any of the devices listed in Section V(2) to disperse a crowd, except where "an immediate risk to public safety or of significant property damage makes it impossible to do so."  *See* Mot. at 7–8.

1       Defendants respond that around 9:25 p.m., one officer deployed a "handheld smoke (non-

2  flashbang) device when a group descended on officers attempting to make an arrest."  Opp'n at 6–

3  7 (citing Thurston Rpt.; Sept. 25-1 Video).  Also, around 9:49 p.m., one officer deployed a

4  "handheld smoke (non-flashbang) device" when "[c]rowd members again impeded officers and

5  threw at least one glass bottle at officers," and another officer "launched a (non-flashbang) smoke

6  shell after "someone threw the [smoke device] back at the officers."  *Id.* at 7 (citing Thurston Rpt.,

7  Sept. 25-2 Video).  Additionally, they argue that their deployments complied with the deployment

8  requirements of Training Bulletin III-G and the Injunction because the officers deployed the

9  handheld smoke devices "in a clear area" in response to "articulated threats to others."  *Id.* at 9

10  (citing Thurston Rpt.; Sept. 25-1 Video; Sept. 25-2 Video).

11       According to Officer Thurston's report, at some time after 9:00 p.m., near the intersection

12  of 14th Street and Madison Street, he observed demonstrators throw items at officers and Sergeant

13  Alaura "deploy a smoke han-ball munition."  Thurston Rpt. at 3.  The munition "land[ed] in a safe

14  area," but a demonstrator picked it up and "thr[ew] it hard directly at Officers."  *Id.*  Around

15  9:25 p.m., while officers were detaining the suspect who had thrown the munition, "several

16  members of the crowd moved towards the Officer's backs," and Officer Thurston saw another

17  smoke han-ball munition deploy.  *Id.*  In Defendants' video footage from an unidentified officer's

18  body-worn camera, officers and demonstrators are walking when officers suddenly rush into the

19  crowd and grab a demonstrator.  Sept. 25-1 Video.  There is commotion among officers and

20  demonstrators; a demonstrator grabs the arm of the officer wearing the body camera, but then

21  backs away immediately; and a cloud of a substance that looks like smoke appears.  *Id.*

22       Also according to Officer Thurston's report, later in the evening and near the intersection

23  of 14th Street and Harrison Street, some officers were attempting to detain one suspect "with an

24  arrest warrant" while other officers were detaining a second suspect.  Thurston Rpt. at 3.  Officer

25  Thurston "heard glass break close by," and, as instructed by Sergeant Alaura, he "deploy[ed] a

26  smoke SKAT-shell."  Officer Thurston directed the deployment "south of the crowd, clear of any

27  protestors."  *Id.*  In Defendants' video footage from Sergeant Alaura's body-worn camera, officers

28  and demonstrators are walking when officers suddenly rush into the crowd and grab a

demonstrator.  Sept. 25-2 Video.  There is a noise that seems to be the deployment of munitions, and a cloud of a substance that looks like smoke appears.  *Id.*  A smoking object flies back towards officers who then rush towards a second suspect.  *Id.*  A glass bottle crashes on the street near the officers.  *Id.*  Sergeant Alaura yells, "Thurston, Thurston, deploy!"  *Id.*  There is a large bang.  *Id.*  Sergeant Alaura then reports, "Alpha Tango, launch smoke deployed, 1400 block Harrison, during an arrest."  *Id.*

Regarding the deployments of the hand-held smoke dispersal devices, the Court finds that, on this limited record, Plaintiffs have failed to prove by clear and convincing evidence that the handheld and launched[31] smoke dispersal devices were *not* deployed "under exigent circumstances" or "a safe distance from the crowd," or that "other techniques" would have "accomplish[ed] the policing goal."  Training Bulletin III-G, § III.H.5.a., b, d.  Defendants have not argued nor produced any evidence that officers gave audible warnings and a reasonable amount of time to disperse prior the deployment of any of the smoke dispersal devices, however, and the Court finds that defendants have violated the Injunction in these respects.[32]  Training Bulletin, III-G § III.H.5.c.

### 3.   The Court Does not Hold Defendants in Contempt

Although the Court finds that Defendants have committed some violations of the Injunction, these violations do not warrant a contempt order because the record indicates that Defendants have made all reasonable efforts to substantially comply.  *See Dual-Deck Video Cassette Recorder*, 10 F.3d at 695; *Donallco*, 787 F.2d at 1378–79.  Lieutenant Beaver declared that OPD "discussed [the Injunction] in detail with all its commanders, supervisors, specially

---

[31]  The Court acknowledges that Section III.H.5. refers to "*hand-held* pyrotechnic gas dispersal devices," but it interprets that provision to also apply to *launched* smoke dispersal devices to avoid the absurdity that the deployment of *launched* smoke devices would be less restricted than the deployment of hand-held smoke devices.  *See also* Training Bulletin III-G, § III.H.4. (restricting non-hand-held crowd control chemical agents), *id.* § IV.F. (prohibiting, among other weapons, "less-lethal specialty impact weapons designed to be skip fired or otherwise deployed in a non-directional non-target specific manner").

[32]  Again, Plaintiffs have not expressly alleged that defendants violated Section V(3) of the Injunction, which requires at least two announcements of an unlawful assembly and sufficient time to disperse prior to deploying any of the devices listed in Section V(2) to disperse a crowd, except where "an immediate risk to public safety or of significant property damage makes it impossible to do so."

United States District Court
Northern District of California

United States District Court
Northern District of California

trained officers who are designated under [Training Bulletin III-G] to possess chemical agents and less-lethal munitions, and all other officers before they were deployed to facilitate protests," and that the Injunction's provisions are "included in protest operations plans."  Beaver Decl. ¶ 6.  This is reflected in several officers' reports, which indicate that they briefed others, or were briefed by others, on the Injunction and/or Training Bulletin III-G.  *See* Gonzales Rpt. at 3; Brown Rpt. at 3; Alaura Rpt. at 3; Au Rpt. at 4; Thurston Rpt. at 2.  Further, while officers failed to issue warnings prior to the deployment of smoke and tear gas and sometimes failed to deploy the dispersal devices a safe distance from the crowd, Plaintiffs have not shown by clear and convincing evidence that officers deployed smoke or tear gas in the absence of exigent circumstances, Training Bulleting III-G, § III.H.5.a., or that officers deployed tear gas in the absence of an imminent threat to physical harm to a person or significant property damage or where other techniques were reasonably likely to mitigate the threat, Injunction § V(2).  To the contrary, Defendants have produced evidence that each time they deployed smoke and/or tear gas, there some was threat to officers' safety.  The sporadic violations that Plaintiffs have identified therefore do not warrant a sanction of contempt.

### 4. The Court Denies Plaintiffs' Proposed Modifications of the Injunction

In their proposed order, Plaintiffs also requested that the Court make several modifications to Section V of the Injunction.  Plaintiffs' Proposed Order.  Plaintiffs did not reference or argue for any such modifications in their motion, and they did not file their Proposed Order until the Court ordered them to do so and after Defendants filed their opposition—pursuant to the briefing schedule agreed to by Plaintiffs.  *See* Prehearing Order; Order Adopting Parties' Briefing Schedule (dkt. 62).  The Court has declined to make the modifications proposed by Plaintiffs.

### B. Defendant's Cross-Motion to Modify

#### 1. Legal Standards

" '[A] sound judicial discretion may call for the modification of the terms of an injunction decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen.' "  *United States v. Washington*, 853 F.3d 946, 979 (9th Cir. 2017) (quoting *Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647

(1961)).  Accordingly, a "district court has inherent authority to modify a preliminary injunction in consideration of new facts."  *A&M Records v. Napster, Inc.*, 284 F.3d 1091, 1098 (9th Cir. 2002).  "A party seeking modification . . . of an injunction bears the burden of establishing that a significant change in facts or law warrants revision . . . of the injunction."  *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000).

### 2.  Whether Defendants are Entitled to Modifications of the Injunction

The Court has reviewed the provisions governing mutual aid within the California Government Code, the Master Mutual Aid Agreement, the Blue Book, the Red Book, OPD General Order L-3, and Training Bulletin III-G.  As the parties agreed at the hearing, it is difficult to harmonize these overlapping provisions with respect to mutual aid agencies' responsibilities, if any, (1) to provide mutual aid upon request and (2) to follow the host agency's command structure and policies while providing mutual aid.  More importantly, the parties also agreed that, *even if* the mutual aid partners do have such responsibilities, the Court cannot presently order the partners to fulfill them because no partners are parties to this case.  *See* Opinion at 32 ("Because no mutual aid partners have been named as defendants, the Court does not have the authority to issue injunctive relief that is binding on the mutual aid partners.").

At the same time, Plaintiffs acknowledged at the hearing the concern shared by the Court and by the City that OPD faces the potential of policing large-scale demonstrations without mutual aid, beginning next week.  *See* Yu Decl. ¶ 7.  Although OPD has policed several demonstrations without mutual aid since the Court issued the Injunction on July 29, the number of participants in those demonstrations—up to 700 on August 26—pales in comparison to the number of participants in the demonstrations earlier this year—up to 8,000 on May 29 and up to 15,000 on June 1—when OPD had the assistance of hundreds of mutual aid officers.  Beaver Decl. ¶ 8; Allison Decl. (dkt. 36-1) ¶¶ 13, 16; Activity Logs (dkt. 36-10) at 2, 15.  If OPD does not have an adequate number of officers for any upcoming election-related demonstrations, there is a risk not only to the safety of officers, but also to the safety of the general public and of the demonstrators themselves.  Accordingly, the Court finds that the lack of mutual aid, combined with the potential for large-scale demonstrations related to the upcoming election, constitutes a significant change in

United States District Court
Northern District of California

1    the facts that warrants revision of the Injunction to appropriately balance the equities of the parties

2    and the public interest.  *See Sharp*, 233 F.3d at 1170; *see generally Winter v. Nat. Res. Defense*

3    *Council, Inc.*, 555 U.S. 7, 24 (2008) (discussing the factors relevant to granting a preliminary

4    injunction).[33]

5           As the Court recognized when issuing its original Injunction, however, if the City and

6    OPD rely heavily on mutual aid partners to police demonstrations, "the effectiveness of the

7    injunctive relief . . . will depend to a large degree on whether officers of mutual aid partners abide

8    by the terms of the preliminary injunction that apply to OPD with respect to the crowd control

9    tactics and munitions they use."  Opinion at 32.  So, in amending the Injunction, the Court has

10   endeavored to make the narrowest possible modifications that might satisfy the need of the City

11   for assistance during large demonstrations, while also minimizing the potential that mutual aid

12   officers use weapons or force against demonstrators in a manner inconsistent with the Injunction

13   or Training Bulletin III-G.

14          At the hearing, the parties agreed that if OPD needs mutual aid, but it cannot secure it

15   pursuant to the terms of the original mutual aid section of the Injunction (now Section VI(B) of the

16   Amended Injunction), then it would be appropriate for OPD to instead obtain mutual aid pursuant

17   to the terms of Training Bulletin III-G.[34]  As the parties acknowledged, the terms of Training

18   Bulletin III-G are very similar to those of the original mutual aid section of the Injunction;

19   importantly, OPD officers are responsible for "ensuring to the extent possible" that mutual aid

20   agencies are briefed on and agree with OPD's command structure and OPD's policies on

21   prohibited weapons and force.  Training Bulletin III-G, § IX.1.–3.  And, as the Court noted in its

22   Amended Injunction, Training Bulletin III-G was "mandated under the settlement agreements and

23   orders in *Spalding v. City of Oakland*, No. 11-cv-02867 TEH (N.D. Cal.), and *Campbell v. City of*

24   *Oakland*, No. 11-cv- 05498 JST (N.D. Cal.)"; it "has been in force for many years"; and "local law

---

[33] The Court's acknowledgment of the *effect* on the City of mutual aid partners' refusal to provide aid should not be construed as an endorsement of the *reasons* those partners provided for their refusal, some of which appear to rest on a flawed reading of the original Injunction.

[34] Notably, the City only requested a temporary suspension of the mutual aid section of the Injunction (section VI)—not of section I, which incorporates the entirety of Training Bulletin III-G.  *See* Cross Mot. at 1, 8–9; Status Rpt. at 1; *see also* Amended Injunction § 1.

enforcement agencies, including the Alameda County Sheriff, have provided mutual aid to Oakland under its terms." Amended Injunction at 5 n.1.

Specifically, under the Amended Injunction, OPD must first "make reasonable efforts" to obtain mutual aid pursuant the terms of the original mutual aid section—Section VI(B) of the Amended Injunction. Amended Injunction, § VI.C. If the Chief of Policies certifies in writing that those efforts "were not sufficient to meet OPD's anticipated need for mutual aid," however, OPD may obtain mutual aid pursuant to the terms of Training Bulletin III-G. *Id.* As under the original Injunction, OPD officers are required to "assume front line positions between mutual aid officers and demonstrators," to the extent possible. *Id.* § VI.A. Within 48 hours of the incident, the Chief of Police must file a report with the Court explaining, among other things, the efforts made to obtain mutual aid pursuant the terms of Section VI.B. of the Amended Injunction and the results of those efforts, as well as the efforts made to obtain mutual aid pursuant to the terms of Training Bulletin III-G and the results of those efforts. *Id.* § VI.C.iii.–iv.

## IV. CONCLUSION

For the reasons stated above, Plaintiff's motion is DENIED, and Defendant's cross-motion is GRANTED in part and DENIED in part.

**IT IS SO ORDERED.**

Dated: October 31, 2020

_____
JOSEPH C. SPERO
Chief Magistrate Judge